**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | | |
|---|---|---|
| **AARON HIRSCH, individually and on behalf of all others similarly situated,** | : : : | |
| **Plaintiff,** | : : | **Civil Action No. 4:18-cv-00245-P** |
| **v.** | : : : | |
| **USHEALTH ADVISORS, LLC and USHEALTH GROUP, INC.,** | : : : | |
| **Defendants.** | : : | |

**DECLARATION OF MICHAEL DELL'ANGELO IN SUPPORT OF**
**PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**

I, Michael Dell'Angelo, declare as follows:

1.      I am over 18 years old, have personal knowledge of the facts stated herein, and can testify competently thereto if called upon to do so.

2.      I submit this Declaration in support of Plaintiff's Motion for Class Certification and the accompanying Memorandum of Law in support thereof ("Memorandum") that are filed currently herewith.

3.      I am a Managing Shareholder of Berger Montague PC, the proposed Lead Class Counsel, and serve as counsel for Plaintiff Aaron Hirsch ("Plaintiff") in the above-captioned litigation. Lane Vines of Berger Montague, Max Maccoby of the Washington Global Law Group PLLC, Jim Zadeh of the Law Office of Jim Zadeh, P.C. and Warren Burns of Burns Charest LLP, also serve as counsel to Plaintiff in this action.

**Facts Supporting Appointment of Berger Montague PC as Class Counsel**

4.      On March 29, 2018, Plaintiff filed a class action complaint. (Dkt. 1).

5.      From the beginning, all counsel have demonstrated commitment to this litigation

and will continue efforts to prosecute it vigorously, led by Berger Montague PC, as Class Counsel, if so appointed by the Court.

6.    Counsel worked closely to develop the factual and legal bases for this action in which Mr. Hirsch alleges that the Defendants repeatedly violated his privacy by calling him numerous times on his personal cellular telephone, despite the fact that his telephone number was registered on the National-Do-Not-Call registry, in violation of the Telephone Consumer Protection Act.

7.    Subsequently, counsel on the original complaint began to work with our now co-counsel, the Law Office of Jim Zadeh, P.C.

8.    Along with other Plaintiff's counsel, Berger Montague has invested considerable resources in developing and litigating Plaintiff's TCPA class action claims. Throughout this litigation, Plaintiff's counsel have worked assiduously to advance and protect the interests of the Plaintiff and proposed Class here.

9.    Plaintiff's counsel have pursued discovery aggressively, crafting requests to secure documents and testimony essential for advancing the claims of the Plaintiff and the proposed Class. Throughout the discovery process, Plaintiff's counsel have resolved nascent discovery disputes through negotiation and compromise, where possible and, where necessary, have pursued and prevailed on numerous discovery disputes. Plaintiff's counsel have engaged in a determined pursuit of documents and information that Defendants refused to produce.

10.    Berger Montague has a track record of successful advocacy on behalf of plaintiffs and the classes they represent. Berger Montague has the experience, expertise, and resources necessary to fully and adequately represent the interests of the Plaintiff and the Class and is fully committed, along with its accomplished co-counsel, to continue to vigorously prosecute the claims

of the Plaintiff and Class going forward. Berger has advanced all costs of prosecuting the litigation and has committed to continue to advance the costs necessary to advance the litigation through trial and any resulting appeals. Thus, Berger Montague is appropriate and adequate to serve as Class Counsel under Fed. R. Civ. P. 23(g).

**Certain Procedural History and Outstanding Discovery**

11.    Defendants filed their Answer on May 15, 2018 (Dkt. 15).

12.    Plaintiff served his First Requests for Production to Defendants on June 28, 2018.

13.    During discovery, Plaintiff has taken depositions of seven key witness. On January 16, 2019, Plaintiff conducted a Rule 30(b)(6) deposition of USHealth by deposing Dean Whaley, Vice President, Financial Planning and Analysis (Jan. 16, 2019), and then deposed certain of the USHealth agents who called and texted Plaintiff (including RJ Martin, Jacquelyn Levine and Gretchen Kennett (Feb. 13, 2019)), the USHealth Regional Sales Leader George Priovolos (May 24, 2019) that oversaw those agents. Plaintiff also conducted a Rule 30(b)(6) deposition of Gryphon Networks, through its General Counsel Melissa Fitzgerald and its Vice President of Network Services Stefan Dunnigan (Jan. 31, 2020). Gryphon is USHealth's vendor that, beginning in October of 2018, was to provide a scrub for USHealth's Internal Do-Not-Call List (but not for the National Do Not Call Registry) scrubs on the telemarketing calls made by USHealth agents using the VanillaSoft CRM (*i.e.*, customer relations management software). Plaintiff also deposed Brad Hannon (Feb. 11, 2020), a former USHealth Field Training Agent who worked under George Priovolos and was involved in training USHealth agents. In addition, Defendants conducted a deposition of Plaintiff (Jan. 15, 2019).

14.    The conduct and substance of these depositions has been handicapped by Defendants' resistance to producing basic discovery in this case and allowing their third-party

vendor to produce Defendants' own relevant documents. Defendants' refusals have resulted in extensive motion practice and in-person hearings to address those motions and the status of discovery.

15.    As of March 6, 2020 when the Court heard objections to Magistrate Judge Cureton's Order compelling Defendants to produce discovery responsive to Plaintiff's discovery requests, Defendants had *only produced 351 pages of discovery* (consisting of 33 unique documents), two audio recordings of calls made to Plaintiff, and USHealth's internal do not call spreadsheet (*in toto*, documents Bates stamped USHEALTH_000001-354).

16.    On March 12, 2020 (Dkt. 156), the Court denied Defendant's Objections, and ordered a rolling production according to the following timeline:

    March 13, 2020 – First Round of Production;

    April 3, 2020 – Second Round of Production;

    April 17, 2020 – Third Round of Production;

    May 1, 2020 – Fourth Round of Production; and

    May 8, 2020 – Substantial completeness pursuant to Discovery Order.

17.    Because Plaintiff's Motion for Class Certification was due on May 1, 2020 (Dkt. 164), Plaintiff has not had the opportunity to receive and review the documents and information to be produced by Defendants in the Fourth Round of Production on May 1, 2020, and in the final round of production on May 8, 2020. Plaintiff not had the opportunity to depose certain USHealth officials, whose depositions were repeatedly postponed in order to await Defendants' production of documents. Specifically, the parties agreed to conduct the depositions of James Schrader, Lawrence Wilford, and William Shelton on June 24-26, 2020, prior to filing a Consent Motion to Modify Amended Scheduling Order on April 16, 2020 (Dkt. 163), which the Court denied. Dkt.

165).

18.     As for third-party discovery, in his First Requests for Production, served on June 28, 2018, Plaintiff requested that USHealth produce call logs of the telemarketing calls at issue. Defendant refused to produce call logs, and Plaintiff served subpoenas on Defendant's vendors Gryphon Networks, VanillaSoft and Velocify, on March 5, 2019 and October 10, 2019, respectively. Defendant sought to block the production of its agents' call logs by filing motions for protective order which the Court denied in full as to the Gryphon subpoena on November 8, 2019 (Dkt. 90) and denied in part as to the VanillaSoft and Velocify subpoenas on February 14, 2020 (Dkt. 137). The Court then granted Plaintiff's comprehensive Motion to Compel on March 12, 2020 (Dkt. 156). Only then did Defendant eliminate the barrier to the production of its agents' call logs by emailing VanillaSoft and Velocify on March 16, 2020, to advise that Defendant had withdrawn its objections to the subpoenas.

19.     Per the Court's and the Magistrate Judge's discovery orders, Defendant and third-party vendors are now producing large sets of documents and data. Third-party vendor VanillaSoft, through Plaintiff's efforts, has recently produced calls logs for four of the USHealth regions, totaling some tens of millions of documented calls. Those call logs include data for the Agent accounts overseen by George Priovolos, Jared Herndon, Harley Brown and Michael Laughlin. Plaintiff expects that additional call logs will be produced for two other USHealth accounts. All of these and other VanillaSoft call logs for calls made by USHealth agents since March 29, 2014 are included in the scope of the alleged class definition.

**The Type and Estimated Expense of Notice**

20.     Plaintiff's counsel propose to provide direct notice to class members via email and mailed postcards. Plaintiff's counsel have obtained two cost estimates for the prospective

dissemination and administration for a class notice in this litigation, received from the Angeion Group, a firm that provides comprehensive notice and management services for class actions, mass tort, and bankruptcy administration, *see* http://www.angeiongroup.com/. Those estimates are attached hereto as Exhibit 19. At the request of Plaintiff's counsel, Plaintiff's expert, the Class Experts Group, LLC, independently evaluated the feasibility of identifying class members, based on the call records produced in this action, for purposes of providing them with a class action notice in the event that a class is certified in this Action. The Class Experts Group concluded that it is possible, common and administratively feasible to identify and issue notice of class certification to individuals in this Action based on the call records produced in the Action. *See* Expert Report of Anya Verkhovskaya, Sections F and G, attached here to as Exhibit 20. Angeion estimates that the form of direct mail and e-mail notice proposed would range from $54,334 for a class of 135,000 consumers and $414,748 for a class of 2 million consumers. Absent a settlement fund which included a provision for notice administration costs, Berger Montague would advance the cost of the proposed notice.

**Certain Documents Referenced in the Plaintiff's Memorandum**

21.     Attached hereto as Exhibit 1 is true and correct copy of the Declaration of David B. Freeman.

22.     Attached hereto as Exhibit 2 is true and correct copy of seven sample USHealth telemarketing scripts Bates stamped USHEALTH_000536-542.

23.     Attached hereto as Exhibit 3 is true and correct copy of the transcript of the Court hearing held on Feb. 5, 2020 (Dkt. 139).

24.     Attached hereto as Exhibit 4 is true and correct copy of an email string terminating with an email from Stefan Dunigan on November 8, 2020, attaching the USHealth Account

Review through October 2019, Bates stamped GRYPHON000024-25.

25.     Attached hereto as Exhibit 5 is true and correct copy of the standard USHealth Advisors ("USHA") Agent Agreement, Bates stamped USHEALTH_000094-110.

26.     Attached hereto as Exhibit 6 is true and correct copy of the memorandum from Freedom Life Insurance Company of America to All Licensed Agents and Appointed Agents, regarding National Do-Not-Call List – Background and Frequently Asked Questions, dated Nov. 1, 2003, Bates stamped USHEALTH_000002-12.

27.     Attached hereto as Exhibit 7 is true and correct copy of the USHA University deck presentation titled "Compliance Basics," Bates stamped USHEALTH_000015-52.

28.     Attached hereto as Exhibit 8 is true and correct copy of exhibit 115 marked at the deposition of USHealth's former Field Training Agent Brad Hannon, conducted on February 11, 2020. During that deposition (Hannon Tr. 184:19-24), counsel for USHealth represented that "this is a list of various electronic transactions from -- from the [USHealth Agent] portal, and the -- among other things, there's the Freedom Life National Do Not Call List that is highlighted there, background and frequently asked questions [which is a referenced to the foregoing document Bates stamped USHEALTH_000002-12]."

29.     Attached hereto as Exhibit 9 is true and correct copy of former USHealth Agent Jacqueline Levine's webpage that was downloaded from the USHealth website and marked as exhibit 56 during the deposition of George Priovolos.

30.     Attached hereto as Exhibit 10 is true and correct copy of the document titled "Marketing Your Business @ USHEALTH ADVISORS – Approved, Compliant Advertising to Help You Market Your Business," Bates stamped USHEALTH_000002-12.

31.     Attached hereto as Exhibit 11 is true and correct copy of the transcript of the

7

deposition of USHealth's Regional Sales Leader George Priovolos, conducted on May 24, 2019.

32.     Attached hereto as Exhibit 12 is true and correct copy of USHA's Regional Sales Leaders, Bates stamped USHEALTH_028550.

33.     Attached hereto as Exhibit 13 is true and correct copy of the transcript of the deposition of USHealth's designated representative Dean Whaley, pursuant to Fed. R. Civ. P. 30(b)(6), conducted on January 16, 2019.

34.     Attached hereto as Exhibit 14 is true and correct copy of Defendant USHA's Supplemental Responses and Objections to the First Requests for Production, dated Oct. 29, 2018.

35.     Attached hereto as Exhibit 15 is true and correct copy of the email confirmation of Plaintiff's telephone registration on the National Do Not Call Registry, available at https://www.donotcall.gov/verify.htlm.

36.     Attached hereto as Exhibit 16 is a chart summarizing the alleged calls and texts from USHealth agents that were received by Aaron Hirsch, along with true and correct copy of the following documents evidencing those calls and texts: AH000037, AH000061, AH000073, AH000093, AH000103, AH000109, AH000127, AH000140, AH000261, AH000262, AH000263-264, GK000031, GK000032, GP000031-32, GP000033, GP000034, JL000001-2, JL000003-4, JL000084, RJM 000065, USHEALTH_000001, USHEALTH_000013, USHEALTH_000353, and VANILLASOFT000026-27.

37.     Attached hereto as Exhibit 17 is true and correct copy of the Declaration of Aaron Hirsch.

38.     Attached hereto as Exhibit 18 is the firm resume Berger Montague PC.

39.     Attached hereto as Exhibit 19 is true and correct copy of two cost estimates for the prospective dissemination and administration for a class notice in this litigation, received from the

8

Angeion Group, a firm that provides comprehensive notice and management services for class actions, mass tort, and bankruptcy administration, *see* http://www.angeiongroup.com/.

40.     Attached hereto as Exhibit 20 is true and correct copy of Expert Report of Anya Verkhovskaya.

41.     Attached hereto as Exhibit 21 is true and correct copy of Expert Report of Ray Horak.

42.     Attached hereto as Exhibit 22 is true and correct copy of the Declaration of Max Maccoby.

43.     Attached hereto as Exhibit 23 is true and correct copy of the Declaration of Jim Zadeh.

44.     Attached hereto as Exhibit 24 is true and correct copy of the Declaration of Warren Burns.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and belief.

Executed this 1st day of May, 2020.


           */s/ Michael Dell'Angelo*
           MICHAEL DELL'ANGELO

9

Exhibit 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| **AARON HIRSCH, individually and on behalf of all others similarly situated,** | : | |
| | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **Civil Action No. 4:18-cv-245-P** |
| | : | |
| **USHEALTH ADVISORS, LLC and USHEALTH GROUP, INC.,** | : | |
| | : | |
| | : | |
| **Defendants.** | : | |

---

## DECLARATION OF DAVID B. FREEMAN

I, David B. Freeman, declare as follows:

1.      I am over 18 years old, have personal knowledge of the facts stated herein, and can testify competently thereto if called upon to do so.

2.      I hold a Bachelor of Business Administration degree from the University of Mississippi, which I earned in 1976. I served five years on active duty as a U.S. Army helicopter pilot, including a year in Vietnam as a medevac pilot, before returning to civilian life as a commercial pilot and as a professional in the computer industry. For approximately seventeen years, I worked in a variety of positions in the pharmacy computer industry, where my experience has included field service, hardware and software production, quality control, software planning and development, training and curriculum development, customer service and customer relations, operations management, fleet and facilities management, and litigation management. I am also a book author, articles writer, and own a small publishing company.

3.      From in or about April 2006 to November 2018, I served as an Instructional Designer/Applications Developer for USHealth Advisors, LLC and USHealth Group, Inc. (collectively, "USHealth"), which is a health insurance company that sells personal and family

DocuSign Envelope ID: 011D74F9-8528-4FCC-8541-0386572CDD4D

health coverage through a group of agents that telemarket health coverage products to consumers across the country.

4.     The USHealth sales agents are located throughout the country and worked under one of USHealth's so-called Regional Leaders, including George Priovolos, among others. Those Regional Leaders have Divisional and Satellite Leaders under them who assist in overseeing the agents that worked within their group. It is somewhat of a misnomer to refer to the group as a Region because the Region is only defined by the agents who work within that group. The Region itself is not bound by geography as to where its office(s) may be located or the areas to which it makes calls. Instead, the telemarketing calls made are nationwide and only limited by the specific states for which a calling agent has been licensed. In addition, the agent's Regional or Divisional Leader also needed to be licensed in those state in which the agents called. It was common that a given agent would be licensed in numerous states and was not dependent upon what USHealth Regional Leader under whom they worked. Moreover, while the office location for a Divisional Leader would typically be a "bricks and mortar" office, the Satellite Leaders would oversee a group of agents who typically worked remotely and thus neither the Leader, the agents nor their leads (*i.e.*, the consumer telephone numbers used for telemarketing) had any geographical tie.

5.     The USHealth Regional Leaders and the agents who worked for them were overseen by Travis Yoder, who was responsible for coordinating their marketing and sales activities for the USHealth home office. Mr. Yoder held weekly telephone conference calls for the agents as a group nationwide to discuss the past week's sales results and issues pertaining to the agents and their work. USHealth used an online electronic portal to communicate and share documents between the agents and the home office. The USHealth agent portal also

Motion for Class Cert App. 0012

DocuSign Envelope ID: 011D74F9-8528-4FCC-8541-0386572CDD4D

housed a Sales Leader Board that kept a running tally of sales by Region, Division, and Satellite plus two lower levels – Field Sales Leader and Field Training Agent, as a competitive and motivational tool for driving sales. I was responsible for tallying sales for the Leader Board. The high-producing sales agents were then awarded incentive trips by USHealth for their performance.

6.      During my tenure with USHealth, I acted as an instructional designer and database developer to support the training of the USHealth sales agents and was involved in the reporting of the agents' telemarketing activities in selling USHealth products to consumers. I worked directly with the management of USHealth, including: Travis Yoder (USHealth's National Sales Manager); James Schrader and Bill Shelton (who were heads of marketing and directed policies for the telemarketing conducted by USHealth's agents); Lawrence Wilford (who worked with USHealth agents related to their leads and DNC scrubbing); Dean Whaley (who oversaw USHealth's finance and operations); Jim White (USHealth Senior Vice President of Sales); and Troy McQuagge (USHealth's CEO).

7.      I also worked directly with the USHealth sales agents, in initially in setting up their agent profile on their individual webpage on the USHealth website, as well as in creating online agent training and tracking agent's participation and test results for the USHealth health coverage products that the agents marketed to consumers.

8.      I acted as one of the primary liaisons between the USHealth sales agents and the USHealth home office, including with regard to the maintenance of the USHealth Internal Do Not Call list ("IDNC") and the ad hoc scrubbing of the agents' telemarketing leads against both the IDNC and the National Do Not Call Registry ("NDNC") as requested.

9.      I understood that while agents may have obtained some leads from USHealth

Motion for Class Cert App. 0013

DocuSign Envelope ID: 011D74F9-8528-4FCC-8541-0386572CDD4D

directly, agents obtained leads through purchases from lead generation company and by simply pulled numbers from the internet.

10.     The general procedure for maintaining the IDNC was as follows: when an agent received a Do Not Call ("DNC") request from a consumer, the agent was to remove the consumer from his/her calling list and then notify the USHealth home office with the consumer's name, telephone number and date of DNC request. The USHealth home office was supposed to then promptly record the DNC request in the IDNC.

11.     The IDNC was used in two ways. First, USHealth scrubbed its list of "B" leads against the IDNC, as well as the NDNC. The "B" leads were leads that agents purchased on their own, called as many times as they wanted, and then sent the leads to USHealth to recycle for another agent call after a period of time. Second, USHealth offered to also make IDNC and NDNC scrubs for leads purchased by the USHealth agents provided that the agents send the leads to USHealth's home office before making calls to those consumers.

12.     While the IDNC was created and maintained by USHeath, the IDNC was not shared with USHealth agents, and thus, agents were unable to perform an IDNC scrub on their own. The NDNC is maintained by the federal Government and allows consumers to register their name in order to express their desire not to be contacted by telemarketers. The NDNC registry requires a paid account to allow general access in order to conduct scrubs for telephone numbers. Such a paid account is relatively expensive, and as a result, would not be cost-effective for individual agents to purchase. Instead, USHealth had an NDNC account and allowed agents to submit telemarketing leads that the USHealth home office could scrub for them if the agent chose to do so.

13.     USHealth did not have procedures and protocols to ensure that agents

4

DocuSign Envelope ID: 011D74F9-8528-4FCC-8541-0386572CDD4D

performed an IDNC or NDNC scrub made for every lead they purchased, and every number they called, to prevent calls to consumers listed on the IDNC and NDNC.

14.     During my tenure, I advised the USHealth management and the agents that simply sending IDNC and NDNC requests to the USHealth home office would not stop consumers from receiving unwanted calls. The telephone leads called by agents were not collectively centralized by USHealth, and thus, were not systematically scrubbed against the IDNC and NDNC.

15.     During my tenure, I specifically noted to the USHealth Regional Leaders and the agents that the USHealth home office could add names to the IDNC but could not stop IDNC calls from being made by the agents in the field, as USHealth did not have a control to scrub and prevent calls from being made to persons on the IDNC. Likewise, USHealth did not have a control to prevent agents from calling NDNC numbers. Again, this was a problem because not only did the bulk of the IDNC requests originate from the telemarketing leads purchased by the agents but so many of those leads were listed on the NDNC.

16.     Moreover, the IDNC scrub, if made, would only be as good as the DNC data itself. To the extent that agents did not promptly communicate every consumer DNC request to USHeath's home office, the telephone number would not make it on our IDNC list. Similarly, if the agent did not properly designate a consumer to have a DNC request, it would also not make it on our IDNC list. Without any uniform procedure or software, USHealth's ability to register consumers on its IDNC had limited effectiveness.

17.     It is my understanding that USHealth understood that a proper IDNC request was a consumer asking to be put on the IDNC by indicating to the agent that the consumer did not want to receive telemarketing calls or be called back (this could be exhibited by the

5

consumer responding in an angry or threatening manner or otherwise expressing their desire not be called).

18.     IDNC and NDNC scrub requests came from the leadership, i.e. Divisions and Satellites with a few Field Sales Leaders participating on behalf of the agents. I don't recall individual agents having the authority to send leads for scrubbing, however all of the sales leaders were encouraged to do so. I'm not aware of agents purchasing leads individually. It is my understanding this was done on their behalf by the sales leaders. While most of the Sales Leaders periodically sent in lead lists for scrubbing and all were encouraged to do so, I had no way of knowing of lists that existed without being scrubbed.

19.     Most USHealth agents used a CRM (customer relationship management), which is an electronic platform that stores telephone numbers of leads and then dials the numbers for the agent. The agent can then make an electronic note of the disposition of call in the CRM. During my tenure, many, if not most, of the USHealth agents were using the Velocify CRM and then migrated over to the VanillaSoft CRM. USHealth, however, did not require the agents to use a particular CRM, or any CRM at all. Because USHealth did not require its agents to use CRM technology or require that such technology be managed through USHealth's home office, fundamental gaps existed within USHealth's internal controls to ensure compliance with the IDNC and NDNC lists, as well as the DNC dispositions for those consumers who expressed that they did not want to be called.

20.     In fact, at the time that I left USHealth, USHealth's home office was considering a plan to centralize the use of the VanillaSoft CRM through the home office to allow direct oversight and control of USHealth's telemarketing. Those efforts were then being spearheaded by Bill Shelton and Travis Yoder. I am unaware of whether those efforts ever came to fruition.

Motion for Class Cert App. 0016

DocuSign Envelope ID: 011D74F9-8528-4FCC-8541-0386572CDD4D

21.     As a result of USHealth's lack of controls for the IDNC and NDNC, it was not unexpected that some of the calls made by the agents would be made to consumers who did not want to be called. As the liaison between USHealth's home office and the agents, I fielded not only DNC requests made by consumers but also some of the complaints and threats that were made by consumers who said that they had received such unwanted telemarketing calls. In some cases, consumers would complain about being bombarded by calls and that they had received multiple unwanted calls, notwithstanding that they had previously made multiple requests to be put on the IDNC and had registered their telephone number on the NDNC.

22.     Some aggrieved consumers threatened to take legal action or seek relief through state and federal regulators. In addition, I received notice of complaints from regulators involving USHealth's telemarketing practices, including for example the Florida Department of Agriculture and Consumer Services. In other instances, the consumer filed litigation in court against USHealth for violation of the Telephone Consumer Protection Act and other telemarketing laws. There were even instances where the same consumer filed or threatened to file a second lawsuit where it was alleged that USHealth had continued to violate the telemarketing laws even after the resolution of a prior lawsuit or complaint.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and belief.

Executed on _____4/27/2020_____

DAVID B. FREEMAN

_David Freeman_
DocuSigned by:

Exhibit 2

DOCUMENT FILED UNDER SEAL

Exhibit 3

1                    IN THE UNITED STATES DISTRICT COURT

2                 FOR THE NORTHERN DISTRICT OF TEXAS

3                       FORT WORTH DIVISION

4    AARON HIRSCH, ET AL        )    CASE NO. 4:18-cv-00245-P
                                )
5           Plaintiff,          )
                                )    FORT WORTH, TEXAS
6    VERSUS                     )
                                )    FEBRUARY 5, 2020
7    USHEALTH ADVISORS LLC, ET AL,)
                                )
8           Defendant.          )    9:00 A.M.

9

10                              VOLUME 1
                     TRANSCRIPT OF STATUS CONFERENCE
11              BEFORE THE HONORABLE MARK T. PITTMAN
                 UNITED STATES DISTRICT COURT JUDGE
12

13   A P P E A R A N C E S:

14   FOR THE PLAINTIFF:        MAX F. MACCOBY
                               *Pro Hac Vice*
15                             Washingon Global Law Group, PLLC
                               1701 Pennsylvania Avenue NW
16                             #200
                               Washington, DC  20006
17                             Telephone:  (202) 248-5439

18                             JAMSHYD (JIM) ZADEH
                               Law Office of Jim Zadeh, PC
19                             1555 Rio Grande Avenue
                               Fort Worth, TX  76102
20                             Telephone:  (817) 335-5100

21

     FOR THE DEFENDANT:        RICHARD W. EPSTEIN
22                             *Pro Hac Vice*
                               Greenspoon Mander, PA
23                             200 East Broward Blvd.
                               Suite 1800
24                             Fort Lauderdale, FL  33301
                               Telephone:  (954) 491-1120

25

```
 1                           DANIEL L. BATES
                            Decker Jones McMackin McLane
 2                          Hall & Bates
                            801 Cherry Street
 3                          Suite 2000 Unite 46
                            Fort Worth, TX  76102
 4                          Telephone:  (817) 336-2400

 5

 6

 7

 8   COURT REPORTER:        MONICA WILLENBURG GUZMAN, CSR, RMR
                            501 W. 10th Street, Room 301
 9                          Fort Worth, Texas  76102
                            Telephone:  817.850.6681
10                          E-Mail:  mguzman.csr@yahoo.com

11

12   Proceedings reported by mechanical stenography, transcript

13   produced by computer.

14

15

16

17

18

19

20

21

22

23

24

25
```

1                              <u>INDEX</u>

2                                           PAGE   VOL.

3

4    Appearances ................................4      1

5    Admonishment by the Court ...................4      1

6    Response by Mr. Maccoby .....................8      1

7    Response by Mr. Epstein ....................14      1

8    Final Statement by the Court ...............25      1

9    Proceedings Adjourned ......................26      1

10    Reporter's Certificate .....................27      1

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1               P R O C E E D I N G S

2           (February 5, 2020, 9:00 a.m.)

3           THE COURT:  Court calls Docket Number

4    4:18-CV-245-P, Hirsch vs. USHealth Advisors, LLC, et al.

5               This matter is being called today for a status

6    conference.  Before we get into the substance of today's

7    hearing I would ask that the parties please identify themself

8    and who they represent.

9           MR. MACCOBY:  Good morning, Your Honor.  Max

10   Maccoby for plaintiff, Aaron Hirsch.

11          MR. ZADEH:  Jim Zadeh for plaintiff, Aaron

12   Hirsch.

13          MR. BATES:  Good morning, Judge.  Dan Bates for

14   USHealth.  I'd like to introduce to the Court Mr. Richard

15   Epstein with the lead counsel's firm from Florida.

16          THE COURT:  Thank you, sir.

17          MR. EPSTEIN:  Good morning, Your Honor.

18          THE COURT:  Good morning.  Y'all may be seated.

19              I don't want to berate you-all, but this is my

20   problem child case.  I have more discovery motions, more

21   failure to move the case along on this one than any other case

22   on my docket.  So, if you're wondering why you got brought

23   over here today I just want to discuss a few matters with you

24   guys.

25              Pending before the Court we have yet another

 1   proposal to move off the scheduling order.  We're currently on

 2   our fourth scheduling order and you guys are asking for the

 3   fifth one.

 4                Now, you might have picked it up through some of

 5   the comments with the last group, judges don't like cases that

 6   have been pending this long and we can't even get past the

 7   discovery stage.  I think it's fair to say, if you were the

 8   judge looking at this docket and the amount of discovery

 9   motions and discovery hearings we've had in this case, you

10   would think the same thing that I did, These guys can't even

11   agree that it's a cloudy day today.  We can't run a case like

12   this.  And if we can't come together on some of these

13   discovery issues I'm going to start sanctioning you.  And I

14   may sanction individual attorneys.  This is just absolutely

15   ridiculous.

16                Let me just read for the record what this case

17   looks like; and you put yourself in my position.  I wish the

18   lead counsel would have been here today to have heard this.

19   This case was originally filed in June of 2018; and I know

20   Judge Means originally had the case.  No trial date was given.

21   You had a mediation date of September of 2018.  Completion of

22   discovery by March the 1st, 2019.  Dispositive motion April 1

23   of 2019.

24                The parties were referred to mediation by Judge

25   Means on June 21 of 2018.  The parties failed to mediate by

1    the 2018 deadline.

2             You got put on a second scheduling order on

3    December the 19th of 2018.  That extended all discovery

4    deadlines set forth in the initial scheduling order by

5    approximately 5 1/2 months.

6             With regards to mediation, the representation

7    was made to the Court that the parties had diligently pursued

8    discovery.  I don't think that that's true.  You certainly

9    pursued a lot of discovery motions.  The parties had

10   diligently pursued discovery.  Keep in mind this was over a

11   year ago.  Both parties have produced documents.  Plaintiffs

12   have noticed a 30(b)6 deposition and is preparing additional

13   deposition notices.

14            Plaintiff has filed a motion to compel

15   production of certain documents, and the parties are briefing

16   that motion.  The parties also seek to defer mediation until

17   the close of discovery to permit a better understanding of the

18   merits of the case, etc., etc.

19            Completion of discovery by that order was August

20   the 12th, 2019.  Again, there was no trial date set.  And I

21   understand that Judge Means does things differently than I do.

22   So, after receiving that, Judge Means administratively closed

23   the case for 45 days on August the 5th, 2019, so the parties

24   could participate in mediation.  Apparently you-all mediated

25   unsuccessfully before a Florida mediator who I have never

1    heard of.

2              You got put on a third scheduling order where

3    you were given yet another mediation date of March the 25th,

4    2020.  Dispositive deadline of May the 25th, 2020.  This was

5    the scheduling order that I put you on on December the 16th,

6    and I gave you a trial date of September 21, 2020.

7              Now, we're now on our fourth and current

8    scheduling order.  Under the fourth scheduling order, which I

9    entered on January the 17th, 2020, I kept the prior dates and

10   I gave you an additional expert designation of March the 5th,

11   2020.

12             Throughout this case we've had five discovery

13   motions pending.  Currently, by my count, we still have two of

14   those pending.  It seems to me that the initial response by

15   the parties is to file a discovery motion and to respond back

16   with another discovery motion.  This is not state court, and I

17   cannot have my docket clogged up with these continuous

18   discovery motions or the time of the magistrate to decide

19   these.

20             I'd like to know what's going on here, why we

21   can't resolve the case, and why are we on our fifth request

22   to, yet again, move out the scheduling order on a case that

23   was filed in June of 2018.

24             So, I'd like to hear from plaintiff first, and

25   then I'll hear from defendant.  What's going on here?

1          *MR. MACCOBY:*  Your Honor, in a nutshell -- and I
2    appreciate the Court giving us attention and hearing this.
3          *THE COURT:*  And keep in mind those dates.  If
4    you were in my shoes, what would you think of everything I
5    just read off?  Would you think that these parties can't agree
6    on anything, because that's what I think.
7          *MR. MACCOBY:*  No, Your Honor.  And we think the
8    Court -- both the District Court and the Magistrate Court
9    should have or should take serious action.
10         We have been -- this is a large scale serious
11   case of Telephone Consumer Protection Act violations involving
12   a company that makes 12 million calls per month with 3500
13   agents with what we contend is woefully inadequate procedures
14   and safeguards where our client was called 11 times after we
15   filed the lawsuit, which shows how little control they have.
16         And despite all of our discovery requests,
17   written discovery, we've only been given 352 pages of
18   discovery; pages.  In a typical case you might get 10,000
19   pages or, you know, 5 gigs or something; but 350 pages.  And
20   what we got was -- what we received were old policies by this
21   company from the 1990 to early 2000s on how to handle the
22   Telephone Consumer Protection Act.
23         Well, Your Honor, we think that if the ordinary
24   process of civil procedure had been followed here this case
25   would have gone away, easily, a year ago.

1          Here's an example of what's going on here.

2    We've had to subpoena third-party vendors to get discovery we

3    think we should have gotten from them, like call logs, agent

4    call logs.  Well, the two subpoenas we sent to -- the three

5    subpoenas to vendors for call logs and the internal do not

6    call list, they filed motions for protective order on all

7    three subpoenas.

8          And one of the motions for protective order was

9    claiming that the internal do not call list that we were

10   trying to get, which they're not supposed to call -- these are

11   people who say I don't want to be called, they're added to the

12   internal do not call list -- they made the argument that

13   that's proprietary business information for their business to

14   help their business.  That's a completely counter-intuitive

15   argument.  How could these people further their business if

16   they're saying don't call us?  But that's the argument they

17   made.

18         Judge Cureton denied them on that motion for

19   protective order.  We just took that deposition last week in

20   Boston.  We found out all these things.  We found out that

21   this is a national/nationwide program of marketing by this

22   company of its health insurance policies where it's disabled

23   the national do not call certification.  In other words,

24   agents can call even if someone is on the national do not call

25   registry, which they're prohibited from doing.  We filed the

1   motion to consolidate with Mr. -- Mr. Zadeh is counsel on our

2   case, but he also --

3               *THE COURT:*  I know he made an appearance in this

4   case.

5               *MR. MACCOBY:*  Right.  And so, he has a companion

6   case.  The Court denied us on the motion to consolidate, we

7   thought it was the same case.  But we -- based on new

8   information that it's nationwide, we may seek to renew our

9   motion.

10              But the fact of the matter is, Your Honor, it's

11  356 pages of discovery.  I mean, we can't do the case.  And,

12  in fact, we have three company depositions coming up in two

13  weeks and we don't know how we're going to do them because

14  they won't give us any e-mails of these -- and these are the

15  three employees at USHealth that did the marketing.  They did

16  all of the 3500 agent calls of 11 to 12 million calls per

17  month to nationwide -- to the public and we can't get their

18  e-mails.  So, I don't know how we're going to do these

19  depositions.

20              I mean, ordinarily in a lawsuit lawyers need

21  documents first, then you do depositions.  Well, how do we do

22  depositions without documents?  Now, we did do -- three of the

23  agents who called our clients we did do those depositions.

24  They didn't give us any of their documents.  Even though each

25  of those agents have websites on the company website, they're

1   agents and they're exclusive to the company, well, they didn't

2   give us those documents.  Well, what did we get from them?

3   Very little.  But we did their depositions anyway last

4   February.

5          We also did the deposition of their manager who

6   sold the lead of my client.  And we did -- like I said, we

7   just -- we did the company deposition, that was enlightening.

8   A year ago we did do the company deposition.  And, Your Honor,

9   we are -- we have one more agent deposition this month.  And,

10  like I said, we have the employee depositions which we have no

11  documents for.

12          But if we win on the third-party vendors who are

13  holding the call logs, agent call logs, which they're

14  blocking, and Judge Cureton is currently trying to decide

15  that, if we win that we're going to seek the call logs.  Now,

16  in our meet and confer, Your Honor, they said they could get

17  us the call logs within two days from the Florida/Sarasota

18  region.  They've been trying to narrow this case just to

19  Florida, because no one wants a nationwide case, obviously,

20  who would.  If you're a defendant you don't want a nationwide

21  case.  So, they're trying to limit it to just this plaintiff,

22  my client; who is actually my neighbor.  So, they're trying to

23  limit it.

24          And so -- but they said, We'll give you the call

25  logs in two days if you withdraw your discovery motions.  This

```
 1   was a month ago, right before we argued to Judge Cureton.  We
 2   said no, because we had no idea what they're going to give us.
 3   But they could give us, in a couple of days, the call logs for
 4   Florida -- for at least the Florida region.  That would
 5   accelerate this case dramatically.
 6            THE COURT:  Believe it or not, I've got more
 7   cases on my docket than just this one, and so does Judge
 8   Cureton.  And this is taking up a significant amount of his
 9   time and my time.  This is just ridiculous and I'm tired of
10   it.
11            And I know Mr. Bates knows and I know Jim knows,
12   that if this was filed downstairs it would have been over a
13   long time ago and people might have had their licenses taken
14   away for this type of activity.  I don't know what was going
15   on in the previous two years, but it's time to get this going.
16            Anyway, go ahead.
17            MR. MACCOBY:  We agree entirely.  And, Your
18   Honor, I can't stress how frustrated we have been as counsel
19   in this case, incredibly frustrated.
20            So, another thing that they promised was the
21   internal do not call list that they maintain.  Well, out of
22   the 14 calls 12 were after our client was added to the
23   internal do not call list.  We have claims for that.  They
24   said they'd produce it.  They just produced it ten minutes ago
25   by e-mail.  We've had this case going for two years and they
```

1    just produced the internal do not call list they maintain --

2    which has our client, by the way, listed six months after they

3    say they added him, which explains why he kept getting

4    calls -- just got it five minutes ago.  Isn't that kind of

5    dramatic?  So, I think that underscores the point that they're

6    just withholding documents.

7              And I'm hoping we just -- I mean, in December we

8    urged the Court to issue that new scheduling order.  We urged

9    the Court to extend the dates, because they were saying they

10   just had no time to do anything in December --

11   November/December, and the Court did grant us time.  But do

12   you think we want to be in a position where we're urging this

13   court desperately for five more months of discovery?  Do you

14   think we wanted that?  Of course not.  We're there because of

15   these motions for protective order.  We're just being blocked

16   left and right.

17             It's one of the most extreme examples I've ever

18   encountered in any case.  And we didn't want to be in this

19   position.  We thank the Court for giving us more time.  We

20   want this case to end, we all do.

21             *THE COURT:*  Well, I do, too.  I want to hear

22   from the defendant.

23             *MR. MACCOBY:*  Okay.

24             *THE COURT:*  I get your point.

25             *MR. MACCOBY:*  Thank you.

1              THE COURT:   This is one of the worst that I've

2    ever seen.  And I don't know how they do it where you come

3    from, but in the Northern District of Texas we have a case

4    known as the *Dondi decision*, which you probably had to read

5    before you came and made an appearance here.  I'd like for

6    you-all out-of-town attorneys to read it again.  I'd also like

7    for you to be familiarized with the Texas Lawyer's Creed,

8    because in this District and Division we don't put up with

9    this type of stuff.

10             Go ahead.

11             MR. EPSTEIN:   Your Honor, as I'm sure you would

12   expect there are often two or three sides.

13             THE COURT:   I know that there are.  But this

14   type of delay is ridiculous.  Now, talk to me.

15             MR. EPSTEIN:   Well, first of all, the main

16   fundamental disagreement that exists in this case, and I think

17   all the lawyers acknowledge exists, is what are the contours

18   of the class going to be?  You know, this is one of those

19   cases where plaintiff's counsel needs to be very, very careful

20   about what they ask for.

21             Mr. Maccoby has already mentioned to you that

22   this is a company that is placing 13 million calls per month.

23   Well, that actually is only partially accurate.  They're

24   placing that many calls through about half of the network of

25   independent sales agents that the company has.  That's the

1   calls that are placed to a particular dialing platform, a --

2           THE COURT:  Have you all not -- if you got these

3   many motions going back and forth, has anybody ever thought,

4   Well, maybe it might be a good idea for us to get in the same

5   room and discuss, hey, how many terabytes of information do

6   you want?  We're happy to give you this information, but do

7   you really want 15 million pages?  How are we going to pay for

8   that?  Has there not been any discussions or have we just

9   hauled off and filed motions and clogged up my docket?

10          MR. EPSTEIN:  No, I'm sure -- the discussion has

11  been had --

12          THE COURT:  You do have a responsibility to do

13  that when you appear in this court.

14          MR. EPSTEIN:  Absolutely, Your Honor.  No one is

15  doubting that, but it's happened at a higher level.  And that

16  is, that all of the call logs -- remember what they're asking

17  for here.  Their class definitions are going back four years

18  from June of 2018 and carried forward to the date of the

19  giving of class notice.  That is a period of -- in excess of

20  six years, for sure, at this point.

21          Now --

22          THE COURT:  Okay.  Have you a said, All right,

23  we won't give you the six, we'll give you two years worth and

24  in the meantime we can go fight it out with Judge Pittman and

25  see how much you get?  Have you been willing to do that?

1              MR. EPSTEIN:  What we have done is said --

2              THE COURT:  Yes or no?

3              MR. EPSTEIN:  No.

4              THE COURT:  There you go.

5              MR. EPSTEIN:  But what we have done is say,

6    We will give you the region that called you.  And they're

7    doing --

8              THE COURT:  And have you given that?

9              MR. EPSTEIN:  They do not --

10             THE COURT:  Yes or no?  Have you given that?

11             MR. EPSTEIN:  They do not have all of that yet.

12             THE COURT:  Okay.  So, you're not doing what --

13   you're not even -- the stuff you're agreeing on you haven't

14   even given them.  Are you kidding me?  I am about to sanction

15   you and your client, personally, if this does not get going.

16   Do you understand that?

17             MR. EPSTEIN:  Well --

18             THE COURT:  Do you understand how serious this

19   is?

20             MR. EPSTEIN:  Of course, Your Honor.

21             And Judge Cureton heard motions that dealt with

22   these very same issues.

23             THE COURT:  I can tell you that he doesn't like

24   this case any more than I do.

25             MR. EPSTEIN:  Well, his ruling on those motions

1    that he heard on January 15th is going to, basically, tell the

2    story.  Because if he opens up discovery for all of the -- all

3    of the calls that have been made during that six or more year

4    period, then that's going to really create, you know, a crap

5    storm, if you will -- you'll understand the term I'm using --

6                    *THE COURT:*  I do.

7                    *MR. EPSTEIN:*  -- of information that has got to

8    be digested here.  Now --

9                    *THE COURT:*  And I understand -- and you have the

10   right, if you disagree with the ruling, mandamus us.  But

11   we've got to get the case going.

12                   *MR. EPSTEIN:*  Well, we have more than that.  We

13   have defenses.  And that has been ignored thus far, as far as

14   what the plaintiff's presentation is.

15                   Mr. Hirsch admitted that he gave express consent

16   to certain of the calls that he received.  USHealth's position

17   is that all of the calls that are placed to telephone numbers

18   that are on the national do not call list, no calls are placed

19   to calls -- to the numbers on the internal do not call list.

20   And we confirmed that, at lease for the last year and a half

21   or so, that for the calls that were placed to a particular

22   dialing platform zero calls were placed to the calls in the

23   internal do not call list.

24                   But the calls that are placed in the national do

25   not call list fall under an exemption.  As the Court is aware,

1    under the TCPA, under the do not call regulations there are

2    exemptions.  And those exemptions are the basis for the

3    rationale for placing those calls.  So, simply giving them the

4    call list, comparing that --

5                   THE COURT:  The stuff that you agreed to give

6    them, though.  I understand what you're fighting over, and

7    you've got a perfect right to do it.  But the stuff that you

8    say, You know what, guys, I understand you want the moon, I

9    can give you a slice of pie.  The slice of pie, have you given

10   them a slice of pie?

11                  MR. EPSTEIN:  They do not -- as I understand it,

12   they do not have the call logs.

13                  THE COURT:  Exactly.  So, the answer is, No, we

14   haven't?

15                  MR. EPSTEIN:  The answer is no.  I said no.

16   They do not have that.

17                  THE COURT:  Don't you think you have at least

18   have an ethical obligation to give them over the stuff that

19   you agree is discoverable?  Yes or no?

20                  MR. EPSTEIN:  The answer, obviously, is yes.

21                  THE COURT:  Yeah.  Exactly.

22                  MR. EPSTEIN:  But again --

23                  THE COURT:  And I can tell you, that's part of

24   the requirement for you to represent your client in this

25   court.  And if you can't do that maybe I ought to yank your

1   pro hac vice status.  And you can tell your other attorneys on

2   this case, the other five of them, you can tell them that too.

3           I want to get this case going.  I'm willing to

4   grant a brief extension on the discovery.  But to the extent

5   that you can agree on a certain amount of information without

6   having to come to court, that should have been turned over

7   months ago, and that's part of the rules of this court.  Go

8   back home to Florida and read the *Dondi* case.

9           MR. EPSTEIN:  We have read it, Your Honor.

10          THE COURT:  Well, I think you need to reread it.

11          MR. EPSTEIN:  Well -- but it also is the basis

12   for many of our arguments, that it imposes --

13          THE COURT:  I don't care about that.  What I

14   care about is the stuff that you can reasonably agree.  You

15   have an ethical obligation to turn that over, and you have sat

16   here and told me today, We haven't given them anything.

17          MR. EPSTEIN:  Well, it's a one-party agreement.

18   And I think you understand that that's not what they want,

19   that's not what they're asking for, and it's not --

20          THE COURT:  Well, at least give them that and

21   let's go from there.  At least give them the stuff that you

22   can agree on.

23           Is this the way they practice law where you are

24   from?

25          MR. EPSTEIN:  Well, unfortunately --

1          THE COURT:  I mean, my gosh, this case is going

2     on 2 1/2 years old.

3          MR. EPSTEIN:  There have been overarching

4     problems that -- well, not quite 2 1/2 years.

5          THE COURT:  It was filed in June of 2018.

6          MR. EPSTEIN:  Which is about a year and a half.

7     I hate to correct the Court.

8          THE COURT:  I understand.  I'm just frustrated.

9     You used the crap storm analogy.  Let me tell you one we say

10    here in Texas, Don't pour water on my leg and tell me it's

11    raining.  You understand what I'm talking about?  If there's

12    an amount of discovery that you agree to give, you need to

13    give it.  Let's get this case going.  Don't hold the whole

14    thing up.  Let me and Judge Cureton decide the other issues,

15    but let's get it going.

16          We're about to be on our fifth scheduling order.

17    And if you can't do that, then we'll have to consider whether

18    you should even be able to represent your client in this

19    court.

20          MR. EPSTEIN:  Well -- and I appreciate that

21    admonition, Your Honor.  But I think you know well that the

22    motions have substance.

23          THE COURT:  No, I understand.  Let's take the

24    motions out of it, the arguments in there.  You sat and told

25    me today that there are certain things that we have agreed

1   that they're entitled to to give them.  Let's start from

2   there, and then let the Court decide the motions.  Okay?

3           MR. EPSTEIN:  Very well.

4           THE COURT:  And let's get it going.  I hate

5   having to bring you here to admonish you.  I don't like having

6   to do this.

7           And you can ask your local counsel, if this

8   would have mysteriously fallen on the docket of the judge

9   downstairs there would be a heck of a lot of bad consequences.

10  And I know you know who I'm talking about.  He wouldn't put up

11  with any of this for a second.  And I should be entitled to

12  the same amount of respect that he is.  I have the same

13  commission that he does.

14          If you can agree on certain things that should

15  be produced, you have an ethical obligation to produce them.

16  Let's fight about the things you're going to fight about, but

17  the things that we can agree upon, turn it over.  And it ought

18  to be turned over pretty darn quick.

19          MR. EPSTEIN:  It will happen.

20          THE COURT:  I mean, you can't just come in here

21  and make excuses up.  You have to give in order to get.  The

22  answer is not going to be, No, you can't have anything we're

23  going to take this to the Court.  It can't be.

24          MR. EPSTEIN:  And that was never the intention.

25  But, again, it usually takes two parties to make an agreement.

1    And one party, essentially, unilaterally deciding things all

2    of a sudden becomes characterized as us dictating to them.

3    There's been a lot of hyperbole.

4              *THE COURT:*  I understand.  Believe it or not I

5    was actually a trial lawyer once upon a time.  I understand

6    that's what we do.  To a certain extent everything is

7    hyperbole when you come before me, and I'm smart enough to see

8    through it.  And I don't care.

9              I'm -- I don't know what the ruling on the

10   motion is going to be that they filed.  I take what he told me

11   with a grain of salt.  But I will tell you if there's things

12   that you've agreed that are discoverable, and I'm hearing none

13   of that's been turned over, it needs to be turned over.

14   That's the one thing that I can tell you that I take to the

15   bank.  You understand me?

16             *MR. EPSTEIN:*  Your Honor --

17             *THE COURT:*  And I'm not characterizing them as

18   right or you are wrong.  But I'm telling you today, if I find

19   out again that there's stuff that you agree is discoverable

20   that you've been holding back, there is going to be some

21   serious consequences.  And it's not just going to be against

22   the client, it's going to be against the attorneys.

23             Do you follow me?

24             *MR. EPSTEIN:*  I do.  And don't take my -- I,

25   obviously, stood at this lectern and a number of other courts

1  and been reminded by a judge that I'm repeating myself.  So,

2  yes, we understand, all right.

3         THE COURT:  Imagine my frustration when I look

4  at this case, when I look at the scheduling in this case, and

5  think, My gosh, they have -- I mean, it's obvious you guys

6  haven't even exchanged the basic discovery.  I mean, come on.

7  You're going -- you're not going to get out of all of it.

8         MR. EPSTEIN:  No, not all of it.  And again, it

9  harkens back to what has been the basic premise of our

10  position with respect to discovery versus their position.

11  They're looking for a class that could comprise a billion to a

12  billion and a half telephone calls, and how that can ever be

13  manageable.  And more importantly, if you really want to look

14  at disposition of cases, how that kind of a class could ever

15  be severable.

16         THE COURT:  And again, let me throw this out.

17         MR. EPSTEIN:  And we're looking --

18         THE COURT:  Look, let me throw this out.  I

19  mean, have you ever thought about just sitting down together

20  breaking bread saying, Guys, this is what we're willing to

21  give you, we'll give you X amount of documents.  We're not

22  going to give you information on a class of 13 million people,

23  we'll let the Court decide that.  Has there ever been any

24  initial meet and greet in the year and a half ago with Judge

25  Means?

1              *MR. EPSTEIN:*  Well, actually -- I beg the

2    Court's indulgence on this.  The class that we're talking

3    about, the Florida region, they make millions of calls a year

4    all by themselves.  But it is the ones that relate to what

5    happened to the plaintiff himself, and that's why we're saying

6    that's what the focus ought to be.

7              *THE COURT:*  And again, have you given the

8    information on the plaintiff themselves?

9              *MR. EPSTEIN:*  Again --

10             *THE COURT:*  Is the answer no?

11             *MR. EPSTEIN:*  The answer is no, of course.

12             *THE COURT:*  Okay.  Get back to your office today

13   and give them the information on the plaintiff.  Let's start

14   from there.  It's like in kindergarten, start with letter A,

15   then we'll go to letter B.

16             Do you understand?

17             *MR. EPSTEIN:*  We will work with them on that.  I

18   will tell you it's not likely going to be able to happen

19   today.  We are all over the place.  And as you've already

20   pointed out, back where I'm from --

21             *THE COURT:*  I know you've got a team of lawyers.

22   I've never seen so many lawyers on a case.  Again, don't pour

23   water on my leg and tell me it's raining, okay?  You have an

24   associate, I bet, back at your firm that you can call on your

25   way back to Florida and say, Get the information, the Judge is

1   very upset.

2                   *MR. EPSTEIN:*  And USHealth has to marshal that

3   because, you know, it's --

4                   *THE COURT:*  Well, they better get to marshaling.

5                   *MR. EPSTEIN:*  They better.  And there is --

6                   *THE COURT:*  They're not going to like what I'm

7   going to rule.

8                   *MR. EPSTEIN:*  We get that.

9                   *THE COURT:*  All right.  Thank you.

10                  I don't need anything further.  I'll take your

11  fifth scheduling order under consideration.  I don't know what

12  I'm going to do.  But I think you've heard, from my comments

13  today, that I'm deeply irritated in the way that this case is

14  going.

15                  I highly, highly admonish my out-of-town

16  attorneys to please, I beg you, to avoid serious consequences

17  in my court read the *Dondi* decision.  It can't be any clearer

18  than that.  It might be a good idea to take a look at the

19  Texas Lawyer's Creed as well, okay?

20                  But when we have a basic agreement that at least

21  a mere monochrome of information is subject to discovery we

22  better not hang around and let the Court decide the full

23  thing.  You have an ethical duty to at least determine the

24  stuff -- at least turn over the discovery that everyone agrees

25  is reasonable and relevant.  That's -- that's basic ethical

1    consideration when practicing law.  If we won't do that we'll
2    never be able to function, the case will never be able to find
3    it's way through the system.  And that's not how we do cases
4    in this District and certainly not in this Division.
5                    With that being said, thank you, gentlemen, for
6    coming over here today.  We'll stand dismissed.
7                    *(Proceedings adjourned)*
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1                    **REPORTER'S CERTIFICATE**

2        I, Monica Willenburg Guzman, CSR, RMR, certify that the

3    foregoing is a true and correct transcript from the record

4    of proceedings in the foregoing entitled matter.

5        I further certify that the transcript fees format

6    comply with those prescribed by the Court and the Judicial

7    Conference of the United States.

8        Signed this 13th day of February, 2020.

9

10

11                        MONICA WILLENBURG GUZMAN, CSR, RMR
                          Texas CSR No. 3386
12                        Official Court Reporter
                          The Northern District of Texas
13                        Fort Worth Division

14

15    CSR Expires:        7/31/2021

16    Business Address:   501 W. 10th Street, Room 310
                          Fort Worth, Texas  76102
17

18    Telephone:          817.850.6681

19    E-Mail Address:     mguzman.csr@yahoo.com

20

21

22

23

24

25

Exhibit 4

DOCUMENT FILED UNDER SEAL

Exhibit 5

DOCUMENT FILED UNDER SEAL

Exhibit 6

DOCUMENT FILED UNDER SEAL

Exhibit 7

DOCUMENT FILED UNDER SEAL

Exhibit 8

DOCUMENT FILED UNDER SEAL

Exhibit 9



(http://ushagent.com/jacquelynlevine)



# DON'T OVER PAY FOR HEALTH COVERAGE

Your Health coverage
doesn't have to be complicated

## Jacquelyn Levine | USHEALTH Advisors Agent



## Contact

- Jacquelyn Levine
- Email (http://ushagent.com/jacquelynlevine/contact/)
- (941) 306-9941 (tel:(941) 306-9941)

Get A Quote!



## Coverage Like No Other - PremierChoice

**Why pay for Coverage Before You Need It?**

In the event You need additional protection, the purchase of PremierChoice Specified Disease/ Sickness Plan, Accident and the Optional Guaranteed Short Term Insurability Rider provides You with a one-time right to purchase Our PremierMed Short Term Medical-Surgical Expense Plan without any additional medical underwriting. **In Other words, Why pay for Coverage Before You Need It?**

**First Dollar Benefits!**

The PremierChoice Specified Disease/ Sickness and Accident Plans allow You to receive first dollar payments for expenses incurred up to a benefit maximum for covered healthcare services. And with the special doctor office visit "rollover"* feature in each Specified Disease/Sickness and Accident Plan, if You don't use Your benefits, You don't lose them.

**No Calendar Year Deductible to Satisfy!**

PremierChoice Specified Disease/ Sickness and Accident plans supplement an essential health benefits plan under which You must first satisfy a deductible every year before You are eligible to receive benefit payments.

*Exclusions and limitation apply. May not be available in all states.*

MedGuard     Accident Protector     SecureDental     LifeProtector

## Why MedGuard*?

Health coverage provides benefits for medical treatment but doesn't include benefits for non-medical expenses. Traditional life insurance pays benefits after death. What if You survive a critical illness? Where will You find the financial resources to cover non-medical costs during Your recovery?

If You are diagnosed with a covered condition, MedGuard will pay You a **lump-sum cash payment!**

**You can use the cash for any purpose You deem necessary, such as helping to:**

| | | |
|---|---|---|
| Maintain Your Family's lifestyle | Pay COBRA or other insurance premiums | Pay Your taxes |
| Replace lost income for You and Your care-giving spouse | Protect Your assets from being spent on recovery | Pay home healthcare expenses |
| Pay travel and temporary housing expenses for You and Your Family while receiving care away from home | Pay tuition expenses if You need to return to school | Pay Your mortgage or other obligations |
| Pay for childcare | Pay out-of-pocket or medical expenses not covered by insurance | Reduce Your debt |
| Finance or protect Your children's college tuition | Pay for experimental treatment | Maintain Your business during recovery |

## (https://www.ushealthfamily.com/wp-content/uploads/2015/06/Untitled-1.jpg)

\*MedGuard is a 5 year renewable term life insurance with an accelerated benefit. Not available in all states. Limitations and exclusions apply.

## Why Choose Us

### We believe in unparalleled value and care. What do you believe in?

We are flexible, affordable and secure. Our full portfolio of plans lets you tailor coverage to YOUR needs and you can rest easy knowing that, We are an innovator in the industry with over 50 Collective years of health coverage experience.

## Latest News

Troy McQuagge Wins Gold in the 2018 International Business Awards (http://www.ushealthgroup.com/NewsReader.aspx?id=77)

USHEALTH has been Consistently Recognized as Insurance Company of the Year (http://www.ushealthgroup.com/NewsReader.aspx?id=73)

USHEALTH Advisors, LLC ("USHEALTH") Completes its Second Annual "Month of H.O.P.E." (http://www.ushealthgroup.com/NewsReader.aspx?id=67)

READ MORE (JACQUELYNLEVINE/NEWS/)

>



## USHEALTH Group

Through its licensed life and health insurance companies, USHEALTH Group, offers quality coverage to policy holders including Sickness and Accident Insurance, Critical Illness, Life, Dental Coverage, Short-Term Accident Disability Income Insurance and much more!

^

Get A Quote!

## ⚙ Our Mission



(http://ushagent.com/jacquelynlevine/hope/)

Helping Other People Everyday (HOPE) is more than a clever acronym for the staff, management and independently contracted Agents of USHEALTH Advisors. For them, it is a mission that is lived on a daily basis; an organizational commitment to make a positive difference in the lives of others.

## USHEALTH Group Central



Login + (https://myushg.ushealthgroup.com/login.aspx)

I'm A Member

USHEALTH Group Members can log into myUSHG.com (https://myushg.ushealthgroup.com/login.aspx), to view personalized information about:

> coverage & benefits
> health & wellness
> treatment & cost estimates
> pharmacy and RX services
> and much more...

> Create a myUSHG Account (https://myushg.ushealthgroup.com/Lookup.aspx)

> Login to myUSHG, click here (https://myushg.ushealthgroup.com/login.aspx)



## View Our Products

> PremierChoice (http://ushagent.com/jacquelynlevine/premierchoice/)
> Secure Advantage (http://ushagent.com/jacquelynlevine/secure-advantage/)
> Critical Illness (jacquelynlevine/critical-illness/)
> Term Life (http://ushagent.com/jacquelynlevine/term-life/)
> Accident (http://ushagent.com/jacquelynlevine/accident/)
> PPO Networks (http://ushagent.com/jacquelynlevine/ppo-networks/)

Motion for Class Cert App. 0140



More News + (http://ushagent.com/Jacquelyn Levine/news/)

News

- Troy McQuagge Wins Gold in the 2018 International Business Awards (http://www.ushealthgroup.com/NewsReader.aspx?id=77)
- USHEALTH has been Consistently Recognized as Insurance Company of the Year (http://www.ushealthgroup.com/NewsReader.aspx?id=73)
- USHEALTH Advisors, LLC ("USHEALTH") Completes its Second Annual "Month of H.O.P.E." (http://www.ushealthgroup.com/NewsReader.aspx?id=67)

READ MORE (JACQUELYNLEVINE/NEWS/)                                                                              ›

## Our Partners:


Cigna.

Midlands Choice

CVS/caremark


HealthPartners
Your partner for good health.


Community Health Network

Legal Notice                                                                                        ·        ⌃

All products are underwritten and issued by Freedom Life Insurance Company of America and National Foundation Life Insurance Company, wholly owned subsidiaries of USHEALTH Group, Inc.

## Latest News

- Troy McQuagge Wins Gold in the 2018 International Business Awards (http://www.ushealthgroup.com/NewsReader.aspx?id=77)
- USHEALTH has been Consistently Recognized as Insurance Company of the Year (http://www.ushealthgroup.com/NewsReader.aspx?id=73)
- USHEALTH Advisors, LLC ("USHEALTH") Completes its Second Annual "Month of H.O.P.E." (http://www.ushealthgroup.com/NewsReader.aspx?id=67)

READ MORE (JACQUELYNLEVINE/NEWS/)                                                              >

## Useful Links

ABOUT US (HTTP://USHAGENT.COM/JACQUELYNLEVINE/ABOUTUSHG/)                                      >

PPO NETWORKS (HTTP://USHAGENT.COM/JACQUELYNLEVINE/PPO-NETWORKS/)                               >

CONTACT HOME OFFICE (JACQUELYNLEVINE/CONTACTUS/)                                               >

## Contact Us

300 Burnett Street, Suite 200
Fort Worth, TX 76102-2734
1.800.387.9027

Copyright 2015 © USHEALTH GROUP All rights reserved. Privacy Policy | Terms of Service

f (https://www.facebook.com/ushealthdirect)   in (https://www.linkedin.com/company-beta/392297/)
✈ (https://twitter.com/ushealth_group)   ⓓ (https://www.instagram.com/ushealth_group/)

Exhibit 10

DOCUMENT FILED UNDER SEAL

Exhibit 11

DOCUMENT FILED UNDER SEAL

Exhibit 12

DOCUMENT FILED UNDER SEAL

Exhibit 13

DOCUMENT FILED UNDER SEAL

Exhibit 14

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | | |
|---|---|---|
| AARON HIRSCH, individually and on behalf of all others similarly situated, | § § § | |
| Plaintiff, | § § | |
| v. | § § | **Civil Action No.** 4:18-cv-245-Y |
| USHEALTH ADVISORS, LLC and USHEALTH GROUP, INC., | § § § | |
| Defendants. | § § § | |

## USHEALTH ADVISORS, LLC'S
## SUPPLEMENTAL OBJECTIONS AND RESPONSES TO PLAINTIFF'S
## FIRST OF REQUESTS FOR PRODUCTION OF DOCUMENTS TO DEFENDANTS

Defendant USHEALTH Advisors, LLC ("USHEALTH"), by and through undersigned counsel, hereby serves its Supplemental Responses and Objections to the First Requests for Production (the "Discovery Requests") propounded by Plaintiff AARON HIRSCH. The Supplemental Responses are made solely to the Discovery Requests that Plaintiff claims to be at issue in his Motion to Compel Production of Documents filed with the Court on October 1, 2018.

## GENERAL OBJECTIONS

**Paragraph No. 7 of the Definitions**: The term "Defendants" shall mean USHEALTH Advisors, LLC and USHEALTH Group, Inc. and any of their present or former corporate parents, subsidiaries, divisions, subdivisions, affiliates, predecessors, successors, joint ventures, board of directors or committees thereof, present and former officers, directors, employees, representatives, agents, and all other persons acting, purporting to act, or authorized

to act on behalf of any of them (other than attorneys), including without limitation, all marketers, consultants, investigators and advisors.

**Objection:** USHEALTH objects to the definition of "Defendants" because such definition impermissibly expands the common definition to include individuals and/or entities that are not specifically identified, are not parties in this case, and for whom USHEALTH has or may have no right to control, respond and no right to possess documents and items that may or may not be in the possession of such individuals or organizations. Further Defendant objects because such definition creates uncertainty as to which individual or entity is involved in the request or the response. USHEALTH responds to these requests only as to the entity, USHEALTH Advisors, LLC through its employees.

**Supplemental Objection**: USHEALTH reasserts the objection above and provides the following clarification: USHEALTH contracts with thousands of licensed insurance agents as independent contractors, and such independently contracted insurance agents make contact with interested persons for the purpose of presenting insurance related products, and some independent contractors pursue lawful telemarketing as one form of their sales strategy. USHEALTH has contracted with over **9,000** independent contractors since March 2014. To include every independent contractor, employee or third party acting on behalf of such independent contractors in the definition of Defendants would be unduly burdensome and impose a substantial expense, and in light of the irrelevance of the responsive information, this Definition is not proportional to the needs of the case. This case is centered on a call allegedly made by R.J. Martin, an independent contractor of USHEALTH. Mr. Martin apparently called on a lead concerning the plaintiff, which lead was apparently generated by an independent, third-party lead generator, with which USHEALTH has no relationship and has no authority or

control over.  The definition of "Defendants" should be limited to the named Defendants in this case, and the scope of the Discovery Requests should further be limited to information, documents, and/or communications related to the call placed by R.J. Martin.   Applying Plaintiff's espoused definition would force USHEALTH to go to each independent contractor one by one and request information that may not exist or that USHEALTH has no possession or control over.  It would also involve telephone calls and other information completely unrelated to the Plaintiff – after all, he, and his lawyers, are only permitted to explore his case and his facts – and whether there is a "class" of people that received the same telephone call from the same people (putting aside for the moment that the telephone calls were not violative of the TCPA). If Plaintiff's definitions stand, USHEALTH would need to search and/or recreate email inboxes for over **9,000** individual contractors, all but one of which have no relevance to this case.  This process could take more than a year.  This Definition causes all of the requests to be objectionable because they are overbroad, seek irrelevant information, are not proportional to the needs of the case, and would cause an undue burden on USHEALTH.

This case is only about consent-based, non-TCPA telephone calls allegedly made to Plaintiff by a single USHA independent insurance agent.  Thus, discovery from USHA will focus on the actual facts and issues in the case only.  Based upon this understanding, USHEALTH makes the following responses to Plaintiff's Requests for Production of Documents.

## SUPPLEMENTAL RESPONSES AND OBJECTIONS TO THE REQUESTS FOR PRODUCTION AT ISSUE IN PLAINTIFF'S MOTION TO COMPEL

**Request for Production No. 3:** All documents sufficient to identify Your employees, vendors and other contractors and agents that provided You with leads and/or consumer contact information for telemarketing using automatic telephone dialing systems, including without limitations ATDS, predictive dialers and systems using Artificial or Prerecorded Voice.

**Response:** Defendant objects to this request because it is overbroad so as to seek documents and information that are irrelevant and not reasonably calculated to lead to discovery of relevant or admissible evidence. Defendant further objects to this request because it is not sufficiently limited in time and scope. Defendant further objects to this request because it is not proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefits.

**Supplemental Response:** None, as the named Defendants do not conduct telemarketing and do not utilize an ATDS, predictive dialer, or system using Artificial or Prerecorded Voice.

**Request for Production No. 4:** All documents which identify on whose behalf Your agents purported to make telemarketing calls using automatic telephone dialing systems, including without limitations ATDS, predictive dialers and systems using Artificial or Prerecorded Voice. This includes whether the calls were purported to be made on behalf of USHEALTH Group Inc., Freedom Life Insurance Company of America, National Foundation Life Insurance Company or otherwise.

**Response:** Defendant objects to this request because it is overbroad so as to seek documents and information that are irrelevant and not reasonably calculated to lead to discovery of relevant or admissible evidence. Defendant further objects to this request because it is not sufficiently limited in time and scope. Defendant further objects to this request because it is not proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the

parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefits.

**Supplemental Response:** None, as the named Defendants do not conduct telemarketing and do not utilize an ATDS, predictive dialer, or system using Artificial or Prerecorded Voice. As explained previously, <u>USHEALTH contracts with thousands of independent contractors, also called independent insurance agents, who conduct their own marketing. Some may use lawful telemarketing, others do not</u>. Use of an ATDS or any telemarketing not allowed by law is prohibited by USHEALTH.

**Request for Production No. 5:** All scripts, conversation templates, matrices, flowcharts and all other similar documents that You used during telemarketing calls using automatic telephone dialing systems, including without limitations ATDS, predictive dialers and systems using Artificial or Prerecorded Voice.

**Response:** Defendant objects to this request because it is overbroad so as to seek documents and information that are irrelevant and not reasonably calculated to lead to discovery of relevant or admissible evidence. Defendant further objects to this request because it is not sufficiently limited in time and scope. Defendant further objects to this request because it is not proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefits.

**Supplemental Response:** None, as the named Defendants do not conduct telemarketing and do not utilize an ATDS, predictive dialer, or system using Artificial or Prerecorded Voice.

**Request for Production No. 7:** Documents sufficient to identify the total number of telephone calls You made for telemarketing purposes for telephone numbers that were listed on the National Do Not Call Registry.

**Response:** Defendant objects to this request because it is overbroad so as to seek documents and information that are irrelevant and not reasonably calculated to lead to discovery of relevant or admissible evidence. Defendant further objects to this request because it is not sufficiently limited in time and scope. Defendant further objects to this request because it is not proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefits. Subject to and without waiving the foregoing objections, USHEALTH has no documents within this request.

**Supplemental Response:** Generally none, as the named Defendants do not conduct telemarketing and do not maintain records for third party independent contractors who do conduct telemarketing. However, while investigating the claims of this case, USHEALTH was able to obtain one call record from independent insurance agent R.J. Martin, which has been produced to Plaintiff (USHEALTH_000001). USHEALTH was also able to obtain a recording of a call made by a third-party lead generator to Plaintiff where Plaintiff consented to receive the call identified in USHEALTH 000013. Additional records of any telephone numbers called by Mr. Martin, if any, are likely within the possession and control of Mr. Martin and/or the third-party lead generator. As to parties who are not the named Defendants, USHEALTH further objects to such request as vague, overbroad, irrelevant, not proportional and unduly burdensome. Plaintiff does not define "Agent" in the Discovery Requests, and was unwilling to

narrow the definition of Defendants or establish an acceptable definition of "Agent" during the meet and confer.   As explained previously, USHEALTH contracts with thousands of independent contractors, also called independent sales agents, who conduct their own marketing.  Some use the telephone, others do not.  Use of an ATDS or any telemarketing not allowed by law is prohibited by USHEALTH.   This request seeks irrelevant information because it is not limited to the call campaign at issue in this case, is overbroad because it seeks documents from third parties over whom the named Defendants have no authority or control, and is otherwise not proportional to the need of the case.

**Request for Production No. 8:** Documents sufficient to identify the telephone numbers You called for telemarketing purposes that were listed on the National Do Not Call Registry.

**Response:** Defendant objects to this request because it is overbroad so as to seek documents and information that are irrelevant and not reasonably calculated to lead to discovery of relevant or admissible evidence. Defendant further objects to this request because it is not sufficiently limited in time and scope. Defendant further objects to this request because it is not proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefits. Subject to and without waiving the foregoing objections, USHEALTH has no documents within this request.

**Supplemental Response:**  See Response to Request No. 7 above.

**Request for Production No. 13:** All organizational charts of Defendants, including but not limited to charts of employees, and charts of related companies and businesses.

**Response:** USHEALTH objects because this request is not limited as to time and scope.

**Supplemental Response:** USHEALTH has produced the only organizational chart that it has in its supplemental production accompanying these supplemental responses. (USHEALTH_000014)

**Request for Production No. 14:** All communications between Defendants concerning telemarketing, including but not limited to equipment used for telemarketing.

**Response:** Defendant objects to this request because it is overbroad so as to seek documents and information that are irrelevant and not reasonably calculated to lead to discovery of relevant or admissible evidence. Defendant further objects to this request because it is not sufficiently limited in time and scope. Defendant further objects to this request because it is not proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefits. Defendant objects because this request is not tailored to exclude portions of investigations constituting attorney-client communications, work product and joint defense materials. Accordingly, this request would require Defendant to respond with unduly burdensome claims of privileges and exemptions from discovery, including without limitation, the attorney-client communication privilege, the investigation exemption, the work product exemptions from discovery, along with the joint defense privilege. Defendant serves notice of claims of all of these privileges and exemptions from discovery.

**Supplemental Response:**  USHEALTH maintains the above objection, and incorporates the clarified objection to the definition of "Defendants" as stated above.  The request is also objectionable in that it seeks "all documents" and is not limited in time, scope or subject matter.  In addition, this case is only about the call that Plaintiff received and the associated form of marketing conducted by Mr. Martin that may have reached more people aside from Plaintiff.  But Plaintiff's discovery is not limited in that regard and thus is not proportional to the needs of the case.  Further, USHEALTH does not telemarket and does not use an ATDS.  After the claims at issue were filed, USHEALTH conducted an internal investigation with its corporate counsel, the communications of which are privileged.  All non-privileged documents, if any, have been produced.

**Request for Production No. 15:**  All agreements, contracts, policies and communications between Defendants and between either Defendant and any non-party vendor, contractors, and/or agents that generate, locate, or otherwise provide You with leads and/or consumer contact information from any state or federal website, including but not limited to websites offering health insurance policies pursuant to The Patient Protection and Affordable Care Act (commonly known as Obamacare).

**Response:**  Defendant objects to this request because it is overbroad so as to seek documents and information that are irrelevant and not reasonably calculated to lead to discovery of relevant or admissible evidence.  Defendant objects to this request because it is not sufficiently limited in time and scope.  Defendant further objects to this request because it is not proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the

burden or expense of the proposed discovery outweighs its likely benefits.  Defendant objects because this request seeks information that is confidential, proprietary, and that may put it at a competitive disadvantage if disclosed or mishandled.  Without a confidentiality agreement or a protective order from the Court to protect the confidentiality of this information, Defendant objects and respectfully declines to produce the requested confidential documents or items.

**Supplemental Response:**  None, as the named Defendants do not conduct telemarketing and do not maintain records for third party independent contractors who do conduct telemarketing.  Records concerning Mr. Martin's telemarketing campaign, if they exist, are within the possession of Mr. Martin and/or the third party lead generator.  To the extent this request calls for independent contractor agreements with USHEALTH's independent sales agents, USHEALTH maintains that this request is unduly burdensome as it would require searching for documents corresponding to over **9,000** independent contractors.  USHEALTH further objects to this request as irrelevant and not proportional to the needs of the case because only one independent contractor, R.J. Martin, was responsible for the calls alleged in Plaintiff's Complaint.  What USHEALTH's other independent contractors do, and USHEALTH's business relationships with these thousands of independent contractors, are irrelevant to this case.  The USHEALTH Advisors Agent Agreement for R.J. Martin ("Agreement") has been produced and explains the relationship among USHEALTH and Mr. Martin.  (USHEALTH_000334-000348).  Similar agreements exist with respect to anyone who desires to set up an independent insurance agency.  An exemplar copy has also been produced.  (USHEALTH_000094-000110).

**Request for Production No. 16:**  All agreements, contracts, policies and communications between Defendants and between either Defendant and any non-party vendor that provided You with leads or consumer contact information, which You used for

telemarketing calls made to cellular telephones using automatic telephone dialing systems, including without limitations ATDS, predictive dialers and systems using Artificial or Prerecorded Voice.

**Response:** Defendant objects to this request because it is overbroad so as to seek documents and information that are irrelevant and not reasonably calculated to lead to discovery of relevant or admissible evidence. Defendant further objects to this request because it is not sufficiently limited in time and scope. Defendant further objects to this request because it is not proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefits. Defendant objects because this request seeks information that is confidential, proprietary, and that may put it at a competitive disadvantage if disclosed or mishandled. Without a confidentiality agreement or a protective order from the Court to protect the confidentiality of this information, Defendant objects and respectfully declines to produce the requested confidential documents or items.

**Supplemental Response:** None, as the named Defendants do not conduct telemarketing, do not use an ATDS, and do not maintain records for third party independent contractors who do conduct telemarketing.

**Request for Production No. 21:** All documents concerning investigations and reviews, including without limitation by any independent auditor, law firm or governmental agency, regarding Your compliance with any federal or state laws or regulations regarding telemarketing or telephone calls.

**Response:**  Defendant objects to this request because it is overbroad so as to seek documents and information that are irrelevant and not reasonably calculated to lead to discovery of relevant or admissible evidence.   Defendant objects to this request because it is not sufficiently limited in time and scope.  Defendant further objects to this request because it is not proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefits. Defendant objects because this request is not tailored to exclude portions of investigations constituting attorney-client communications.  Accordingly, this request would require Defendant to respond with unduly burdensome claims of privileges and exemptions from discovery, including without limitation, the attorney-client communication privilege, the investigation exemption, and the work product exemptions from discovery.  Defendant serves notice of claims of all of these privileges and exemptions from discovery.   Subject to and without waiving the foregoing objections, USHEALTH has no non-privileged documents within this request.

**Supplemental Response:**   USHEALTH contracts with licensed insurance agents as independent contractors, and such independently contracted insurance agents make contact with interested persons for the purpose of presenting insurance related products, and some independent contractors inevitably receive consumer complaints regarding marketing and may maintain employees who handle such complaints.  To identify every independent contractor or employee thereof who has ever been involved in addressing consumer complaints would be unduly burdensome and impose a substantial expense, and in light of the irrelevance of the responsive information, this request is not proportional to the needs of the case.

USHEALTH will produce the documents that reflect TCPA complaints (formal or informal) it is aware of for the time period of March 2014 through the present, along with the responses made by USHEALTH to those complaints. (USHEALTH_000121-000333). USHEALTH refers Plaintiff to those documents for the identities of any USHEALTH personnel involved.

As drafted, however, this Request encompasses the entirety of USHEALTH's personnel and independent agents. The term "Defendant" is defined by Plaintiff to essentially include anyone and every entity which has ever purported to act with or on behalf of USHEALTH. In addition, the "relevant time period" of Plaintiff's Discovery Requests is from March 2014 to the present. USHEALTH had over **9,000** independent insurance agents during "the relevant time period", and USHEALTH does not have any capability to search generally across all of its independent insurance agents. Rather, USHEALTH would have to go agent to agent to even begin to look for potentially responsive documents; this would include having to reconstruct independent agent mailboxes as well.

Thus, anything beyond the information already produced would have little to no relationship to the claims or defenses in this case and, for a variety of reasons, this request seeks information that is not proportional to the needs of this case, which alleges the involvement of only a single independent contractor, R.J. Martin.

**Request for Production No. 22:** All documents concerning any complaint, criticism or claim made against You involving the use of telemarketing, telephone calls or violation of any of federal or state laws or regulations concerning telephone calls.

**Response:** USHEALTH objects to this request because it is overbroad so as to seek documents and information that are irrelevant and not reasonably calculated to lead to

discovery of relevant or admissible evidence.  Defendant objects to this request because it is not sufficiently limited in time and scope.  Defendant further objects to this request because it is not proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefits. Defendant further objects to this request because it is vague and lacks specificity to enable this Defendant to understand specifically what documents, items or files are requested so that a search can be made, appropriate objections can be made and claims of privilege from discovery may be perfected. Defendant objects because this request is not tailored to exclude portions of investigations constituting attorney-client communications.   Accordingly, this request would require Defendant to respond with unduly burdensome claims of privileges and exemptions from discovery, including without limitation, the attorney-client communication privilege, the investigation exemption, and the work product exemptions from discovery. Defendant serves notice of claims of all of these privileges and exemptions from discovery.

**Supplemental Response:**   See USHEALTH's Supplemental Response to Request Number 21.

**Request for Production No. 23:** To the extent not already produced, all documents concerning Plaintiff.

**Response:** Defendant objects to this request because it is vague and lacks specificity to enable this Defendant to understand what documents, items or files are requested so that a search can be made, appropriate objections can be made and claims of privilege from discovery may be perfected.   Subject to and without waiving the foregoing objection, USHEALTH

produces with this response an audio recording with Bates numbers USHEALTH_00001 and

USHEALTH_00013.

 **Supplemental Response:**   USHEALTH has provided all documents in its possession

regarding Plaintiff.

Dated: October 29, 2018                                  Respectfully submitted,

                                             */s/Jeffrey A. Backman*
                                             JEFFREY A. BACKMAN
                                             Florida Bar No. 662501
                                             jeffrey.backman@gmlaw.com
                                             khia.joseph@gmlaw.com
                                             **Greenspoon Marder, LLP**
                                             200 East Broward Blvd., Suite 1800
                                             Fort Lauderdale, FL  33301
                                             Tel:  (954) 491-1120; Fax: (954) 213-0140

                                             Daniel L. Bates
                                             State Bar No. 01899900
                                             dbates@deckerjones.com
                                             **DECKER JONES, P.C.**
                                             801 Cherry Street, Unit #46
                                             Burnett Plaza, Suite 2000
                                             Fort Worth, Texas 76102
                                             (817) 336-2400
                                             (817) 336-2181 (Fax)

                                             **ATTORNEYS FOR DEFENDANTS,**
                                             *USHEALTH ADVISORS, LLC and*
                                             *USHEALTH GROUP, INC.*

## CERTIFICATE OF SERVICE

I hereby certify that on October 29, 2018, a true and correct copy of the foregoing document was forwarded to counsel of record in accordance with the Federal Rules of Civil Procedure, via U.S. Mail and electronic mail, as follows:

Warren T. Burns
Daniel Charest
**BURNS CHAREST LLP**
900 Jackson Street, Suite 500
Dallas, TX 75202
wburns@burnscharest.com
dcharest@burnscharest.com

Max F. Maccoby
**Washington Global Law Group, PLLC**
1701 Pennsylvania Ave NW, Ste 200
Washington DC 20006
maccoby@washglobal-law.com

Michael Dell'Angelo
Arthur Stock
Lane L. Vines
**BERGER & MONTAGUE, P.C.**
1622 Locust Street
Philadelphia, PA 19103
mdellangelo@bm.net
lvines@bm.net

Thomas Bick
**BUTZEL LONG, P.C.**
1909 K Street, NW, Suite 500
Washington, D.C. 20006
maccoby@butzel.com
bick@butzel.com

*/s/Jeffrey A. Backman*
JEFFREY A. BACKMAN

Exhibit 15

 **Gmail**

Aaron Hirsch <awhirsch@gmail.com>

---

## National Do Not Call Registry - Your Registration Is Confirmed
1 message

---

**Verify@donotcall.gov** <Verify@donotcall.gov>
To: aaron@aaronhirsch.com

Mon, Feb 24, 2020 at 5:40 PM

Thank you for registering your phone number with the National Do Not Call Registry. You successfully registered your phone number ending in 8313 on June 30, 2003. Most telemarketers will be required to stop calling you 31 days from your registration date.

Visit https://www.donotcall.gov  to register another number or file a complaint against someone violating the Registry.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Please do not reply to this message as it is from an unattended mailbox. Any replies to this email will not be responded to or forwarded. This service is used for outgoing emails only and cannot respond to inquiries.

AH000260

Motion for Class Cert App. 0298

Exhibit 16

| Date | Time | Phone | Caller |
|---|---|---|---|
| *6/30/2003* | | | *Hirsch registers his phone number on National Do Not Call Registry* AH000260 (NDNC confirmatory email) |
| 11/10/2017 | 11:29 a.m. | 443-328-4533 | Dosys ("Denise Moore") USHEALTH_000013, GP000033 (audio) AH000127 (phone bill) AH000103 (call log spreadsheet) |
| 11/13/2017 | 9:59 a.m. | 813-300-2446 | RJ Martin USHEALTH_000001, RJM 000065 (Velocify screen shots) AH000127 (phone bill) AH000103 (call log spreadsheet) |
| *11/13/2017* | | | *Hirsch requested "do not call" and his phone number is listed on Velocify as "Do Not Call"* -- USHEALTH_000001, RJM 000065 (Velocify screen shots), AH000103 (call log spreadsheet) |
| 12/1/2017 | 10:19 a.m. | 443-328-4533 | Jim White AH000140 (phone bill) AH000103 (call log spreadsheet) |
| *12/1/2017* | | | *Hirsch requested "do not call"* -- AH000103 (call log spreadsheet) |
| *4/11/2018* | | | *Hirsch serves initial Class Action Complaint (Dkt. 1)* |
| *4/25/2018* | | | *Hirsch's phone number is again listed on Velocify as "Do Not Call"* USHEALTH_000001, RJM 000065 (Velocify screen shots) |
| 5/15/2018 | 10:14 a.m. | 410-635-1449 | Dosys (JL000001-2) AH000037 (phone bill) AH000103 (call log spreadsheet) |
| 5/16/2018 | 3:55 p.m. | 202-759-3068 | Jacquelyn Levine JL000001-2 (email), AH000037 (phone bill) AH000103 (call log spreadsheet) |
| *5/16/2018* | | | *Hirsch requested "do not call"* -- AH000103 (call log spreadsheet) |
| *7/13/2018* | | | *Hirsch's Phone Number is entered on USHealth's IDNC* USHEALTH Internal Do Not Call spreadsheet |
| 7/14/2018 | 2:11 p.m. | 240-233-4757 | Dosys (JL000003-4) AH000061 (phone bill) AH000103 (call log spreadsheet) |
| 7/16/2018 | 2:54 p.m. | 817-406-9546 | Jacquelyn Levine (JL000003-4) AH000073 (phone bill) AH000103 (call log spreadsheet) |

| Date | Time | Phone | Caller |
|------|------|-------|--------|
| 8/13/2018 (text) | 1:33 p.m. | 937-418-7341 | Devin Cahill<br>AH000261 (text)<br>AH000103 (call log spreadsheet) |
| 8/13/2018 (text) | 1:39 p.m. | 937-418-7341 | Devin Cahill<br>AH000261 (text)<br>AH000103 (call log spreadsheet) |
| *8/13/2018 (text)* | *Hirsch texted Devin Cahill to request that he be put on IDNC* AH000261 (text) | | |
| 8/13/2018 (text) | 2:25 p.m. | 937-418-7341 | Devin Cahill<br>AH000262 (text)<br>AH000103 (call log spreadsheet) |
| 10/18/2018 (text) | 3:18 p.m. | 727-270-0538 | Gretchen Kennett<br>GP000031-32 (text), GK000032 (text)<br>AH000263-264 (text)<br>AH000103 (call log spreadsheet) |
| 11/8/2018 | 12:25 p.m. | 410-221-3099 | Dosys "in Maryland" ("John Smith")<br>USHEALTH_000353 (audio)<br>GP000034 (audio), AH000093 (phone bill)<br>AH000103 (call log spreadsheet) |
| 11/8/2018 | 12:47 p.m. | 817-406-9542 | Mike Pope<br>AH000061 (phone bill)<br>AH000103 (call log spreadsheet) |
| *11/8/2018* | *Hirsch requested "do not call"* -- AH000103 (call log spreadsheet) | | |
| 11/14/2018 | 9:56 a.m. | --- | Brianna Goff<br>VANILLASOFT000026-27 (call log spreadsheet) |
| *11/14/2018* | *Hirsch requested "do not call"* VANILLASOFT000026-27 (call log spreadsheet) | | |
| *2/5/2019* | *Aaron Hirsch is listed on VanillaSoft as "DO NOT CALL"* GK000031, JL000084 (VanillaSoft screen shot) | | |
| *2/26/2019* | *Hirsch files Amended Class Action Complaint* Dkt. 42, filed in No. 18-cv-245-P (N.D. Tex.) | | |
| 3/2/2019 | 11:39 a.m. | 410-774-0575 | David Miller (name may be alias and call may have been placed by Dosys)<br>AH000109 (phone bill)<br>AH000103 (call log spreadsheet) |
| 3/2/2019 | *Hirsch requested "do not call"* -- AH000103 (call log spreadsheet) | | |

SUPPORTING DOCUMENTS FILED UNDER SEAL

Exhibit 17

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | |
|---|---|
| AARON HIRSCH, individually and on behalf of all others similarly situated,<br><br>    Plaintiff,<br><br>v.<br><br>USHEALTH ADVISORS, LLC and USHEALTH GROUP, INC.,<br><br>    Defendants. | Civil Action No. 4:18-cv-245-P |

## <u>DECLARATION OF AARON HIRSCH</u>

I, Aaron Hirsch, declare as follows:

1. <u>I am over 18 years old, have personal knowledge of the facts stated herein, and can testify competently thereto if called upon to do so.</u>

2. <u>I am the named Plaintiff in the above-captioned litigation, and I seek appointment by the Court to serve as the class representative of the Class of consumers proposed in Plaintiff's Motion for Class Certification. I provide this Declaration in support of that appointment and that Motion.</u>

3. <u>I am a residential property developer in the Washington, D.C. area who has worked in that field for about twenty-one years. I have developed 85 residences. I also manage several rental properties that I own, including a seven-unit micro-unit apartment building located in Washington, D.C. I earned a Bachelor of Business Administration from the University of Wisconsin-Madison and a Masters degree in International Relations from the Johns Hopkins University School of Advanced International Studies.</u>

4.   My phone number ending in 8313 is a cellular number and serves as my residential line in that I used it as my primary telephone number for receiving personal and residential calls, and to make and receive calls at my residence.

5.   During the entire class period of March 29, 2014 to the present, I have only used my 8313 cellular number as my residential line. When I call friends and family, I only call them from that cellular number. When I make personal calls of any other kind, I only make calls from that cellular number.

6.   I registered my 8313 cellular number on June 30, 2003 on the National Do Not Call ("NDNC") Registry.

7.   In the past ten years, I have been extremely annoyed by the wasted time and invasion of privacy caused by the ever-increasing number of telemarketing calls to my 8313 cellular number, which ignore the fact that my cellular number has been registered on the NDNC Registry since 2003. I finally became so fed up by these telemarketing calls despite my NDNC registration, and I reached out to Max Maccoby, who is my neighbor and an attorney, for legal advice and help to stop the calls.

8.   I then researched on my own to learn about the TCPA (Telephone Consumer Protection Act) and the class action process before deciding how I would proceed.

9.   After that, I decided to take notes of the unwanted and harassing phone calls I was receiving.

10. On November 10, 2017, I received a call from someone marketing health insurance products. The telemarketer asked if an insurance agent could call me to further discuss those products. The telemarketer was cagey and evasive, and I agreed to another call so that I could find out who was calling me.

2

11. In the follow up call on November 13, 2017, a USHealth agent named R.J. Martin attempted to sell me individual health insurance. I asked him to put me on USHealth's internal-do-not-call list ("IDNC"), and he stated he would do so.

12. I have never had any business relationship with USHealth. I did not need to purchase health insurance and had no interest in hearing USHealth's sales pitch.

13. On December 1, 2017, a USHealth agent who identified himself as Jim White called me to sell me health insurance. I asked him to put me on the USHealth IDNC, and he said he would put me on the USHealth IDNC.

14. On March 29, 2018, I brought a class action against USHealth for these three calls.

15. Prior to filing this lawsuit, I decided to file my individual claims and claims on behalf of other consumers like me who were receiving unwanted calls from USHealth.

16. In doing so, I agreed to act as a class representative for those other consumers, in that I understood it means that I must act in the best interests of the Class as a whole in this litigation and not to put my individual interests first. I also understood that I would be responsible for overseeing my counsel's prosecution of this action and that I would fully participate and support the prosecution by answering discovery, producing responsive documents, travelling to Fort Worth to give deposition testimony and to attend and testify at trial, keeping informed of the progress of the case, and consulting with my attorneys regarding the progress in the case and decisions about how to conduct the litigation, including settlement.

17. As this case has progressed, no conflicts of interest have arisen between me and the proposed Class. On the contrary, my interests are totally aligned with the proposed Class in seeking the successful prosecution of this case.

18. Before and throughout this litigation, I have taken all steps reasonable and necessary to preserve and produce responsive documents to USHealth in this litigation, which to date has totaled 277 pages of responsive documents.

19. I have answered eleven discovery requests, including three sets of interrogatories (some 23 interrogatories); three sets of requests for admission (some 46 requests), and five sets of document requests (some 83 requests). I have had to amend my interrogatory answers asking about USHealth's telemarketing calls five times solely because its agents kept calling me during the pendency of this action.

20. On January 14, 2019, I traveled to Fort Worth, Texas, and sat for an all-day deposition and answered all questions asked by USHealth's counsel. In 2019 and 2020, I have spent three days participating by telephone in mediation sessions in this case. In fact, I have spent over 200 hours working on this case on behalf of the Class. I have carefully studied the pleadings as this case has progressed, and I am prepared to continue to work just as hard as I have worked to reach a successful result for the Class. I intend to participate in a jury trial if need be.

21. Incredibly, after I filed this action, USHealth continued to call me, including at least 12 more times trying to sell me insurance.

22. On May 15, 2018, I received a call from someone marketing health insurance products. Again, the telemarketer was very cagey and would not tell me on whose behalf he was calling, so I agreed to a follow up call to find out who was calling me. In the follow up call on May 16, 2018, a USHealth tried to sell me individual health insurance. I asked her to put me on USHealth IDNC, and she said she would put me on the USHealth IDNC.

4

23. The same thing happened two months later. On July 14, 2018, I received a call from someone marketing health insurance products. Again, the telemarketer was very cagey and would not tell me on whose behalf he was calling, so I agreed to a follow up call to find out who was calling me. In the follow up call on July 16, 2018, a USHealth agent tried to sell me individual health insurance. I asked her to put me on USHealth IDNC, and she said she would put me on the USHealth IDNC. The USHealth agent identified herself as Jacqueline Levine. I have since learned it was the same USHealth agent, Jacqueline Levine, that called me on May 16, 2018. As I stated above, during the May 16, 2018 call, I had asked Ms. Levine to put me on USHealth IDNC, and she said she would put me on the USHealth IDNC.

24. On August 13, 2018, a USHealth agent named Devin Cahill texted me to sell me health insurance. I asked him to put me on the USHealth IDNC, and he said he would put me on the USHealth IDNC. Mr. Cahill texted me three times that day. This was followed on October 18, 2018, when another USHealth agent, Gretchen Kennett, again texted me trying to sell health insurance.

25. On November 8, 2018, I again received a scheduling call from someone marketing health insurance products. After the telemarketer would not tell me on whose behalf he was calling, I agreed to a follow up call later that same day to find out who was calling me. In the follow up call that day, a USHealth agent named Mike Pope called to sell me health insurance. I asked him to put me on the USHealth IDNC.

26. According to documents recently produced by USHealth's vendor, I have learned that on November 14, 2018, yet another USHealth agent, Brianna Goff, called to sell me health insurance and I asked her to be put me on the USHealth IDNC.

5

27. Finally, on March 2, 2019, a USHealth agent named David Miller called me to sell me health insurance. I asked him to put me on the USHealth IDNC, and he said he would put me on the USHealth IDNC. Since that day, I am unaware of having received any additional telemarketing calls from USHealth.

28. Telemarketing calls from USHealth have wasted my time. They are intrusive, harassing, unwanted, and simply an invasion of my privacy. These calls are particularly obnoxious as I long ago registered my 8313 cellular number on the NDNC and have repeatedly asked the USHealth telemarketers to stop calling me.

29. I would like to see USHealth implement a policy, and some form of control, to stop making calls to consumers who have advised that they do not want to be called, especially where they have registered on the NDNC or have asked to be put on the IDNC.

30. I support the request to the Court to certify this litigation as a class action, and I fully support the appointment of Berger Montague PC as class counsel and respectfully request appointment to serve as the class representative.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed on April 30, 2020

Aaron Hirsch

6

Exhibit 18



1818 Market Street | Suite 3600 | Philadelphia, PA 19103
info@bm.net
bergermontague.com
800-424-6690

### About Berger Montague

Berger Montague is a full-spectrum class action and complex civil litigation firm, with nationally known attorneys highly sought after for their legal skills. The firm has been recognized by courts throughout the country for its ability and experience in handling major complex litigation, particularly in the fields of antitrust, securities, mass torts, civil and human rights, whistleblower cases, employment, and consumer litigation.  In numerous precedent-setting cases, the firm has played a principal or lead role.

The *National Law Journal*, which recognizes a select group of law firms each year that have done "exemplary, cutting-edge work on the plaintiffs' side," has selected Berger Montague in 12 out of 14 years (2003-2005, 2007-2013, 2015-2016) for its "Hot List" of top plaintiffs' oriented litigation firms in the United States. From 2018-2020, the *National Law Journal* recognized Berger Montague as "Elite Trial Lawyers" after reviewing more than 300 submissions for this award. The firm has also achieved the highest possible rating by its peers and opponents as reported in *Martindale-Hubbell* and was ranked as a 2020 "Best Law Firm" by *U.S. News - Best Lawyers*.

Currently, the firm consists of 66 lawyers; 26 paralegals; and an experienced support staff.  Few firms in the United States have our breadth of practice and match our successful track record in such a broad array of complex litigation.

### History of the Firm

Berger Montague was founded in 1970 by the late David Berger to concentrate on the representation of plaintiffs in a series of antitrust class actions.  David Berger helped pioneer the use of class actions in antitrust litigation and was instrumental in extending the use of the class action procedure to other litigation areas, including securities, employment discrimination, civil and human rights, and mass torts.  The firm's complement of nationally recognized lawyers has represented both plaintiffs and defendants in these and other areas and has recovered billions of dollars for its clients.  In complex litigation, particularly in areas of class action litigation, Berger Montague has established new law and forged the path for recovery.

The firm has been involved in a series of notable cases, some of them among the most important in the last 50 years of civil litigation.  For example, the firm was one of the principal counsel for

1

plaintiffs in the *Drexel Burnham Lambert/Michael Milken* securities and bankruptcy litigation. Claimants in these cases recovered approximately $2 billion in the aftermath of the collapse of the junk bond market and the bankruptcy of *Drexel* in the late 1980's. The firm was also among the principal trial counsel in the *Exxon Valdez Oil Spill* litigation in Anchorage, Alaska, a trial resulting in a record jury award of $5 billion against Exxon, later reduced by the U.S. Supreme Court to $507.5 million. Berger Montague was lead counsel in the *School Asbestos Litigation*, in which a national class of secondary and elementary schools recovered in excess of $200 million to defray the costs of asbestos abatement. The case was the first mass tort property damage class action certified on a national basis. Berger Montague was also lead/liaison counsel in the *Three Mile Island Litigation* arising out of a serious nuclear incident.

Additionally, in the human rights area, the firm, through its membership on the executive committee in the *Holocaust Victim Assets Litigation*, helped to achieve a $1.25 billion settlement with the largest Swiss banks on behalf of victims of Nazi aggression whose deposits were not returned after the Second World War. The firm also played an instrumental role in bringing about a $4.37 billion settlement with German industry and government for the use of slave and forced labor during the Holocaust.

## Practice Areas and Case Profiles

**Antitrust**
In antitrust litigation, the firm has served as lead, co-lead or co-trial counsel on many of the most significant civil antitrust cases over the last 50 years, including *In re Corrugated Container Antitrust Litigation* (recovery in excess of $366 million), the *Infant Formula* case (recovery of $125 million), the *Brand Name Prescription Drug* price-fixing case (settlement of more than $700 million), the *State of Connecticut Tobacco Litigation* (settlement of $3.6 billion), the *Graphite Electrodes Antitrust Litigation* (settlement of more than $134 million), and the *High-Fructose Corn Syrup Litigation* ($531 million).

> Once again, Berger Montague has been selected by *Chambers and Partners* for its 2019 *Chambers USA* Guide as one of Pennsylvania's top antitrust firms. *Chambers USA 2019* states that Berger Montague's antitrust practice group is "a preeminent force in the Pennsylvania antitrust market, offering expert counsel to clients from a broad range of industries."
>
> The *Legal 500*, a guide to worldwide legal services providers, ranked Berger Montague as a Top-Tier Law Firm for Antitrust: Civil Litigation/Class Actions: Plaintiff in the United States in its 2019 guide and states that Berger Montague's antitrust department "has acted as lead counsel or co-lead counsel in antitrust cases of the utmost complexity and significance since its inception in 1970."

Motion for Class Cert App. 0342

- ***In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation:*** Berger Montague served as co-lead counsel for a national class including millions of merchants in the *Payment Card Interchange Fee and Merchant Discount Antitrust Litigation* against Visa, MasterCard, and several of the largest banks in the U.S. (*e.g.*, Chase, Bank of America, and Citi). The lawsuit alleged that merchants paid excessive fees to accept Visa and MasterCard cards because the payment cards, individually and together with their respective member banks, violated the antitrust laws. The challenged conduct included, *inter alia*, the collective fixing of interchange fees and adoption of rules that hindered any competitive pressure by merchants to reduce those fees. The lawsuit further alleged that defendants maintained their conspiracy even after both Visa and MasterCard changed their corporate forms from joint ventures owned by member banks to publicly-owned corporations following commencement of this litigation. On September 18, 2018, after thirteen years of hard-fought litigation, Visa and MasterCard agreed to pay as much as approximately $6.26 billion, but no less than approximately $5.56 billion, to settle the case. This result is the largest-ever class action settlement of an antitrust case. The settlement received preliminary approval on January 24, 2019. The settlement received final approval on December 16, 2019, for approximately $5.6 billion.

- ***In re Dental Supplies Antitrust Litigation:*** Berger Montague served as co-lead counsel for a class of dental practices and dental laboratories in *In re Dental Supplies Antitrust Litigation*, a suit brought against Henry Schein, Inc., Patterson Companies, Inc., and Benco Dental Supply Company, the three largest distributors of dental supplies in the United States. On September 7, 2018, co-lead counsel announced that they agreed with defendants to settle on a classwide basis for $80 million. The settlement received final approval on June 24, 2019. The suit alleged that the defendants, who collectively control close to 90 percent of the dental supplies and equipment distribution market, conspired to restrain trade and fix prices at anticompetitive levels, in violation of the Sherman Act. In furtherance of the alleged conspiracy, plaintiffs claimed that the defendants colluded to boycott and pressure dental manufacturers, dental distributors, and state dental associations that did business with or considered doing business with the defendants' lower-priced rivals. The suit claimed that, because of the defendants' anticompetitive conduct, members of the class were overcharged on dental supplies and equipment. In the 2019 Fairness Hearing, Judge Brian M. Cogan of the U.S. District Court for the Eastern District of New York said: "This is a substantial recovery that has the deterrent effect that class actions are supposed to have, and I think it was done because we had really good Plaintiffs' lawyers in this case who were running it."

- ***In re Domestic Drywall Antitrust Litigation:*** Berger Montague served as co-lead counsel on behalf of a class of direct purchasers of drywall, in a case alleging that the dominant manufacturers of drywall engaged in a conspiracy to fix drywall prices in the U.S. and to abolish the industry's long-standing practice of limiting price increases for the duration of a construction project through "job quotes." Berger Montague represented a class of direct purchasers of drywall from defendants for the period from January 1, 2012

3

to January 31, 2013. USG Corporation and United States Gypsum Company (collectively, "USG"), New NGC, Inc., Lafarge North America Inc., Eagle Materials, Inc., American Gypsum Company LLC, TIN Inc. d/b/a Temple-Inland Inc., and PABCO Building Products, LLC were named as defendants in this action. On August 20, 2015, the district court granted final approval of two settlements—one with USG and the other with TIN Inc.— totaling $44.5 million. On December 8, 2016, the district court granted final approval of a $21.2 million settlement with Lafarge North America, Inc. On February 18, 2016, the district court denied the motions for summary judgment filed by American Gypsum Company, New NGC, Inc., Lafarge North America, Inc., and PABCO Building Products. On August 23, 2017, the district court granted direct purchaser plaintiffs' motion for class certification. On January 29, 2018, the district court granted preliminary approval of a joint settlement with the remaining defendants, New NGC, Inc., Eagle Materials, Inc., American Gypsum Company LLC, and PABCO Building Products, LLC, for $125 million. The settlement received final approval on July 17, 2018, bringing the total amount of settlements for the class to $190.7 million.

- ***In re Currency Conversion Fee Antitrust Litigation:*** Berger Montague, as one of two co-lead counsel, spearheaded a class action lawsuit alleging that the major credit cards had conspired to fix prices for foreign currency conversion fees imposed on credit card transactions.  After eight years of litigation, a settlement of $336 million was approved in October 2009, with a Final Judgment entered in November 2009.  Following the resolution of eleven appeals, the District Court, on October 5, 2011, directed distribution of the settlement funds to more than 10 million timely filed claimants, among the largest class of claimants in an antitrust consumer class action.  A subsequent settlement with American Express increased the settlement amount to $386 million.  (MDL No. 1409 (S.D.N.Y)).

- ***In re Marchbanks Truck Service Inc., et al. v. Comdata Network, Inc.:*** Berger Montague was co-lead counsel in this antitrust class action brought on behalf of a class of thousands of Independent Truck Stops.  The lawsuit alleged that defendant Comdata Network, Inc. had monopolized the market for specialized Fleet Cards used by long-haul truckers. Comdata imposed anticompetitive provisions in its agreements with Independent Truck Stops that artificially inflated the fees Independents paid when accepting the Comdata's Fleet Card for payment.  These contractual provisions, commonly referred to as anti-steering provisions or merchant restraints, barred Independents from taking various competitive steps that could have been used to steer fleets to rival payment cards. The settlement for $130 million and valuable prospective relief was preliminary approved on March 17, 2014, and finally approved on July 14, 2014. In its July 14, 2014 order approving Class Counsel's fee request, entered contemporaneously with its order finally approving the settlement, the Court described this outcome as "substantial, both in absolute terms, and when assessed in light of the risks of establishing liability and damages in this case."

- ***Ross, et al. v. Bank of America (USA) N.A., et al.:*** Berger Montague, as lead counsel for the cardholder classes, obtained final approval of settlements reached with Chase,

4

Bank of America, Capital One and HSBC, on claims that the defendant banks unlawfully acted in concert to require cardholders to arbitrate disputes, including debt collections, and to preclude cardholders from participating in any class actions. The case was brought for injunctive relief only. The settlements remove arbitration clauses nationwide for 3.5 years from the so-called "cardholder agreements" for over 100 million credit card holders. This victory for consumers and small businesses came after nearly five years of hard-fought litigation, including obtaining a decision by the Court of Appeals reversing the order dismissing the case, and will aid consumers and small businesses in their ability to resist unfair and abusive credit card practices. In June 2009, the National Arbitration Forum (or "NAF") was added as a defendant. Berger Montague also reached a settlement with NAF. Under that agreement, NAF ceased administering arbitration proceedings involving business cards for a period of three and one-half (3.5) years, which relief is in addition to the requirements of a Consent Judgment with the State of Minnesota, entered into by the NAF on July 24, 2009.

- **In re High Fructose Corn Syrup Antitrust Litigation:** Berger Montague was one of three co-lead counsel in this nationwide class action alleging a conspiracy to allocate volumes and customers and to price-fix among five producers of high fructose corn syrup. After nine years of litigation, including four appeals, the case was settled on the eve of trial for $531 million. (MDL. No. 1087, Master File No. 95-1477 (C.D. Ill.)).

- **In re Linerboard Antitrust Litigation:** Berger Montague was one of a small group of court-appointed executive committee members who led this nationwide class action against producers of linerboard. The complaint alleged that the defendants conspired to reduce production of linerboard in order to increase the price of linerboard and corrugated boxes made therefrom. At the close of discovery, the case was settled for more than $200 million. (98 Civ. 5055 and 99-1341 (E.D. Pa.)).

- **Johnson, et al. v AzHHA, et al.:** Berger Montague was co-lead counsel in this litigation on behalf of a class of temporary nursing personnel, against the Arizona Hospital and Healthcare Association, and its member hospitals, for agreeing and conspiring to fix the rates and wages for temporary nursing personnel, causing class members to be underpaid. The court approved $24 million in settlements on behalf of this class of nurses. (Case No. 07-1292 (D. Ariz.)).

- **In re Graphite Electrodes Antitrust Litigation:** Berger Montague was one of the four co-lead counsel in a nationwide class action price-fixing case. The case settled for in excess of $134 million and over 100% of claimed damages. (02 Civ. 99-482 (E.D. Pa.)).

- **In re Catfish Antitrust Litig. Action**: The firm was co-trial counsel in this action which settled with the last defendant a week before trial, for total settlements approximating $27 million. (No. 2:92CV073-D-O, MDL No. 928 (N.D. Miss.)).

5

- ***In re Carbon Dioxide Antitrust Litigation:***  The firm was co-trial counsel in this antitrust class action which settled with the last defendant days prior to trial, for total settlements approximating $53 million, plus injunctive relief.  (MDL No. 940 (M.D. Fla.)).

- ***In re Infant Formula Antitrust Litigation***:  The firm served as co-lead counsel in an antitrust class action where settlement was achieved two days prior to trial, bringing the total settlement proceeds to $125 million.  (MDL No. 878 (N.D. Fla.)).

- ***Red Eagle Resources Corp., Inc., v. Baker Hughes, Inc.:***  The firm was a member of the plaintiffs' executive committee in this antitrust class action which yielded a settlement of $52.5 million.  (C.A. No. H-91-627 (S.D. Tex.)).

- ***In re Corrugated Container Antitrust Litigation:***  The firm, led by H. Laddie Montague, was co-trial counsel in an antitrust class action which yielded a settlement of $366 million, plus interest, following trial. (MDL No. 310 (S.D. Tex.)).

- ***Bogosian v. Gulf Oil Corp.:***  With Berger Montague as sole lead counsel, this landmark action on behalf of a national class of more than 100,000 gasoline dealers against 13 major oil companies led to settlements of over $35 million plus equitable relief on the eve of trial.  (No. 71-1137 (E.D. Pa.)).

- ***In re Master Key Antitrust Litigation:***  The firm served as co-lead counsel in an antitrust class action that yielded a settlement of $21 million during trial.  (MDL No. 45 (D. Conn.)).

The firm has also played a leading role in cases in the pharmaceutical arena, especially in cases involving the delayed entry of generic competition, having achieved over $1 billion in settlements in such cases over the past decade, including:

- ***King Drug Co. v. Cephalon, Inc.:***  Berger Montague played a major role (serving on the executive committee) in this antitrust class action on behalf of direct purchasers of generic versions of the prescription drug Provigil (modafinil).   After nine years of hard-fought litigation, the court approved a $512 million partial settlement, the largest settlement ever for a case alleging delayed generic competition. (Case No. 2:06-cv-01797 (E.D. Pa.)). The case is continuing against one defendant.

- ***In re Asacol Antitrust Litigation:***  The firm served as class counsel for direct purchasers of Asacol HS and Delzicol that alleged that defendants participated in a scheme to block generic competition for the ulcerative colitis drug Asacol. The case settled for $15 million. (Case No. 15-cv-12730-DJC (D. Mass.)).

- ***In re Celebrex (Celecoxib) Antitrust Litigation***:  The firm represented a class of direct purchasers of brand and generic Celebrex (celecoxib) in an action alleging that Pfizer, in violation of the Sherman Act, improperly obtained a patent for Celebrex from the U.S. Patent and Trademark Office in a scheme to unlawfully extend patent protection and delay

6

market entry of generic versions of Celebrex.  The case settled for $94 million. (Case No. 14-cv-00361 (E.D. VA.)).

- *In re K-Dur Antitrust Litigation:* Berger Montague served as co-lead counsel for the class in this long-running antitrust litigation.  Berger Montague litigated the case before the Court of Appeals and won a precedent-setting victory, and continued the fight before the Supreme Court. On remand, the case settled for $60.2 million.  (Case No. 01-1652 (D.N.J.)).

- *In re Aggrenox Antitrust Litigation:* Berger Montague represented a class of direct purchasers of Aggrenox in in an action alleging that defendants delayed the availability of less expensive generic Aggrenox through, inter alia, unlawful reverse payment agreements.  The case settled for $146 million. (Case No. 14-02516 (D. Conn.)).

- *In re Solodyn Antitrust Litigation:* Berger Montague serves as co-lead counsel representing a class of direct purchasers of brand and generic Solodyn (extended-release minocycline hydrochloride tablets) alleging that defendants entered into agreements not to compete in the market for extended-release minocycline hydrochloride tablets in violation of the Sherman Act.  The case settled for a total of more than $76 million.  (Case No. 14-MD-2503-DJC (D. Mass.)).

- *In re Prandin Direct Purchaser Antitrust Litigation:*  Berger Montague served as co-lead counsel and recovered $19 million on behalf of direct purchasers of the diabetes medication Prandin.  (Case No. 2:10-cv-12141 (E.D. Mich.)).

- *Mylan Pharmaceuticals, Inc. v. Warner Chilcott Public Ltd. Co.:*  Berger Montague was appointed as co-lead counsel in a case challenging Warner Chilcott's alleged anticompetitive practices with respect to the branded drug Doryx.  The case settled for $15 million.  (Case No. 2:12-cv-03824 (E.D. Pa.)).

- *In re Neurontin Antitrust Litigation:*  Berger Montague served as part of a small group of firms challenging the maintenance of a monopoly relating to the pain medication Neurontin.  The case settled for $190 million.  (Case No. 02-1830 (D.N.J.)).

- *In re Skelaxin Antitrust Litigation:*  Berger Montague was among a small group of firms litigating on behalf of direct purchasers of the drug Skelaxin.  The case settled for $73 million.  (Case No. 2:12-cv-83 / 1:12-md-02343) (E.D. Tenn.)).

- *In re Wellbutrin XL Antitrust Litigation:*  Berger Montague served as co-lead counsel for a class of direct purchasers of the antidepressant Wellbutrin XL.  A settlement of $37.5 million was reached with Valeant Pharmaceuticals (formerly Biovail), one of two defendants in the case. (Case No. 08-cv-2431 (E.D. Pa.)).

- ***Rochester Drug Co-Operative, Inc. v. Braintree Labs., Inc.:***   Berger Montague, appointed as co-lead counsel, prosecuted this case on behalf of direct purchasers alleging sham litigation led to the delay of generic forms of the brand drug Miralax.  The case settled for $17.25 million. (Case No. 07-142 (D. Del.)).

- ***In re Oxycontin Antitrust Litigation:***  Berger Montague served as co-lead counsel on behalf of direct purchasers of the prescription drug Oxycontin.  The case settled in 2011 for $16 million.  (Case No. 1:04-md-01603 (S.D.N.Y)).

- ***Meijer, Inc., et al. v. Abbott Laboratories:***  Berger Montague served as co-lead counsel in a class action on behalf of pharmaceutical wholesalers and pharmacies charging Abbott Laboratories with illegally maintaining monopoly power and overcharging purchasers in violation of the federal antitrust laws.  Plaintiffs alleged that Abbott had used its monopoly with respect to its anti-HIV medicine Norvir (ritonavir) to protect its monopoly power for another highly profitable Abbott HIV drug, Kaletra.  This antitrust class action settled for $52 million after four days of a jury trial in federal court in Oakland, California.  (Case No. 07-5985 (N.D. Cal.)).

- ***In re Nifedipine Antitrust Litigation:*** Berger Montague played a major role (serving on the executive committee) in this antitrust class action on behalf of direct purchasers of generic versions of the anti-hypertension drug Adalat (nifedipine).  After eight years of hard-fought litigation, the court approved a total of $35 million in settlements.  (Case No. 1:03-223 (D.D.C.)).

- ***In re DDAVP Direct Purchaser Antitrust Litigation:***  Berger Montague served as co-lead counsel in a case that charged defendants with using sham litigation and a fraudulently obtained patent to delay the entry of generic versions of the prescription drug DDAVP.  Berger Montague achieved a $20.25 million settlement only after winning a precedent-setting victory before the United States Court of Appeals for the Second Circuit that ruled that direct purchasers had standing to recover overcharges arising from a patent-holder's misuse of an allegedly fraudulently obtained patent.  (Case No. 05-2237 (S.D.N.Y.)).

- ***In re Terazosin Antitrust Litigation:***  Berger Montague was one of a small group of counsel in a case alleging that Abbott Laboratories was paying its competitors to refrain from introducing less expensive generic versions of Hytrin.  The case settled for $74.5 million.  (Case No. 99-MDL-1317 (S.D. Fla.)).

- ***In re Remeron Antitrust Litigation:***  Berger Montague was one of a small group of counsel in a case alleging that the manufacturer of this drug was paying its competitors to refrain from introducing less expensive generic versions of Remeron.  The case settled for $75 million.  (2:02-CV-02007-FSH (D. N.J.)).

- ***In re Tricor Antitrust Litigation:***  Berger Montague was one of a small group of counsel in a case alleging that the manufacturer of this drug was paying its competitors to refrain

8

from introducing less expensive generic versions of Tricor. The case settled for $250 million. (No. 05-340 (D. Del.)).

- ***In re Relafen Antitrust Litigation:*** Berger Montague was one of a small group of firms who prepared for the trial of this nationwide class action against GlaxoSmithKline, which was alleged to have used fraudulently-procured patents to block competitors from marketing less-expensive generic versions of its popular nonsteroidal anti-inflammatory drug, Relafen (nabumetone). Just before trial, the case was settled for $175 million. (No. 01-12239-WGY (D. Mass.)).

- ***In re Cardizem CD Antitrust Litigation:*** Berger Montague served on the executive committee of firms appointed to represent the class of direct purchasers of Cardizem CD. The suit charged that Aventis (the brand-name drug manufacturer of Cardizem CD) entered into an illegal agreement to pay Andrx (the maker of a generic substitute to Cardizem CD) millions of dollars to delay the entry of the less expensive generic product. On November 26, 2002, the district court approved a final settlement against both defendants for $110 million. (No. 99-MD-1278, MDL No. 1278 (E.D. Mich.)).

- ***In re Buspirone Antitrust Litigation:*** The firm served on the court-appointed steering committee in this class action, representing a class of primarily pharmaceutical wholesalers and resellers. The Buspirone class action alleged that pharmaceutical manufacturer BMS engaged in a pattern of illegal conduct surrounding its popular anti-anxiety medication, Buspar, by paying a competitor to refrain from marketing a generic version of Buspar, improperly listing a patent with the FDA, and wrongfully prosecuting patent infringement actions against generic competitors to Buspar. On April 11, 2003, the Court approved a $220 million settlement. (MDL No. 1410 (S.D.N.Y.)).

- ***North Shore Hematology-Oncology Assoc., Inc. v. Bristol-Myers Squibb Co.:*** The firm was one of several prosecuting an action complaining of Bristol Myers's use of invalid patents to block competitors from marketing more affordable generic versions of its life-saving cancer drug, Platinol (cisplatin). The case settled for $50 million. (No. 1:04CV248 (EGS) (D.D.C.)).

**Commercial Litigation**

Berger Montague helps business clients achieve extraordinary successes in a wide variety of complex commercial litigation matters. Our attorneys appear regularly on behalf of clients in high stakes federal and state court commercial litigation across the United States. We work with our clients to develop a comprehensive and detailed litigation plan, and then organize, allocate and deploy whatever resources are necessary to successfully prosecute or defend the case.

- ***Erie Power Technologies, Inc. v. Aalborg Industries A/S, et al.:*** Berger Montague represented a trustee in bankruptcy against officers and directors and the former corporate parent and obtained a very favorable confidential settlement. (No. 04-282E (W.D. Pa.)).

- ***Moglia v. Harris et al.:***  Berger Montague represented a liquidating trustee against the officers of U.S. Aggregates, Inc. and obtained a settlement of $4 million.  (No. C 04 2663 (CW) (N.D. Cal.)).

- ***Gray v. Gessow et al.:***  The firm represented a litigation trust and brought two actions, one against the officers and directors of Sunterra Inc. an insolvent company, and the second against Sunterra's accountants, Arthur Andersen and obtained an aggregate settlement of $4.5 million.  (Case No. MJG 02-CV-1853 (D. Md.) and No. 6:02-CV-633-ORL-28JGG (M.D. Fla.)).

- ***Fitz, Inc. v. Ralph Wilson Plastics Co.:***  The firm served as sole lead counsel and obtained, after 7 years of litigation, in 2000 a settlement whereby fabricator class members could obtain full recoveries for their losses resulting from defendants' defective contact adhesives.  (No. 1-94-CV-06017 (D.N.J.)).

- ***Provident American Corp. and Provident Indemnity Life Insurance Company v. The Loewen Group Inc. and Loewen Group International Inc.:***  Berger Montague settled this individual claim, alleging a 10-year oral contract (despite six subsequent writings attempting to reduce terms to writing, each with materially different terms added, all of which were not signed), for a combined payment in cash and stock of the defendant, of $30 Million.  (No. 92-1964 (E.D. Pa.)).

- ***Marilou Whitney (Estate of Cornelius Vanderbilt Whitney) v. Turner/Time Warner:***  Berger Montague settled this individual claim for a confidential amount, seeking interpretation of the distribution agreement for the movie, *Gone with the Wind* and undistributed profits for the years 1993-1997, with forward changes in accounting and distribution.

- ***American Hotel Holdings Co., et. al v. Ocean Hospitalities, Inc., et. al.:***  Berger Montague defended against a claim for approximately $16 million and imposition of a constructive trust, arising out of the purchase of the Latham Hotel in Philadelphia.  Berger Montague settled the case for less than the cost of the trial that was avoided.  (June Term, 1997, No. 2144 (Pa. Ct. Com. Pl., Phila. Cty.))

- ***Creative Dimensions and Management, Inc. v. Thomas Group, Inc.:***  Berger Montague defended this case against a claim for $30 million for breach of contract.  The jury rendered a verdict in favor of Berger Montague's client on the claim (i.e., $0), and a verdict for the full amount of Berger Montague's client on the counterclaim against the plaintiff.  (No. 96-6318 (E.D. Pa.)).

- ***Robert S. Spencer, et. al. v. The Arden Group, Inc., et al.:***  Berger Montague represented an owner of limited partnership interests in several commercial real estate partnerships in a lawsuit against the partnerships' general partner.  The terms of the

settlement are subject to a confidentiality agreement.  (Aug. Term, 2007, No. 02066 (Pa. Ct. Com. Pl., Phila. Cty. - Commerce Program)).

- *Forbes v. GMH:*  Berger Montague represented a private real estate developer/investor who sold a valuable apartment complex to GMH for cash and publicly-held securities.  The case which claimed securities fraud in connection with the transaction settled for a confidential sum which represented a significant portion of the losses experienced.  (No. 07-cv-00979 (E.D. Pa.)).

**Commodities & Financial Instruments**

Berger Montague ranks among the country's preeminent firms for managing and trying complex Commodities & Financial Instruments related cases on behalf of individuals and as class actions. The Firm's commodities clients include individual hedge and speculation traders, hedge funds, energy firms, investment funds, and precious metals clients.

- *In re Peregrine Financial Group Customer Litigation:*  Berger Montague served as co-lead counsel in a class action which helped deliver settlements worth more than $75 million on behalf of former customers of Peregrine Financial Group, Inc., in litigation against U.S. Bank, N.A., and JPMorgan Chase Bank, N.A., arising from Peregrine's collapse in July 2012. The lawsuit alleges that both banks breached legal duties by allowing Peregrine's owner to withdraw and put millions of dollars in customer funds to non-customer use. (No. 1:12-cv-5546)

- *In re MF Global Holdings Ltd. Investment Litigation*:  Berger Montague is one of two co-lead counsel that represented thousands of commodities account holders who fell victim to the alleged massive theft and misappropriation of client funds at the former major global commodities brokerage firm MF Global.  Berger Montague reached a variety of settlements, including with JPMorgan Chase Bank, the MF Global SIPA Trustee, and the CME Group, that collectively helped to return approximately $1.6 billion to the class. Ultimately, class members received more than 100% of the funds allegedly misappropriated by MF Global even after all fees and expenses. (No. 11-cv-07866 (S.D.N.Y.).

- *In re Commodity Exchange, Inc., Gold Futures and Options Trading Litigation*:  Berger Montague is one of two co-lead counsel representing traders of gold-based derivative contracts, physical gold, and gold-based securities against The Bank of Nova Scotia, Barclays Bank plc, Deutsche Bank AG, HSBC Bank plc, Société Générale and the London Gold Market Fixing Limited.  Plaintiffs allege that the defendants, members of the London Gold Market Fixing Limited, which sets an important benchmark price for gold, conspired to manipulate this benchmark for their collective benefit.  (1:14-md-02548 (S.D.N.Y.)).

- *In re Libor-Based Financial Instruments Antitrust Litigation*:  Berger Montague represents investors who transacted in Eurodollar futures contracts and options on futures contracts on the Chicago Mercantile Exchange ("CME") between August 2007 and May

11

2010.  The lawsuit alleges that the defendant banks knowingly and intentionally understated their true borrowing costs.  By doing so, the defendant banks caused Libor to be calculated or suppressed at artificially low rates.  The defendants' alleged manipulation of Libor allowed their banks to pay artificially low interest rates to purchasers of Libor-based financial instruments thereby harming investors in futures, swaps, and other Libor-based derivative products.  On February 28, 2018, the Court denied Plaintiff's motion for class certification. That decision is on appeal which is pending.    (No. 1:11-md-02262-NRB (S.D.N.Y.)).

- *Brown, et al. v. Kinross Gold, U.S.A., et al.:* Berger Montague was one of two co-lead counsel in this action alleging that a leading gold mining company illegally forced out preferred shareholders. The action resulted in a settlement of $29.25 million in cash and $6.5 million in other consideration (approximately 100% of damages and accrued dividends after fees and costs). (No. 02-cv-00605 (D.N.V.)).

**Consumer Protection**

Berger Montague's Consumer Protection Group protects consumers when they are injured by false or misleading advertising, defective products, data privacy breaches, and various other unfair trade practices.  Consumers too often suffer the brunt of corporate wrongdoing, particularly in the area of false or misleading advertising, defective products, and data or privacy breaches.

- *In re Public Records Fair Credit Reporting Act Litigation:*  Berger Montague is class counsel in three class action settlements involving how the big three credit bureaus, Experian, TransUnion, and Equifax, report public records, including tax liens and civil judgments.  The settlements provide groundbreaking injunctive relief valued at over $100 billion and provide streamlined a streamlined process for consumers to receive uncapped monetary payments for claims related to inaccurate reporting of public records.

- *In re: CertainTeed Fiber Cement Siding Litigation*, MDL No. 2270 (E.D. Pa.).  The firm, as one of two Co-Lead Counsel firms obtained a settlement of more than $103 million in this multidistrict products liability litigation concerning CertainTeed Corporation's fiber cement siding, on behalf of a nationwide class.

- *Countrywide Predatory Lending Enforcement Action:*  Berger Montague advised the Ohio Attorney General (and several other state attorneys general) regarding predatory lending in a landmark law enforcement proceeding against *Countrywide* (and its parent, Bank of America) culminating in 2008 in mortgage-related modifications and other relief for borrowers across the country valued at some $8.6 billion.

- *In re Experian Data Breach Litigation:* Berger Montague served on the Executive Committee of this class action lawsuit that arose from a 2015 data breach at Experian in which computer hackers stole personal information including Social Security numbers and other sensitive personal information for approximately 15 million consumers. The settlement is valued at over $170 million. It consisted of $22 million for a non-reversionary cash Settlement Fund; $11.7 million for Experian's remedial measures implemented in

12

connection with the lawsuit; and two years of free credit monitoring and identity theft insurance. The aggregate value of credit monitoring claimed by class members during the claims submission process exceeded $138 million, based on a $19.99 per month retail value of the service.

- *In re Pet Foods Product Liability Litigation*:  The firm served as one of plaintiffs' co-lead counsel in this multidistrict class action suit seeking to redress the harm resulting from the manufacture and sale of contaminated dog and cat food.  The case settled for $24 million.  Many terms of the settlement are unique and highly beneficial to the class, including allowing class members to recover up to 100% of their economic damages without any limitation on the types of economic damages they may recover.  (1:07-cv-02867 (D.N.J.), MDL Docket No. 1850 (D.N.J.)).

- *In re TJX Companies Retail Security Breach Litigation*:  The firm served as co-lead counsel in this multidistrict litigation brought on behalf of individuals whose personal and financial data was compromised in the then-largest theft of personal data in history.  The breach involved more than 45 million credit and debit card numbers and 450,000 customers' driver's license numbers.  The case was settled for benefits valued at over $200 million. Class members whose driver's license numbers were at risk were entitled to 3 years of credit monitoring and identity theft insurance (a value of $390 per person based on the retail cost for this service), reimbursement of actual identity theft losses, and reimbursement of driver's license replacement costs.  Class members whose credit and debit card numbers were at risk were entitled to cash of $15-$30 or store vouchers of $30-$60.  (No. 1:07-cv-10162-WGY, (D. Mass.)).

- *In Re: Heartland Payment Systems, Inc. Customer Data Security Breach Litigation:*  The firm served on the Executive Committee of this multidistrict litigation and obtained a settlement of cash and injunctive relief for a class of 130 million credit card holders whose credit card information was stolen by computer hackers.  The breach was the largest known theft of credit card information in history.  (No. 4:09-MD-2046 (S.D. Tex. 2009)).

- *In re: Countrywide Financial Corp. Customer Data Security Breach Litigation*:  The firm served on the Executive Committee of this multidistrict litigation and obtained a settlement for a class of 17 million individuals whose personal information was at risk when a rogue employee sold their information to unauthorized third parties. Settlement benefits included:  (i) reimbursement of several categories of out-of-pocket costs; (ii) credit monitoring and identity theft insurance for 2 years for consumers who did not accept Countrywide's prior offer of credit monitoring; and (iii) injunctive relief.  The settlement was approved by the court in 2010.  (3:08-md-01998-TBR (W.D. Ky. 2008)).

- *In re Educational Testing Service Praxis Principles of Learning and Teaching: Grades 7-12 Litigation*:  The firm served on the plaintiffs' steering committee and obtained an $11.1 million settlement in 2006 on behalf of persons who were incorrectly scored on a teacher's licensing exam.  (MDL No. 1643 (E.D. La.)).

13

- ***Vadino, et al. v. American Home Products Corporation, et al.:***  The firm filed a class complaint different from that filed by any other of the filing firms in the New Jersey State Court "Fen Phen" class action, and the class sought in the firm's complaint was ultimately certified.  It was the only case anywhere in the country to include a claim for medical monitoring.  In the midst of trial, the New Jersey case was folded into a national settlement which occurred as the trial was ongoing, and which was structured to include a medical monitoring component worth in excess of $1 billion.  (Case Code No. 240 (N.J. Super. Ct.)).

- ***Parker v. American Isuzu Motors, Inc.:***  The firm served as sole lead counsel and obtained a settlement whereby class members recovered up to $500 each for economic damages resulting from accidents caused by faulty brakes.  (Sept. Term 2003, No. 3476 (Pa. Ct. Com. Pl., Phila. Cty.)).

- ***Salvucci v. Volkswagen of America, Inc. d/b/a Audi of America, Inc.:***  The firm served as co-lead counsel in litigation brought on behalf of a nationwide class alleging that defendants failed to disclose that its vehicles contained defectively designed timing belt tensioners and associated parts and that defendants misrepresented the appropriate service interval for replacement of the timing belt tensioner system.  After extensive discovery, a settlement was reached.  (Docket No. ATL-1461-03 (N.J. Sup. Ct. 2007)).

- ***Burgo v. Volkswagen of America, Inc. d/b/a Audi of America, Inc.:***  The firm served as co-lead counsel in litigation brought on behalf of a nationwide class against premised on defendants' defective tires that were prone to bubbles and bulges.  Counsel completed extensive discovery and class certification briefing.  A settlement was reached while the decision on class certification was pending.  The settlement consisted of remedies including total or partial reimbursement for snow tires, free inspection/replacement of tires for those who experienced sidewall bubbles, blisters, or bulges, and remedies for those class members who incurred other costs related to the tires' defects.  (Docket No. HUD-L-2392-01 (N.J. Sup. Ct. 2001)).

- ***Crawford v. Philadelphia Hotel Operating Co.:***  The firm served as co-lead counsel and obtained a settlement whereby persons who contracted food poisoning at a business convention recovered $1,500 each.  (March Term, 2004, No. 000070 (Pa. Ct. Com. Pl., Phila. Cty.)).

- ***Block v. McDonald's Corporation***:  The firm served as co-lead counsel and obtained a settlement of $12.5 million with McDonald's stemming from its failure to disclose the use of beef fat in its french fries.  (No. 01-CH-9137 (Ill. Cir. Ct., Cook Cty.)).

**Corporate Governance and Shareholder Rights**
Berger Montague protects the interests of individual and institutional investors in shareholder derivative actions in state and federal courts across the United States.  Our attorneys help

individual and institutional investors reform poor corporate governance, as well as represent them in litigation against directors of a company for violating their fiduciary duty or provide guidance on shareholder rights.

- **Emil Rossdeutscher and Dennis Kelly v. Viacom:** The firm, as lead counsel, obtained a settlement resulting in a fund of $14.25 million for the class. (C.A. No. 98C-03-091 (JEB) (Del. Super. Ct.)).

- **Fox v. Riverview Realty Partners, f/k/a Prime Group Realty Trust, et al.:** The firm, as lead counsel, obtained a settlement resulting in a fund of $8.25 million for the class.

### Employee Benefits & ERISA

Berger Montague represents employees who have claims under the federal Employee Retirement Income Security Act. We litigate cases on behalf of employees whose 401(k) and pension investments have suffered losses as a result of the breach of fiduciary duties by plan administrators and the companies they represent. Berger Montague has recovered hundreds of millions of dollars in lost retirement benefits for American workers and retirees, and also gained favorable changes to their retirement plans.

- **In re Unisys Corp. Retiree Medical Benefits:** The firm, as co-lead counsel, handled the presentation of over 70 witnesses, 30 depositions, and over 700 trial exhibits in this action that has resulted in partial settlements in 1990 of over $110 million for retirees whose health benefits were terminated. (MDL No. 969 (E.D. Pa.)).

- **Local 56 U.F.C.W. v. Campbell Soup Co.:** The firm represented a class of retired Campbell Soup employees in an ERISA class action to preserve and restore retiree medical benefits. A settlement yielded benefits to the class valued at $114.5 million. (No. 93-MC-276 (SSB) (D.N.J.)).

- **Rose v. Cooney:** No. 5:92-CV-208 (D. Conn.) The firm, acting as lead counsel, obtained more than $29 million in cash and payment guarantees from Xerox Corporation to resolve claims of breach of fiduciary duty for plan investments in interest contracts issued by Executive Life Insurance Company.

- **In re Masters, Mates & Pilots Pension Plan and IRAP Litig.:** No. 85 Civ. 9545 (VLB) (S.D.N.Y) The firm, as co-lead counsel, participated in lengthy litigation with the U.S. Department of Labor to recover losses to retirement plans resulting from imprudent and prohibited investments; settlements in excess of $20 million, which fully recovered lost principal, were obtained to resolve claims of fiduciary breaches in selecting and monitoring investment managers and investments.

- **In re Lucent Technologies, Inc. ERISA Litigation:** No. 01-CV-3491 (D.N.J.) The firm served as co-lead counsel in this class action on behalf of participants and beneficiaries

of the Lucent defined contribution plans who invested in Lucent stock, and secured a settlement providing injunctive relief and for the payment of $69 million.

- ▪ **Diebold v. Northern Trust Investments, N.A.:** 1:09-cv-01934 (N.D. Ill.) As co-lead counsel in this ERISA breach of fiduciary duty case, the firm secured a $36 million settlement on behalf of participants in retirement plans who participated in Northern Trust's securities lending program. Plaintiffs alleged that defendants breached their ERISA fiduciary duties by failing to manage properly two collateral pools that held cash collateral received from the securities lending program. The settlement represented a recovery of more than 25% of alleged class member losses.

- ▪ **In re SPX Corporation ERISA Litigation:** No. 3:04-cv-192 (W.D.N.C.) The firm recovered 90% of the estimated losses 401(k) plan participants who invested in the SPX stock fund claimed they suffered as a result of defendants' breaches of their ERISA fiduciary duties caused them.

- ▪ **In re Nortel Networks ERISA Litigation:** Civil Action No. 01-cv-1855 (MD Tenn.) The firm represented a class of former workers of the bankrupt telecommunications company of mismanaging their employee stock fund in violation of their fiduciary duties. The case settled for $21.5 million.

- ▪ **Glass Dimensions, Inc. v. State Street Bank & Trust Co.:** 1:10-cv-10588-DPW (D. Mass). The firm served as co-lead counsel in this ERISA case that alleged that defendants breached their fiduciary duties to the retirement plans it managed by taking unreasonable compensation for managing the securities lending program in which the plans participated. After the court certified a class of the plans that participated in the securities lending program at issue, the case settled for $10 million on behalf of 1,500 retirement plans that invested in defendants' collective investment funds.

- ▪ **In re Eastman Kodak ERISA Litigation:** Master File No. 6:12-cv-06051-DGL (W.D.N.Y.) The firm served as class counsel in this ERISA breach of fiduciary duty class action which alleged that defendants breached their fiduciary duties to Kodak retirement plan participants by allowing plan investments in Kodak common stock. The case settled for $9.7 million.

- ▪ **Lequita Dennard v. Transamerica Corp. et al.:** Civil Action No. 1:15-cv-00030-EJM (N.D. Iowa). The firm served as counsel to plan participants who alleged that they suffered losses when plan fiduciaries failed to act solely in participants' interests, as ERISA requires, when they selected, removed and monitored plan investment options. The case settled for structural changes to the plan and $3.8 million monetary payment to the class.

**Employment & Unpaid Wages**

The Berger Montague Employment & Unpaid Wages Department works tirelessly to safeguard the rights of employees, and devotes all of their energies to helping the firm's clients achieve their

goals.  Our attorneys' understanding of federal and state wage and hour laws, federal and state civil rights and discrimination laws, ERISA, the WARN Act, laws protecting whistleblowers, such as federal and state False Claims Acts, and other employment laws, allows us to develop creative strategies to vindicate our clients' rights and help them secure the compensation to which they are entitled.

Berger Montague is at the forefront of class action litigation, seeking remedies for employees under the Fair Labor Standards Act, state wage and hour law, breach of contract, unjust enrichment, and other state common law causes of action.

Berger Montague's Employment & Unpaid Wages Group, which is co-chaired by Managing Shareholder Shanon Carson and Shareholder Sarah Schalman-Bergen, is repeatedly recognized for outstanding success in effectively representing its clients. In 2015, The National Law Journal selected Berger Montague as the top plaintiffs' law firm in the Employment Law category at the Elite Trial Lawyers awards ceremony. Portfolio Media, which publishes Law360, also recognized Berger Montague as one of the eight Top Employment Plaintiffs' Firms in 2009.

Representative cases include the following:

- *Fenley v. Wood Group Mustang, Inc*:  The firm served as lead counsel and obtained a settlement of $6.25 million on behalf of a class of oil and gas inspectors who allegedly did not receive overtime compensation for hours worked in excess of 40 per week. (Civil Action No. 2:15-cv-326 (S.D. Ohio)).

- *Sanders v. The CJS Solutions Group, LLC*:  The firm served as co-lead counsel and obtained a settlement of $3.24 million on behalf of a class of IT healthcare consultants who allegedly did not receive overtime premiums for hours worked in excess of 40 per week. (Civil Action No. 17-3809 (S.D.N.Y.)).

- *Gundrum v. Cleveland Integrity Services, Inc..*:  The firm served as lead counsel and obtained a settlement of $4.5 million on behalf of a class of oil and gas inspectors who allegedly did not receive overtime compensation for hours worked in excess of 40 per week. (Civil Action No. 4:17-cv-55 (N.D. Okl.)).

- *Fenley v. Applied Consultants, Inc.*:  The firm served as lead counsel and obtained a settlement of $9.25 million on behalf of a class of oil and gas inspectors who allegedly did not receive overtime compensation for hours worked in excess of 40 per week. (Civil Action No. 2:15-cv-259 (W.D. Pa.)).

- *Acevedo v. Brightview Landscapes, LLC*:  The firm served as co-lead counsel and obtained a settlement of $6.95 million on behalf of a class of landscaping crew members who allegedly did not receive proper overtime premiums for hours worked in excess of 40 per week. (Civil Action No. 3:13-cv-02529 (M.D. Pa.)).

17

- ***Jantz v. Social Security Administration:***  The firm served as co-lead counsel and obtained a settlement on behalf of employees with targeted disabilities ("TDEs") alleged that SSA discriminated against TDEs by denying them promotional and other career advancement opportunities.  The settlement was reached after more than ten years of litigation, and the Class withstood challenges to class certification on four separate occasions.  The settlement includes a monetary fund of $9.98 million and an unprecedented package of extensive programmatic changes valued at approximately $20 million.  EEOC No. 531-2006-00276X (2015).

- ***Ciamillo v. Baker Hughes, Incorporated:*** The firm served as lead counsel and obtained a settlement of $5 million on behalf of a class of oil and gas workers who allegedly did not receive any overtime compensation for working hours in excess of 40 per week. (Civil Action No. 14-cv-81 (D. Alaska)).

- ***Employees Committed for Justice v. Eastman Kodak Company:***  The firm served as co-lead counsel and obtained a settlement of $21.4 million on behalf of a nationwide class of African American employees of Kodak alleging a pattern and practice of racial discrimination (pending final approval).  A significant opinion issued in the case is *Employees Committed For Justice v. Eastman Kodak Co.*, 407 F. Supp. 2d 423 (W.D.N.Y. 2005) (denying Kodak's motion to dismiss).  No. 6:04-cv-06098 (W.D.N.Y.)).

- ***Salcido v. Cargill Meat Solutions Corp.:***  The firm served as co-lead counsel and obtained a settlement of $7.5 million on behalf of a class of thousands of employees of Cargill Meat Solutions Corp. alleging that they were forced to work off-the-clock and during their breaks.  This is one of the largest settlements of this type of case involving a single plant in U.S. history.  (Civil Action Nos. 1:07-cv-01347-LJO-GSA and 1:08-cv-00605-LJO-GSA (E.D. Cal.)).

- ***Miller v. Hygrade Food Products, Inc.:***  The firm served as lead counsel and obtained a settlement of $3.5 million on behalf of a group of African American employees of Sara Lee Foods Corp. to resolve charges of racial discrimination and retaliation at its Ball Park Franks plant.  (No. 99-1087 (E.D. Pa.)).

- ***Chabrier v. Wilmington Finance, Inc.:***  The firm served as co-lead counsel and obtained a settlement of $2,925,000 on behalf of loan officers who worked in four offices to resolve claims for unpaid overtime wages.  A significant opinion issued in the case is *Chabrier v. Wilmington Finance, Inc.*, 2008 WL 938872 (E.D. Pa. April 04, 2008) (denying the defendant's motion to decertify the class).   (No. 06-4176 (E.D. Pa.)).

- ***Bonnette v. Rochester Gas & Electric Co.:***  The firm served as co-lead counsel and obtained a settlement of $2 million on behalf of a class of African American employees of Rochester Gas & Electric Co. to resolve charges of racial discrimination in hiring, job assignments, compensation, promotions, discipline, terminations, retaliation, and a hostile

work        environment.        (No.        07-6635        (W.D.N.Y.)).

- ***Confidential.***  The firm served as lead counsel and obtained a settlement of $6 million on behalf of a group of African American employees of a Fortune 100 company to resolve claims of racial discrimination, as well as injunctive relief which included significant changes to the Company's employment practices (settled out of court while charges of discrimination were pending with the U.S. Equal Employment Opportunity Commission).

## Environment & Public Health

Berger Montague lawyers are trailblazers in the fields of environmental class action litigation and mass torts. Our attorneys have earned their reputation in the fields of environmental litigation and mass torts by successfully prosecuting some of the largest, most well-known cases of our time. Our Environment & Public Health Group also prosecutes significant claims for personal injury, commercial losses, property damage, and environmental response costs. In 2016 Berger Montague was named an Elite Trial Lawyer Finalist in special litigation (environmental) by The National Law Journal.

- ***Cook v. Rockwell International Corporation:***  In February 2006, the firm won a $554 million jury verdict on behalf of thousands of property owners whose homes were exposed to plutonium or other toxins from the former Rocky Flats nuclear weapons site northwest of Denver, Colorado.  Judgment in the case was entered by the court in June 2008 which, with interest, totaled $926 million.  Recognizing this tremendous achievement, the Public Justice Foundation bestowed its prestigious Trial Lawyer of the Year Award for 2009 on Merrill G. Davidoff, David F. Sorensen, and the entire trial team for their "long and hard-fought" victory against "formidable corporate and government defendants."  (No. 90-cv-00181-JLK (D. Colo.)).  The jury verdict in that case was vacated on appeal in 2010, but on a second trip to the Tenth Circuit, Plaintiffs secured a victory in 2015, with the case then being sent back to the district court.   A $375 million settlement was reached in May 2016, and final approval by the district court was obtained in April 2017.

- ***In re Exxon Valdez Oil Spill Litigation:***  On September 16, 1994, a jury trial of several months duration resulted in a record punitive damages award of $5 billion against the Exxon defendants as a consequence of one of the largest oil spills in U.S. history.  The award was reduced to $507.5 million pursuant to a Supreme Court decision.  David Berger was co-chair of the plaintiffs' discovery committee (appointed by both the federal and state courts).   Harold Berger served as a member of the organizing case management committee.  H. Laddie Montague was specifically appointed by the federal court as one of the four designated trial counsel.  Both Mr. Montague and Peter Kahana shared (with the entire trial team) the 1995 "Trial Lawyer of the Year Award" given by the Trial Lawyers for Public Justice.  (No. A89-0095-CVCHRH (D. Alaska)).

- ***In re Ashland Oil Spill Litigation:***  The firm led by Harold Berger served as co-lead counsel and obtained a $30 million settlement for damages resulting from a very large oil spill.  (Master File No. M-14670 (W.D. Pa.)).

- **State of Connecticut Tobacco Litigation:**  Berger Montague was one of three firms to represent the State of Connecticut in a separate action in state court against the tobacco companies.  The case was litigated separate from the coordinated nationwide actions.  Although eventually Connecticut joined the national settlement, its counsel's contributions were recognized by being awarded the fifth largest award among the states from the fifty states' Strategic Contribution Fund.

- **In re School Asbestos Litigation:**  As co-lead counsel, the firm successfully litigated a case in which a nationwide class of elementary and secondary schools and school districts suffering property damage as a result of asbestos in their buildings were provided relief.  Pursuant to an approved settlement, the class received in excess of $70 million in cash and $145 million in discounts toward replacement building materials.  (No. 83-0268 (E.D. Pa.)).

- **Drayton v. Pilgrim's Pride Corp.:**  The firm served as counsel in a consolidation of wrongful death and other catastrophic injury cases brought against two manufacturers of turkey products, arising out of a 2002 outbreak of Listeria Monocytogenes in the Northeastern United States, which resulted in the recall of over 32 million pounds of turkey – the second largest meat recall in U.S. history at that time.   A significant opinion issued in the case is *Drayton v. Pilgrim's Pride Corp.*, 472 F. Supp. 2d 638 (E.D. Pa. 2006) (denying the defendants' motions for summary judgment and applying the alternative liability doctrine).  All of the cases settled on confidential terms in 2006.  (No. 03-2334 (E.D. Pa.)).

- **In re SEPTA 30th Street Subway/Elevated Crash Class Action:**  Berger Montague represented a class of 220 persons asserting injury in a subway crash.  Despite a statutory cap of $1 million on damages recovery from the public carrier, and despite a finding of sole fault of the public carrier in the investigation by the National Highway Transit Safety Administration, Berger Montague was able to recover an aggregate of $3.03 million for the class.  (1990 Master File No. 0001 (Pa. Ct. Com. Pls., Phila. Cty.)).

- **In re Three Mile Island Litigation:**  As lead/liaison counsel, the firm successfully litigated the case and reached a settlement in 1981 of $25 million in favor of individuals, corporations and other entities suffering property damage as a result of the nuclear incident involved.  (C.A. No. 79-0432 (M.D. Pa.)).

- **In Re Louisville Explosions Litigation:**  This case was one of the earliest examples of a class action trial of an environmental class action.   It redressed damage to private property owners and employees resulting from a February 13, 1981 sewer explosion which was one of the largest explosion mishaps in U.S. history.  In February, 1984 the matter went to trial, and after the plaintiffs' case and the denial of motions for direct verdict the litigation settled for net payments to the class members of 100% to 300% or more of direct monetary damages, depending on their zone's distance from the streets that

20

exploded.  Claimants lined up near the claims office for blocks to file claims.  Mr. Davidoff was lead counsel and lead trial counsel.  (No. CV 81-0080, W.D. Ky.).

**Insurance Fraud**

When insurance companies and affiliated financial services entities engage in fraudulent, deceptive or unfair practices, Berger Montague helps injured parties recover their losses.  We focus on fraudulent, deceptive and unfair business practices across all lines of insurance and financial products and services sold by insurers and their affiliates, which include annuities, securities and other investment vehicles.

- ▪ ***Spencer v. Hartford Financial Services Group, Inc.:***  The firm, together with co-counsel, prosecuted this national class action against The Hartford Financial Services Group, Inc. and its affiliates in the United States District Court for the District of Connecticut (*Spencer v. Hartford Financial Services Group, Inc.*, Case No. 05-cv-1681) on behalf of approximately 22,000 claimants, each of whom entered into structured settlements with Hartford property and casualty insurers to settle personal injury and workers' compensation claims.  To fund these structured settlements, the Hartford property and casualty insurers purchased annuities from their affiliate, Hartford Life.  By purchasing the annuity from Hartford Life, The Hartford companies allegedly were able to retain up to 15% of the structured amount of the settlement in the form of undisclosed costs, commissions and profit - all of which was concealed from the settling claimants.  On March 10, 2009, the U.S. District Court certified for trial claims on behalf of two national subclasses for civil RICO and fraud (256 F.R.D. 284 (D. Conn. 2009)).  On October 14, 2009, the Second Circuit Court of Appeals denied The Hartford's petition for interlocutory appeal under Federal Rule of Civil Procedure 23(f).On September 21, 2010, the U.S. District Court entered judgment granting final approval of a $72.5 million cash settlement.

- ▪ ***Nationwide Mutual Insurance Company v. O'Dell:***  The firm, together with co-counsel, prosecuted this class action against Nationwide Mutual Insurance Company in West Virginia Circuit Court, Roane County (*Nationwide Mutual Insurance Company v. O'Dell*, Case No. 00-C-37), on behalf of current and former West Virginia automobile insurance policyholders, which arose out of Nationwide's failure, dating back to 1993, to offer policyholders the ability to purchase statutorily-required optional levels of underinsured ("UIM") and uninsured ("UM") motorist coverage in accordance with West Virginia Code 33-6-31.  The court certified a trial class seeking monetary damages, alleging that the failure to offer these optional levels of coverage, and the failure to provide increased first party benefits to personal injury claimants, breached Nationwide's insurance policies and its duty of good faith and fair dealing, and violated the West Virginia Unfair Trade Practices Act.  On June 25, 2009, the court issued final approval of a settlement that provided a minimum estimated value of $75 million to Nationwide auto policyholders and their passengers who were injured in an accident or who suffered property damage.

**Predatory Lending and Borrowers' Rights**

21

Berger Montague's attorneys fight vigorously to protect the rights of borrowers when they are injured by the practices of banks and other financial institutions that lend money or service borrowers' loans.  Berger Montague has successfully obtained multi-million dollar class action settlements for nationwide classes of borrowers against banks and financial institutions and works tirelessly to protect the rights of borrowers suffering from these and other deceptive and unfair lending practices.

- ▪ **Coonan v. Citibank, N.A.**:  The firm, as Co-Lead Counsel, prosecuted this national class action against Citibank and its affiliates in the United States District Court for the Northern District of New York concerning alleged kickbacks Citibank received in connection with its force-placed insurance programs.  The firm obtained a settlement of $122 million on behalf of a class of hundreds of thousands of borrowers.

- ▪ **Arnett v. Bank of America, N.A.**:  The firm, as Co-Lead Counsel, prosecuted this national class action against Bank of America and its affiliates in the United States District Court for the District of Oregon concerning alleged kickbacks received in connection with its force-placed flood insurance program.  The firm obtained a settlement of $31 million on behalf of a class of hundreds of thousands of borrowers.

- ▪ **Clements v. JPMorgan Chase Bank, N.A.**:  The firm, as Co-Lead Counsel, prosecuted this national class action against JPMorgan Chase and its affiliates in the United States District Court for the Northern District of California concerning alleged kickbacks received in connection with its force-placed flood insurance program.   The firm obtained a settlement of $22,125,000 on behalf of a class of thousands of borrowers.

- ▪ **Holmes v. Bank of America, N.A.**:  The firm, as Co-Lead Counsel, prosecuted this national class action against Bank of America and its affiliates in the United States District Court for the Western District of North Carolina concerning alleged kickbacks received in connection with its force-placed wind insurance program.  The firm obtained a settlement of $5.05 million on behalf of a class of thousands of borrowers.

## Securities & Investor Protection

In the area of securities litigation, the firm has represented public institutional investors – such as the retirement funds for the States of Pennsylvania, Connecticut, New Hampshire, New Jersey, Louisiana and Ohio, as well as the City of Philadelphia and numerous individual investors and private institutional investors.  The firm was co-lead counsel in the *Melridge Securities Litigation* in the Federal District Court in Oregon, in which jury verdicts of $88.2 million and a RICO judgment of $239 million were obtained.  Berger Montague has served as lead or co-lead counsel in numerous other major securities class action cases where substantial settlements were achieved on behalf of investors.

- ▪ **In re Merrill Lynch Securities Litigation:**  Berger Montague, as co-lead counsel, obtained a recovery of $475 million for the benefit of the class in one of the largest recoveries among the recent financial crisis cases.  (No. 07-cv-09633 (S.D.N.Y.)).

- ***In re Sotheby's Holding, Inc. Securities Litigation***:  The firm, as lead counsel, obtained a $70 million settlement, of which $30 million was contributed, personally, by an individual defendant.  (No. 00-cv-1041 (DLC) (S.D.N.Y.)).

- ***In re: Oppenheimer Rochester Funds Group Securities Litigation:***  The firm, as co-lead counsel, obtained a $89.5 million settlement on behalf of investors in six tax-exempt bond mutual funds managed by OppenheimerFunds, Inc.  (No. 09-md-02063-JLK (D. Col.)).

- ***In re KLA Tencor Securities Litigation:***  The firm, as a member of Plaintiffs' Counsel's Executive Committee, obtained a cash settlement of $65 million in an action on behalf of investors against KLA-Tencor and certain of its officers and directors.  (No. 06-cv-04065 (N.D. Cal.)).

- ***Ginsburg v. Philadelphia Stock Exchange, Inc., et al.:***  The firm represented certain shareholders of the Philadelphia Stock Exchange in the Delaware Court of Chancery and obtained a settlement valued in excess of $99 million settlement.  (C.A. No. 2202-CC (Del. Ch.)).

- ***In re Sepracor Inc. Securities Litigation:***  The firm, as co-lead counsel, obtained a settlement of $52.5 million for the benefit of bond and stock purchaser classes.  (No. 02-cv-12235-MEL (D. Mass.)).

- ***In re CIGNA Corp. Securities Litigation:***  The firm, as co-lead counsel, obtained a settlement of $93 million for the benefit of the class.  (Master File No. 2:02-cv-8088 (E.D. Pa.)).

- ***In re Fleming Companies, Inc. Securities Litigation:***  The firm, as lead counsel, obtained a class settlement of $94 million for the benefit of the class.  (No. 5-03-MD-1530 (TJW) (E.D. Tex.)).

- ***In re Xcel Energy Inc. Securities, Derivative & "ERISA" Litigation:***  The firm, as co-lead counsel in the ***securities*** actions, obtained a cash settlement of $80 million on behalf of investors against Xcel Energy and certain of its officers and directors.  (No. 02-cv-2677 (DSD/FLN) (D. Minn.)).

- ***In re NetBank, Inc. Securities Litigation:***  The firm served as lead counsel in this certified class action on behalf of the former common shareholders of NetBank, Inc. The $12.5 million settlement, which occurred after class certification proceedings and substantial discovery, is particularly noteworthy because it is one of the few successful securities fraud class actions litigated against a subprime lender and bank in the wake of the financial crisis.  (No. 07-cv-2298-TCB (N.D. Ga.)).

23

- **Brown v. Kinross Gold U.S.A. Inc.:**  The firm represented lead plaintiffs as co-lead counsel and obtained $29.25 million cash settlement and an additional $6,528,371 in dividends for a gross settlement value of $35,778,371.  (No. 02-cv-0605 (D. Nev.))  All class members recovered 100% of their damages <u>after</u> fees and expenses.

- **In re Campbell Soup Co. Securities Litigation:**  The firm, as co-lead counsel, obtained a settlement of $35 million for the benefit of the class.  (No. 00-cv-152 (JEI) (D.N.J.)).

- **In re Premiere Technologies, Inc. Securities Litigation:**  The firm, as co-lead counsel, obtained a class settlement of over $20 million in combination of cash and common stock.  (No.1:98-cv-1804-JOF (N.D. Ga.)).

- **In re PSINet, Inc., Securities Litigation:**  The firm, as co-lead counsel, obtained a settlement of $17.83 million on behalf of investors.  (No. 00-cv-1850-A (E.D. Va.)).

- **In re Safety-Kleen Corp. Securities Litigation:**  The firm, as co-lead counsel, obtained a class  settlement in the amount of $45 million against Safety-Kleen's outside accounting firm and certain of the Company's officers and directors.  The final settlement was obtained 2 business days before the trial was to commence.  (No. 3:00-cv-736-17 (D.S.C.)).

- **The City Of Hialeah Employees' Retirement System v. Toll Brothers, Inc.:**  The firm, as co-lead counsel, obtained a class settlement of $25 million against Home Builder Toll Brothers, Inc.  (No. 07-cv-1513 (E.D. Pa.)).

- **In re Rite Aid Corp. Securities Litigation:**  The firm, as co-lead counsel, obtained settlements totaling $334 million against Rite Aid's outside accounting firm and certain of the company's former officers.  (No. 99-cv-1349 (E.D. Pa.)).

- **In re Sunbeam Inc. Securities Litigation:**  As co-lead counsel and designated lead trial counsel (by Mr. Davidoff), the firm obtained a settlement on behalf of investors of $142 million in the action against Sunbeam's outside accounting firm and Sunbeam's officers.  (No. 98-cv-8258 (S.D. Fla.)).

- **In re Waste Management, Inc. Securities Litigation:**  In 1999, the firm, as co-lead counsel, obtained a class settlement for investors of $220 million cash which included a settlement against Waste Management's outside accountants.  (No. 97-cv-7709 (N.D. Ill.)).

- **In re IKON Office Solutions Inc. Securities Litigation:**  The firm, serving as both co-lead and liaison counsel, obtained a cash settlement of $111 million in an action on behalf of investors against IKON and certain of its officers.  (MDL Dkt. No. 1318 (E.D. Pa.)).

- **In re Melridge Securities Litigation:**  The firm served as lead counsel and co-lead trial counsel for a class of purchasers of Melridge common stock and convertible debentures.

24

A four-month jury trial yielded a verdict in plaintiffs' favor for $88.2 million, and judgment was entered on RICO claims against certain defendants for $239 million. The court approved settlements totaling $57.5 million. (No. 87-cv-1426 FR (D. Ore.)).

- **Aldridge v. A.T. Cross Corp.:** The firm represented a class of investors in a securities fraud class action against A.T. Cross, and won a significant victory in the U.S. Court of Appeals for the First Circuit when that Court reversed the dismissal of the complaint and lessened the pleading standard for such cases in the First Circuit, holding that it would not require plaintiffs in a shareholder suit to submit proof of financial restatement in order to prove revenue inflation. *See Aldridge v. A.T. Cross Corp.*, 284 F.3d 72 (1st Cir. 2002). The case ultimately settled for $1.5 million. (C.A. No. 00-203 ML (D.R.I.)).

- **Silver v. UICI:** The firm, as co-lead counsel, obtained a settlement resulting in a fund of $16 million for the class. (No. 3:99-cv-2860-L (N.D. Tex.)).

- **In re Alcatel Alsthom Securities Litigation:** The firm, as co-lead counsel, obtained a class settlement for investors of $75 million cash. (MDL Docket No. 1263 (PNB) (E.D. Tex.)).

- **Walco Investments, Inc. et al. v. Kenneth Thenen, et al. (Premium Sales):** The firm, as a member of the plaintiffs' steering committee, obtained settlements of $141 million for investors victimized by a Ponzi scheme. Reported at: 881 F. Supp. 1576 (S.D. Fla. 1995); 168 F.R.D. 315 (S.D. Fla. 1996); 947 F. Supp. 491 (S.D. Fla. 1996)).

- **In re The Drexel Burnham Lambert Group, Inc.:** The firm was appointed co-counsel for a mandatory non-opt-out class consisting of all claimants who had filed billions of dollars in securities litigation-related proofs of claim against The Drexel Burnham Lambert Group, Inc. and/or its subsidiaries. Settlements in excess of $2.0 billion were approved in August 1991 and became effective upon consummation of Drexel's Plan of Reorganization on April 30, 1992. (No. 90-cv-6954 (MP), Chapter 11, Case No. 90 B 10421 (FGC), Jointly Administered, reported at, *inter alia*, 960 F.2d 285 (2d Cir. 1992), *cert. dismissed*, 506 U.S. 1088 (1993) ("Drexel I") and 995 F.2d 1138 (2d Cir. 1993) ("Drexel II")).

- **In re Michael Milken and Associates Securities Litigation:** As court-appointed liaison counsel, the firm was one of four lead counsel who structured the $1.3 billion "global" settlement of all claims pending against Michael R. Milken, over 200 present and former officers and directors of Drexel Burnham Lambert, and more than 350 Drexel/Milken-related entities. (MDL Dkt. No. 924, M21-62-MP (S.D.N.Y.)).

- **RJR Nabisco Securities Litigation:** The firm represented individuals who sold RJR Nabisco securities prior to the announcement of a corporate change of control. This securities case settled for $72 million. (No. 88-cv-7905 MBM (S.D.N.Y.)).

- ***Qwest Securities Action:*** The firm represented New Jersey in an opt-out case against Qwest and certain officers, which was settled for $45 million. (C.A. No. L-3838-02 (Superior Court New Jersey, Law Division)).

**Whistleblower, *Qui Tam*, and False Claims Act**

Berger Montague has represented whistleblowers in matters involving healthcare fraud, defense contracting fraud, IRS fraud, securities fraud, and commodities fraud, helping to return more than $1.1 billion to federal and state governments. In return, whistleblower clients retaining Berger Montague to represent them in state and federal courts have received more than $100 million in rewards. Berger Montague's time-tested approach in Whistleblower/Qui Tam representation involves cultivating close, productive attorney-client relationships with the maximum degree of confidentiality for our clients.

**Judicial Praise for Berger Montague Attorneys**

Berger Montague's record of successful prosecution of class actions and other complex litigation has been recognized and commended by judges and arbitrators across the country. Some remarks on the skill, efficiency, and expertise of the firm's attorneys are excerpted below.

**Antitrust**

From **Judge Margo K. Brodie,** of the U.S. District Court for the Eastern District of New York:

> "Class counsel has without question done a tremendous job in litigating this case. They represent some of the best plaintiff-side antitrust groups in the country, and the size and skill of the defense they litigated against cannot be overstated. They have also demonstrated the utmost professionalism despite the demands of the extreme perseverance that this case has required…"

*In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation*, No. 1:05-md-01720 (E.D.N.Y. 2019) (Mem. & Order).

From **Judge Brian M. Cogan**, of the U.S. District Court of the Eastern District of New York:

> "This is a substantial recovery that has the deterrent effect that class actions are supposed to have, and I think it was done because we had really good Plaintiffs' lawyers in this case who were running it."

Transcript of June 24, 2019 Fairness Hearing, *In re Dental Supplies Antitrust Litigation*, No. 16-cv-696 (E.D.N.Y.).

From **Judge Michael M. Baylson**, of the U.S. District Court of the Eastern District of Pennsylvania:

> "[C]ounsel… for direct action plaintiffs have done an outstanding job here with representing the class, and I thought your briefing was always very on point. I thought the presentation of the very contentious issues on the class action motion was very well done, it was very well briefed, it was well argued."

Transcript of the June 28, 2018 Hearing in ***In re Domestic Drywall Antitrust Litigation***, No. MD-13-2437 at 11:6-11.

From **Judge Madeline Cox Arleo,** of the U.S. District Court for the District of New Jersey praising the efforts of all counsel:

> "I just want to thank you for an outstanding presentation.  I don't say that lightly . . . it's not lost on me at all when lawyers come very, very prepared.  And really, your clients should be very proud to have such fine lawyering.  I don't see lawyering like this every day in the federal courts, and I am very grateful.  And I appreciate the time and the effort you put in, not only to the merits, but the respect you've shown for each other, the respect you've shown for the Court, the staff, and the time constraints.  And as I tell my law clerks all the time, good lawyers don't fight, good lawyers advocate.  And I really appreciate that more than I can express."

Transcript of the September 9 to 11, 2015 Daubert Hearing in ***Castro v. Sanofi Pasteur***, No. 11-cv-07178 (D.N.J.) at 658:14-659:4.

From **Judge William H. Pauley, III**, of the U.S. District Court of the Southern District of New York:

> "Class Counsel did their work on their own with enormous attention to detail and unflagging devotion to the cause.  Many of the issues in this litigation . . . were unique and issues of first impression."

* * *

> "Class Counsel provided extraordinarily high-quality representation.  This case raised a number of unique and complex legal issues ….  The law firms of Berger Montague and Coughlin Stoia were indefatigable.  They represented the Class with a high degree of professionalism, and vigorously litigated every issue against some of the ablest lawyers in the antitrust defense bar."

***In re Currency Conversion Fee Antitrust Litigation***, 263 F.R.D. 110, 129 (2009).

From **Judge Faith S. Hochberg,** of the United States District court for the District of New Jersey:

"[W]e sitting here don't always get to see such fine lawyering, and it's really wonderful for me both to have tough issues and smart lawyers ... I want to congratulate all of you for the really hard work you put into this, the way you presented the issues, ... On behalf of the entire federal judiciary I want to thank you for the kind of lawyering we wish everybody would do."

*In re Remeron Antitrust Litig.*, Civ. No. 02-2007 (Nov. 2, 2005).

From U.S. District **Judge Jan DuBois**, of the U.S. District Court of the Eastern District of Pennsylvania:

"[T]he size of the settlements in absolute terms and expressed as a percentage of total damages evidence a high level of skill by petitioners ... The Court has repeatedly stated that the lawyering in the case at every stage was superb, and does so again."

*In Re Linerboard Antitrust Litig.*, 2004 WL 1221350, at *5-*6 (E.D. Pa. 2004).

From **Judge Nancy G. Edmunds**, of the U.S. District Court of the Eastern District of Michigan:

"[T]his represents an excellent settlement for the Class and reflects the outstanding effort on the part of highly experienced, skilled, and hard working Class Counsel....[T]heir efforts were not only successful, but were highly organized and efficient in addressing numerous complex issues raised in this litigation[.]"

*In re Cardizem CD Antitrust Litig.*, MDL No. 1278 (E.D. Mich., Nov. 26, 2002).

From **Judge Charles P. Kocoras,** of the U.S. District Court for the Northern District of Illinois:

"The stakes were high here, with the result that most matters of consequence were contested. There were numerous trips to the courthouse, and the path to the trial court and the Court of Appeals frequently traveled. The efforts of counsel for the class has [sic] produced a substantial recovery, and it is represented that the cash settlement alone is the second largest in the history of class action litigation. . . . There is no question that the results achieved by class counsel were extraordinary [.]"

Regarding the work of Berger Montague in achieving more than $700 million in settlements with some of the defendants in *In Re Brand Name Prescription Drugs Antitrust Litigation*, 2000 U.S. Dist. LEXIS 1734, at *3-*6 (N.D. Ill. Feb. 9, 2000).

28

From **Judge Peter J. Messitte,** of the U.S. District Court for the District of Maryland:

> "The experience and ability of the attorneys I have mentioned earlier, in my view in reviewing the documents, which I have no reason to doubt, the plaintiffs' counsel are at the top of the profession in this regard and certainly have used their expertise to craft an extremely favorable settlement for their clients, and to that extent they deserve to be rewarded."

Settlement Approval Hearing, Oct. 28, 1994, in **Spawd, Inc. and General Generics v. Bolar Pharmaceutical Co., Inc.**, CA No. PJM-92-3624 (D. Md.).

From **Judge Donald W. Van Artsdalen,** of the U.S. District Court for the Eastern District of Pennsylvania:

> "As to the quality of the work performed, although that would normally be reflected in the not immodest hourly rates of all attorneys, for which one would expect to obtain excellent quality work at all times, the results of the settlements speak for themselves. Despite the extreme uncertainties of trial, plaintiffs' counsel were able to negotiate a cash settlement of a not insubstantial sum, and in addition, by way of equitable relief, substantial concessions by the defendants which, subject to various condition, will afford the right, at least, to lessee-dealers to obtain gasoline supply product from major oil companies and suppliers other than from their respective lessors. The additional benefits obtained for the classes by way of equitable relief would, in and of itself, justify some upward adjustment of the lodestar figure."

**Bogosian v. Gulf Oil Corp.**, 621 F. Supp. 27, 31 (E.D. Pa. 1985).

From **Judge Krupansky**, who had been elevated to the Sixth Circuit Court of Appeals:

> Finally, the court unhesitatingly concludes that the quality of the representation rendered by counsel was uniformly high.  The attorneys involved in this litigation are extremely experienced and skilled in their prosecution of antitrust litigation and other complex actions.  Their services have been rendered in an efficient and expeditious manner, but have nevertheless been productive of highly favorable result.

**In re Art Materials Antitrust Litigation**, 1984 CCH Trade Cases ¶65,815 (N.D. Ohio 1983).

From **Judge Joseph Blumenfeld,** of the U.S. District Court for the District of Connecticut:

29

"The work of the Berger firm showed a high degree of efficiency and imagination, particularly in the maintenance and management of the national class actions."

*In re Master Key Antitrust Litigation*, 1977 U.S. Dist. LEXIS 12948, at *35 (Nov. 4, 1977).


**Securities & Investor Protection**

From **Judge Jed Rakoff** of the U.S. District Court for the Southern District of New York:

Court stated that lead counsel had made "very full and well-crafted" and "excellent submissions"; that there was a "very fine job done by plaintiffs' counsel in this case"; and that this was "surely a very good result under all the facts and circumstances."

*In re Merrill Lynch & Co., Inc. Securities, Derivative & ERISA Litigation*, Master File No. 07-cv-9633(JSR)(DFE) (S.D.N.Y., July 27, 2009).


From **Judge Michael M. Baylson** of the U.S. District Court for the Eastern District of Pennsylvania:

"The Court is aware of and attests to the skill and efficiency of class counsel: they have been diligent in every respect, and their briefs and arguments before the Court were of the highest quality. The firm of Berger Montague took the lead in the Court proceedings; its attorneys were well prepared, articulate and persuasive."

*In re CIGNA Corp. Sec. Litig.*, 2007 U.S. Dist. LEXIS 51089, at *17-*18 (E.D. Pa. July 13, 2007).


From **Judge Stewart Dalzell** of the U.S. District Court for the Eastern District of Pennsylvania:

"The quality of lawyering on both sides, but I am going to stress now on the plaintiffs' side, simply  has not been exceeded in any case, and we have had some marvelous counsel appear before us and make superb arguments, but they really don't come any better than Mrs. Savett... [A]nd the arguments we had on the motion to dismiss [Mrs. Savett argued the motion], both sides were fabulous, but plaintiffs' counsel were as good as they come."

*In re U.S. Bioscience Secs. Litig.*, No. 92-0678 (E.D. Pa. April 4, 1994).


From **Judge Wayne Andersen** of the U.S. District Court for the Northern District of Illinois:

Motion for Class Cert App. 0370

"[Y]ou have acted the way lawyers at their best ought to act. And I have had a lot of cases… in 15 years now as a judge and I cannot recall a significant case where I felt people were better represented than they are here… I would say this has been the best representation that I have seen."

*In re: Waste Management, Inc. Secs. Litig.*, No. 97-C 7709 (N.D. Ill. 1999).

From **Chancellor William Chandler, III** of the Delaware Chancery Court:

"All I can tell you, from someone who has only been doing this for roughly 22 years, is that I have yet to see a more fiercely and intensely litigated case than this case.  Never in 22 years have I seen counsel going at it, hammer and tong, like they have gone at it in this case.  And I think that's a testimony – Mr. Valihura correctly says that's what they are supposed to do.  I recognize that; that is their job, and they were doing it professionally."

*Ginsburg v. Philadelphia Stock Exchange, Inc.*, No. 2202 (Del. Ch., Oct. 22, 2007).

From **Judge Stewart Dalzell** of the U.S. District Court for the Eastern District of Pennsylvania:

"Thanks to the nimble class counsel, this sum, which once included securities worth $149.5 million is now all cash.  Seizing on an opportunity Rite Aid presented, class counsel first renegotiated what had been stock consideration into Rite Aid Notes and then this year monetized those Notes.  Thus, on February 11, 2003, Rite Aid redeemed those Notes from the class, which then received $145,754,922.00.  The class also received $14,435,104 in interest on the Notes."

"Co-lead counsel … here were extraordinarily deft and efficient in handling this most complex matter… they were at least eighteen months ahead of the United States Department of Justice in ferreting out the conduct that ultimately resulted in the write down of over $1.6 billion in previously reported Rite Aid earnings.  In short, it would be hard to equal the skill class counsel demonstrated here."

*In re Rite Aid Corp. Securities Litigation*, 269 F. Supp. 2d 603, 605, n.1, 611 (E.D. Pa. 2003).

From **Judge Helen J. Frye**, United States District Judge for the U.S. District Court for the District of Oregon:

Motion for Class Cert App. 0371

"In order to bring about this result [partial settlements then totaling $54.25 million], Class Counsel were required to devote an unusual amount of time and effort over more than eight years of intense legal litigation which included a four-month long jury trial and full briefing and argument of an appeal before the Ninth Circuit Court of Appeals, and which produced one of the most voluminous case files in the history of this District."

\* \* \*

"Throughout the course of their representation, the attorneys at Berger Montague and Stoll, Stoll, Berne, Lokting & Shlachter who have worked on this case have exhibited an unusual degree of skill and diligence, and have had to contend with opposing counsel who also displayed unusual skill and diligence."

*In Re Melridge, Inc. Securities Litigation*, No. CV 87-1426-FR (D. Ore. April 15, 1996).

From **Judge Marvin Katz** of the U.S. District Court for the Eastern District of Pennsylvania:

"[T]he co-lead attorneys have extensive experience in large class actions, experience that has enabled this case to proceed efficiently and professionally even under short deadlines and the pressure of handling thousands of documents in a large multi-district action... These counsel have also acted vigorously in their clients' interests...."

\* \* \*

"The management of the case was also of extremely high quality.... [C]lass counsel is of high caliber and has extensive experience in similar class action litigation.... The submissions were of consistently high quality, and class counsel has been notably diligent in preparing filings in a timely manner even when under tight deadlines."

Commenting on class counsel, where the firm served as both co-lead and liaison counsel in *In re Ikon Office Solutions, Inc. Securities Litigation*, 194 F.R.D. 166, 177, 195 (E.D. Pa. 2000).

From **Judge William K. Thomas,** Senior District Judge for the United States District Court for the Northern District of Ohio:

"In the proceedings it has presided over, this court has become directly familiar with the specialized, highly competent, and effective quality of the legal services performed by Merrill G. Davidoff, Esq. and Martin I. Twersky, Esq. of Berger Montague...."

\* \* \*

"Examination of the experience-studded biographies of the attorneys primarily involved in this litigation and review of their pioneering prosecution of many class actions in antitrust,

32

securities, toxic tort matters and some defense representation in antitrust and other litigation, this court has no difficulty in approving and adopting the hourly rates fixed by Judge Aldrich."

Commenting in *In re Revco Securities Litigation*, Case No. 1:89CV0593, Order (N.D. Oh. September 14, 1993).

**Civil/Human Rights Cases**

From **Deputy Treasury Secretary Stuart E. Eizenstat**:

> "We must be frank. It was the American lawyers, through the lawsuits they brought in U.S. courts, who placed the long-forgotten wrongs by German companies during the Nazi era on the international agenda. It was their research and their work which highlighted these old injustices and forced us to confront them. Without question, we would not be here without them.... For this dedication and commitment to the victims, we should always be grateful to these lawyers."

In his remarks at the July 17, 2000, signing ceremony for the international agreements which established the German Foundation to act as a funding vehicle for the payment of claims to Holocaust survivors.

**Insurance Litigation**

From **Judge Janet C. Hall**, of the U.S. District Court of the District of Connecticut:

> Noting the "very significant risk in pursuing this action" given its uniqueness in that "there was no prior investigation to rely on in establishing the facts or a legal basis for the case....[and] no other prior or even now similar case involving parties like these plaintiffs and a party like these defendants." Further, "the quality of the representation provided to the plaintiffs ... in this case has been consistently excellent.... [T]he defendant[s] ... mounted throughout the course of the five years the case pended, an extremely vigorous defense.... [B]ut for counsel's outstanding work in this case and substantial effort over five years, no member of the class would have recovered a penny.... [I]t was an extremely complex and substantial class ... case ... [with an] outstanding result."

Regarding the work of Berger Montague attorneys Peter R. Kahana and Steven L. Bloch, among other co-class counsel, in *Spencer, et al. v. The Hartford Financial Services Group, Inc., et al.*, in the Order approving the $72.5 million final settlement of this action, dated September 21, 2010 (No. 3:05-cv-1681, D. Conn.).

Motion for Class Cert App. 0373

**Customer/Broker Arbitrations**

From **Robert E. Conner**, Public Arbitrator with the National Association of Securities Dealers, Inc.:

> "[H]aving participated over the last 17 years in 400 arbitrations and trials in various settings, ... the professionalism and the detail and generally the civility of everyone involved has been not just a cause for commentary at the end of these proceedings but between ourselves [the arbitration panel] during the course of them, and ... the detail and the intellectual rigor that went into the documents was fully reflective of the effort that was made in general.  I wanted to make that known to everyone and to express my particular respect and admiration."

About the efforts of Berger Montague shareholders Merrill G. Davidoff and Eric L. Cramer, who achieved a $1.1 million award for their client, in *Steinman v. LMP Hedge Fund, et al.*, NASD Case No. 98-04152, at Closing Argument, June 13, 2000.

**Employment & Unpaid Wages**

From **Judge Timothy R. Rice**, United States Magistrate Judge for the U.S. District Court for the Eastern District of Pennsylvania:

> Describing Berger Montague as "some of the finest legal representation in the nation," who are "ethical, talented, and motivated to help hard working men and women."

Regarding the work of Berger Montague attorneys Sarah R. Schalman-Bergen and Camille F. Rodriguez in *Gonzalez v. Veritas Consultant Group, LLC, d/b/a Moravia Health Network*, No. 2:17-cv-1319-TR (E.D. Pa. March 13, 2019).

From **Judge Malachy E. Mannion**, United States District Judge for the U.S. District Court for the Middle District of Pennsylvania:

> "At the final approval hearing, class counsel reiterated in detail the arguments set forth in the named plaintiffs' briefing. ... The court lauded the parties for their extensive work in reaching a settlement the court deemed fair and reasonable.
>
> \* \* \*
>
> "The court is confident that [class counsel] are highly skilled in FLSA collective and hybrid actions, as seen by their dealings with the court and the results achieved in both negotiating and handling the settlement to date."

34

*Acevedo v. Brightview Landscapes, LLC*, No. 3:13-cv-2529, 2017 WL 4354809 (M.D. Pa. Oct. 2, 2017).

From **Judge Joseph F. Bataillon**, United States District Judge for the U.S. District Court for the District of Nebraska:

> [P]laintiffs' counsel succeeded in vindicating important rights. ... The court is familiar with "donning and doffing" cases and based on the court's experience, defendant meat packing companies' litigation conduct generally reflects "what can only be described as a deeply-entrenched resistance to changing their compensation practices to comply with the requirements of FLSA." (citation omitted). Plaintiffs' counsel perform a recognized public service in prosecuting these actions as a 'private Attorney General' to protect the rights of underrepresented workers.
>
> The plaintiffs have demonstrated that counsel's services have benefitted the class. ... The fundamental policies of the FLSA were vindicated and the rights of the workers were protected.

Regarding the work of Berger Montague among other co-counsel in *Morales v. Farmland Foods, Inc.*, No. 8:08-cv-504, 2013 WL 1704722 (D. Neb. Apr. 18, 2013).

From **Judge Jonathan W. Feldman**, United States Magistrate Judge for the U.S. District Court for the Western District of New York:

> "The nature of the instant application obliges the Court to make this point clear: In my fifteen years on the bench, no case has been litigated with more skill, tenacity and legal professionalism than this case. The clients, corporate and individual, should be proud of the manner in which their legal interests were brought before and presented to the Court by their lawyers and law firms."

and

> "...the Court would be remiss if it did not commend class counsel and all those who worked for firms representing the thousands of current and former employees of Kodak for the outstanding job they did in representing the interests of their clients. For the last several years, lead counsel responsibilities were shared by Shanon Carson .... Their legal work in an extraordinarily complex case was exemplary, their tireless commitment to seeking justice for their clients was unparalleled and their conduct as officers of the court was beyond reproach."

Motion for Class Cert App. 0375

**Employees Committed For Justice v. Eastman Kodak,** (W.D.N.Y. 2010) ($21.4 million settlement).

**Other**

From **Stephen M. Feiler, Ph.D.,** Director of Judicial Education, Supreme Court of Pennsylvania, Administrative Office of Pennsylvania Courts, Mechanicsburg, PA *on behalf of the Common Pleas Court Judges (trial judges) of Pennsylvania*:

> "On behalf of the Supreme Court of Pennsylvania and AOPC's Judicial Education Department, thank you for your extraordinary commitment to the *Dealing with Complexities in Civil Litigation* symposia. We appreciate the considerable time you spent preparing and delivering this important course across the state. It is no surprise to me that the judges rated this among the best programs they have attended in recent years."

About the efforts of Berger Montague attorneys Merrill G. Davidoff, Peter Nordberg and David F. Sorensen in planning and presenting a CLE Program to trial judges in the Commonwealth of Pennsylvania.

**Founding Partner**

**David Berger - *1912-2007***

David Berger was the founder and the Chairman of Berger Montague. He received his A.B. *cum laude* in 1932 and his LL.B. *cum laude* in 1936, both from the University of Pennsylvania. He was a member of The Order of the Coif and was an editor of the *University of Pennsylvania Law Review*. He had a distinguished scholastic career including being Assistant to Professor Francis H. Bohlen and Dr. William Draper Lewis, Director of the American Law Institute, participating in the drafting of the first Restatement of Torts. He also served as a Special Assistant Dean of the University of Pennsylvania Law School. He was a member of the Board of Overseers of the Law School and Associate Trustee of the University of Pennsylvania. In honor of his many contributions, the Law School established the David Berger Chair of Law for the Improvement of the Administration of Justice.

David Berger was a law clerk for the Pennsylvania Supreme Court. He served as a deputy assistant to Director of Enemy Alien Identification Program of the United States Justice Department during World War II.

Thereafter he was appointed Lt.j.g. in the U.S. Naval Reserve and he served in the South Pacific aboard three aircraft carriers during World War II. He was a survivor of the sinking of the U.S.S. Hornet in the Battle of Santa Cruz, October 26, 1942. After the sinking of the Hornet, Admiral Halsey appointed him a member of his personal staff when the Admiral became Commander of the South Pacific. Mr. Berger was ultimately promoted to Commander. He was awarded the Silver Star and Presidential Unit Citation.

After World War II, he was a law clerk in the United States Court of Appeals.  The United States Supreme Court appointed David Berger a member of the committee to draft the Federal Rules of Evidence, the basic evidentiary rules employed in federal courts throughout the United States. David Berger was a fellow of the American College of Trial Lawyers, the International Society of Barristers, and the International Academy of Trial Lawyers, of which he was a former Dean.  He was a Life Member of the Judicial Conference of the Third Circuit and the American Law Institute.

A former Chancellor (President) of the Philadelphia Bar Association, he served on numerous committees of the American Bar Association and was a lecturer and author on various legal subjects, particularly in the areas of antitrust, securities litigation, and evidence.

David Berger served as a member of President John F. Kennedy's committee which designed high speed rail lines between Washington and Boston.  He drafted and activated legislation in the Congress of the United States which resulted in the use of federal funds to assure the continuance of freight and passenger lines throughout the United States.  When the merger of the Pennsylvania Railroad and the New York Central Railroad, which created the Penn Central Transportation Company, crashed into Chapter 11, David Berger was counsel for Penn Central and a proponent of its reorganization.  Through this work, Mr. Berger ensured the survival of the major railroads in the Northeastern section of the United States including Penn Central, New Jersey Central, and others.

Mr. Berger's private practice included clients in London, Paris, Dusseldorf, as well as in Philadelphia, Washington, New York City, Florida, and other parts of the United States.  David Berger instituted the first class action in the antitrust field, and for over 30 years he and the Berger firm were lead counsel and/or co-lead counsel in countless class actions brought to successful conclusions, including antitrust, securities, toxic tort and other cases.  He served as one of the chief counsel in the litigation surrounding the demise of Drexel Burnham Lambert, in which over $2.6 billion was recovered for various violations of the securities laws during the 1980s.  The recoveries benefitted such federal entities as the FDIC and RTC, as well as thousands of victimized investors.

In addition, Mr. Berger was principal counsel in a case regarding the Three Mile Island accident near Harrisburg, Pennsylvania, achieving the first legal recovery of millions of dollars for economic harm caused by the nation's most serious nuclear accident.  As part of the award in the case, David Berger established a committee of internationally renowned scientists to determine the effects on human beings of emissions of low level radiation.

In addition, as lead counsel in *In re Asbestos School Litigation*, he brought about settlement of this long and vigorously fought action spanning over 13 years for an amount in excess of $200 million.

David Berger was active in Democratic politics.  President Clinton appointed David Berger a member of the United States Holocaust Memorial Council, in which capacity he served from 1994-2004.  In addition to his having served for seven years as the chief legal officer of Philadelphia,

37

he was a candidate for District Attorney of Philadelphia, and was a Carter delegate in the Convention which nominated President Carter.

Over his lengthy career David Berger was prominent in a great many philanthropic and charitable enterprises some of which are as follows:  He was the Chairman of the David Berger Foundation and a long time honorary member of the National Commission of the Anti-Defamation League. He was on the Board of the Jewish Federation of Philadelphia and, at his last place of residence, Palm Beach, as Honorary Chairman of the American Heart Association, Trustee of the American Cancer Society, a member of the Board of Directors of the American Red Cross, and active in the Jewish Federation of Palm Beach County.

David Berger's principal hobby was tennis, a sport in which he competed for over 60 years.  He was a member of the Board of Directors of the International Tennis Hall of Fame and other related organizations for assisting young people in tennis on a world-wide basis.

### Firm Chair

### Eric L. Cramer – Chairman

Mr. Cramer is Firm Chairman and Co-Chair of the Firm's antitrust department. He has a national practice in the field of complex litigation, primarily in the area of antitrust class actions. He is currently co-lead counsel in multiple significant antitrust class actions across the country in a variety of industries and is responsible for winning numerous significant settlements for his clients totaling well over $3 billion. Most recently, he has focused on representing workers claiming that anticompetitive practices have suppressed their pay, including cases on behalf of mixed-martial-arts fighters and chicken growers.

In 2019, *The National Law Journal* awarded Mr. Cramer the 2019 Keith Givens Visionary Award, which was developed to honor an outstanding trial lawyer who has moved the industry forward through his or her work within the legal industry ecosystem, demonstrating excellence in all aspects of work from client advocacy to peer education and mentoring. In 2018, he was named Philadelphia antitrust "Lawyer of the Year" by *Best Lawyers*, and in 2017, he won the American Antitrust Institute's Antitrust Enforcement Award for Outstanding Antitrust Litigation Achievement in Private Law Practice for his work in *Castro v. Sanofi Pasteur Inc.*, No. 11-cv-07178 (D.N.J.). In that case, Mr. Cramer represented a national class of physicians challenging Sanofi Pasteur with anticompetitive conduct in the market for meningitis vaccines, resulting in a settlement of more than $60 million for the class. He has also been identified as a top tier antitrust lawyer by *Chambers & Partners* in Pennsylvania and nationally. *Chambers* observed that Mr. Cramer is "really a tremendous advocate in the courtroom, with a very good mind and presence." He has been highlighted annually since 2011 by *The Legal 500* as one of the country's top lawyers in the field of complex antitrust litigation, and repeatedly deemed one of the "Best Lawyers in America," including in 2020. In 2014 and 2018, Mr. Cramer was selected by *Philadelphia Magazine* as one of the top 100 lawyers in Philadelphia.

Mr. Cramer is also a frequent speaker at antitrust and litigation related conferences. He was the only Plaintiffs' lawyer selected to serve on the American Bar Association's Antitrust Section Transition Report Task Force delivered to the incoming Obama Administration in 2012. He is a Senior Fellow and Vice President of the Board of Directors of the American Antitrust Institute; a past President of COSAL (Committee to Support the Antitrust Laws), a leading industry group; a member of the Advisory Board of the Institute of Consumer Antitrust Studies of the Loyola University Chicago School of Law; and a member of the Board of Directors of Public Justice, a national public interest law firm.

He has written widely in the fields of class certification and antitrust law. Among other writings, Mr. Cramer has co-authored *Antitrust, Class Certification, and the Politics of Procedure*, 17 George Mason Law Review 4 (2010), which was cited by both the First Circuit in *In re Nexium Antitrust Litig.*, 777 F.3d 9, 27 (1st Cir. 2015), *quoting* Davis & Cramer, 17 Geo. Mason L. Rev. 969, 984-85 (2010), and the Third Circuit in *Behrend* v. *Comcast Corp.*, 655 F.3d 182, 200, n.10 (3d Cir. 2011), *rev'd on other grounds*, 133 S. Ct. 1426 (2013). He has also co-written a number of other pieces, including: *Of Vulnerable Monopolists?: Questionable Innovation in the Standard for Class Certification in Antitrust Cases*, 41 Rutgers Law Journal 355 (2009-2010); *A Questionable New Standard for Class Certification in Antitrust Cases*, published in the ABA's Antitrust Magazine, Vol. 26, No. 1 (Fall 2011); a Chapter of American Antitrust Institute's Private International Enforcement Handbook (2010), entitled "*Who May Pursue a Private Claim?*"; and, a chapter of the American Bar Association's Pharmaceutical Industry Handbook (July 2009), entitled "Assessing Market Power in the Prescription Pharmaceutical Industry."

Mr. Cramer is a *summa cum laude* graduate of Princeton University (1989), where he was elected to *Phi Beta Kappa*. He graduated *cum laude* from Harvard Law School with a J.D. in 1993.

### Selected Attorney Biographies

### Michael C. Dell'Angelo – Managing Shareholder
Michael Dell'Angelo is a Managing Shareholder in the Antitrust, Commercial Litigation, Commodities & Financial Instruments practice groups and Co-Chair of the Securities department. He serves as co-lead counsel in a variety of complex antitrust cases, including *Le, et al. v. Zuffa, LLC*, No. 15-1045 (D. Nev.) (alleging the Ultimate Fighting Championship ("UFC") obtained illegal monopoly power of the market for Mixed Martial Arts promotions and suppressed the compensation of MMA fighters).

Mr. Dell'Angelo is responsible for winning numerous significant settlements for his clients and class members. Most recently, as co-lead counsel, Mr. Dell'Angelo recently helped to reach settlements totaling more than $190 million in the multidistrict litigation *In re Domestic Drywall Antitrust Litig.*, No. 13-md-2437 (E.D. Pa.). There, in granting final approval to the last settlement, the court observed about Mr. Dell'Angelo and his colleagues that "Plaintiffs' counsel are experienced antitrust lawyers who have been working in this field of law for many years and have brought with them a sophisticated and highly professional approach to gathering persuasive evidence on the topic of price-fixing." *In re Domestic Drywall Antitrust Litig.*, No. 13-md-2437, 2018 WL 3439454, at *18 (E.D. Pa. July 17, 2018). "[I]t bears repeating," the court emphasized,

"that the result attained is directly attributable to having highly skilled and experienced lawyers represent the class in these cases." Id.

Mr. Dell'Angelo also serves as co-lead counsel or class counsel in numerous cases alleging price-fixing or other wrongdoing affecting a variety of financial instruments, including *In re Commodity Exchange, Inc., Gold Futures and Options Trading Litig.*, 1:14-MD-2548-VEC (S.D.N.Y.); *In re Platinum and Palladium Antitrust Litig.*, No. 14-cv-09391-GHW (S.D.N.Y.); *Contant, et al. v. Bank of America Corp., et al.*, 1:17-cv-03139-LGS (S.D.N.Y.); *In re Libor-Based Financial Instruments Antitrust Litig.*, No. 11-md-2262 (S.D.N.Y.); *Alaska Elec. Pension Fund, et al. v. Bank of Am. Corp., et al.*, No. 14 Civ. 7126-JMF (S.D.N.Y.); *In re Crude Oil Commodity Futures Litig.*, No. 11-cv-3600 (S.D.N.Y.); and *In re London Silver Fixing, Ltd. Antitrust Litig.*, No. 14-md-2573 (S.D.N.Y.).

*The National Law Journal* recently featured Mr. Dell'Angelo in its profile of Berger Montague for a special annual report entitled "Plaintiffs' Hot List." *The National Law Journal*'s Hot List identifies the top plaintiff practices in the country. The Hot List profile focused on Mr. Dell'Angelo's role in the MF Global litigation (*In re MF Global Holding Ltd. Inv. Litig.*, No. 12-MD-2338-VM (S.D.N.Y.)). In *MF Global*, Mr. Dell'Angelo represented former commodity account holders seeking to recover approximately $1.6 billion of secured customer funds after the highly publicized collapse of MF Global, a major commodities brokerage. At the outset of this high-risk litigation, the odds appeared grim: MF Global had declared bankruptcy, leaving the corporate officers, a bank, and a commodity exchange as the only prospect for the recovery of class's misappropriated funds. Nonetheless, four years later, a result few would have believed possible was achieved. Through a series of settlements, the former commodity account holders recovered more than 100 percent of their missing funds, totaling over $1.6 billion.

Mr. Dell'Angelo has been recognized consistently as a Pennsylvania Super Lawyer, a distinction conferred upon him annually since 2007. He is regularly invited to speak at Continuing Legal Education (CLE) and other seminars and conferences, both locally and abroad. In response to his recent CLE, "How to Deal with the Rambo Litigator," Mr. Dell'Angelo was singled out as "One of the best CLE speakers [attendees] have had the pleasure to see."

**Lane L. Vines – Senior Counsel**
Lane Vines is a Senior Counsel in the Securities, Commercial and Qui Tam (Whistleblower) Litigation practice groups at Berger Montague. For the past 20 years, he has prosecuted both class action and individual opt-out securities fraud cases for state government entities, public pension funds, and other large investors. He has also represented consumers in class actions involving unlawful and deceptive practices, as well as relators in qui tam/whistleblower litigations. Mr. Vines is admitted to practice law in Pennsylvania, New Jersey and numerous federal courts.

Mr. Vines also has experience in the defense of securities, commercial and criminal cases. For example, he was one of the Firm's principal attorneys defending a public company which obtained a pre-trial dismissal in full of a proposed securities fraud class action against a gold mining

40

company based in South Africa.  See *In re DRDGold Ltd. Securities Litigation*, 05-cv-5542 (VM), 2007 U.S. Dist. LEXIS 7180 (S.D.N.Y. Jan. 31, 2007).

During law school, Mr. Vines was a member of the Villanova Law Review and served as a Managing Editor of Outside Works.  In that role, he selected outside academic articles for publication and oversaw the editorial process through publication. Prior to law school, Mr. Vines worked as an auditor for a Big 4 public accounting firm, a property controller for a commercial real estate development firm, and served as the Legislative Assistant to the Minority Leader of the Philadelphia City Council.

Mr. Vines has achieved the highest peer rating, "AV Preeminent" in Martindale-Hubbell for legal abilities and ethical standards. Mr. Vines is admitted to practice law in Pennsylvania, New Jersey and several federal courts.

41

Exhibit 19

## Angeion Group Project Proposal Schedule of Fees and Charges

| | |
|---|---|
| **Case/Project Name:** | *Confidential TCPA* -- 135,000 Class Members |
| **Type of Case:** | Notice |
| **Submission Date:** | April 23, 2020 |
| **Firm(s) Submitted to:** | Berger Montague |
| **Firm(s) Contact:** | Michael C. Dell'Angelo, Esq. & Lane L. Vines, Esq. |
| **Angeion Representative:** | Steven Weisbrot, Esq. & Christopher Chimicles, MBA |



| Case Management Fee | VOLUME | RATE ($) | TOTAL ($) |
|---|---|---|---|
| Case/project start-up fee may include pre-administration consulting, preparing the technology environment, establishing project management workflows, and database set-up/management. | | | |
| *Est. Class Size (unduplicated)* | *135,000* | **SUBTOTAL** | 1,500.00 |

| Notification Fees & Costs | | | |
|---|---|---|---|
| **Reverse Look-up** | VOLUME | RATE ($) | TOTAL ($) |
| Reverse look-up to obtain *email and mailing address* | | | |
| | | **SUBTOTAL** | 11,500.00 |

| Email Notice | VOLUME | RATE ($) | TOTAL ($) |
|---|---|---|---|
| Email notice to ~74,250 class members | | | |
| | | **SUBTOTAL** | 5,092.00 |

| Mail to class members | VOLUME | RATE ($) | TOTAL ($) |
|---|---|---|---|
| Preparing the postcard notice and mailing the notice (includes printing and postage) | | | |
| | | **SUBTOTAL** | 20,982.00 |

| Processing Undeliverable Direct Mail Notices | VOLUME | RATE ($) | TOTAL ($) |
|---|---|---|---|
| Process undeliverable direct mail notices, skip tracing and re-mailing the notices | | | |
| | | **SUBTOTAL** | 5,862.00 |

| Processing Notice Requests and Class Member Correspondence | VOLUME | RATE ($) | TOTAL ($) |
|---|---|---|---|
| Processing notice requests and handling class member inquiries | | | |
| | | **SUBTOTAL** | 532.00 |

| Website Requirements | VOLUME | RATE ($) | TOTAL ($) |
|---|---|---|---|
| Set-up fee and monthly maintenance/hosting for Angeion Group website w/relevant case documents | | | |
| | | **SUBTOTAL** | 2,940.00 |

| Call Center Requirements | VOLUME | RATE ($) | TOTAL ($) |
|---|---|---|---|
| Set-up and implementation of IVR (integrated voice response) as well as transcription services for class members | | | |
| | | **SUBTOTAL** | 1,700.00 |

| Angeion Reporting Requirements | VOLUME | RATE ($) | TOTAL ($) |
|---|---|---|---|
| General reporting to counsel, the Court and internal reporting requirements | | | |
| | | **SUBTOTAL** | 3,930.00 |

| Process Opt Outs | VOLUME | RATE ($) | TOTAL ($) |
|---|---|---|---|
| Review and process Opt Outs | | | |
| | | **SUBTOTAL** | 65.00 |

**Angeion Group Project Proposal Schedule of Fees and Charges**

| | |
|---|---|
| Case/Project Name: | *Confidential TCPA  -- 135,000 Class Members* |
| Type of Case: | Notice |
| Submission Date: | April 23, 2020 |
| Firm(s) Submitted to: | Berger Montague |
| Firm(s) Contact: | Michael C. Dell'Angelo, Esq. & Lane L. Vines, Esq. |
| Angeion Representative: | Steven Weisbrot, Esq. & Christopher Chimicles, MBA |



| Other Relevant Costs | VOLUME | RATE ($) | TOTAL ($) |
|---|---|---|---|
| P.O. Box for Opt Outs | | | |
| Scanning of documents and image storage | | | |
| Miscellaneous | | | |
| | | SUBTOTAL | 230.00 |

**ESTIMATED PROJECT FEES & COSTS (excl. postage)**      37,170
**ESTIMATED POSTAGE COSTS**      17,163
**TOTAL ESTIMATED COSTS**      54,334

*All media/notification costs (includes media/printing/postage/email campaign) must be paid 14 days prior to the inception of the program.*

Postcard notice, email notice and reverse look-up costs are an estimate and are based upon volume, number of pages or other parameters.  Pricing may increase or decrease if the volume, number of pages or other variable factors are altered.

The estimated hours listed in this proposal for services performed are minimum hourly estimates.  Any additional time will be billed at the rates quoted in this proposal.

Postcards are printed in one lot to achieve preferred/bulk rate pricing

*Postage is an estimate.

## Angeion Group Project Proposal Schedule of Fees and Charges

| | |
|---|---|
| Case/Project Name: | *Confidential TCPA*  -- 2,000,000 Class Members |
| Type of Case: | Notice |
| Submission Date: | April 23, 2020 |
| Firm(s) Submitted to: | Berger Montague |
| Firm(s) Contact: | Michael C. Dell'Angelo, Esq. & Lane L. Vines, Esq. |
| Angeion Representative: | Steven Weisbrot, Esq. & Christopher Chimicles, MBA |



| Case Management Fee | VOLUME | RATE ($) | TOTAL ($) |
|---|---|---|---|
| Case/project start-up fee may include pre-administration consulting, preparing the technology environment, establishing project management workflows, and database set-up/management. | | | |
| *Est. Class Size (unduplicated)* | 2,000,000 | **SUBTOTAL** | 2,500.00 |

| Notification Fees & Costs | | | |
|---|---|---|---|
| **Reverse Look-up** | VOLUME | RATE ($) | TOTAL ($) |
| Reverse look-up to obtain *email and mailing address* | | | |
| | | **SUBTOTAL** | 74,950.00 |

| Email Notice | VOLUME | RATE ($) | TOTAL ($) |
|---|---|---|---|
| Email notice to ~1,100,000 class members | | | |
| | | **SUBTOTAL** | 12,660.00 |

| Mail to class members | VOLUME | RATE ($) | TOTAL ($) |
|---|---|---|---|
| Preparing the postcard notice and mailing the notice (includes printing and postage) | | | |
| | | **SUBTOTAL** | 258,560.00 |

| Processing Undeliverable Direct Mail Notices | VOLUME | RATE ($) | TOTAL ($) |
|---|---|---|---|
| Process undeliverable direct mail notices, skip tracing and re-mailing the notices | | | |
| | | **SUBTOTAL** | 51,860.00 |

| Processing Notice Requests and Class Member Correspondence | VOLUME | RATE ($) | TOTAL ($) |
|---|---|---|---|
| Processing notice requests and handling class member inquiries | | | |
| | | **SUBTOTAL** | 1,230.00 |

| Website Requirements | VOLUME | RATE ($) | TOTAL ($) |
|---|---|---|---|
| Set-up fee and monthly maintenance/hosting for Angeion Group website w/relevant case documents | | | |
| | | **SUBTOTAL** | 2,940.00 |

| Call Center Requirements | VOLUME | RATE ($) | TOTAL ($) |
|---|---|---|---|
| Set-up and implementation of IVR (integrated voice response) as well as transcription services for class members | | | |
| | | **SUBTOTAL** | 4,950.00 |

| Angeion Reporting Requirements | VOLUME | RATE ($) | TOTAL ($) |
|---|---|---|---|
| General reporting to counsel, the Court and internal reporting requirements | | | |
| | | **SUBTOTAL** | 3,930.00 |

| Process Opt Outs | VOLUME | RATE ($) | TOTAL ($) |
|---|---|---|---|
| Review and process Opt Outs | | | |
| | | **SUBTOTAL** | 163.00 |

## Angeion Group Project Proposal Schedule of Fees and Charges

**Case/Project Name:** *Confidential TCPA  -- 2,000,000 Class Members*
**Type of Case:** Notice
**Submission Date:** April 23, 2020
**Firm(s) Submitted to:** Berger Montague
**Firm(s) Contact:** Michael C. Dell'Angelo, Esq. & Lane L. Vines, Esq.
**Angeion Representative:** Steven Weisbrot, Esq. & Christopher Chimicles, MBA



| Other Relevant Costs | VOLUME | RATE ($) | TOTAL ($) |
|---|---|---|---|
| P.O. Box for Opt Outs | | | |
| Scanning of documents and image storage | | | |
| Miscellaneous | | | |
| | | SUBTOTAL | 1,005.00 |

**ESTIMATED PROJECT FEES & COSTS (excl. postage)**    168,690
**ESTIMATED POSTAGE COSTS**    246,058
**TOTAL ESTIMATED COSTS**    414,748

*All media/notification costs (includes media/printing/postage/email campaign) must be paid 14 days prior to the inception of the program.*

Postcard notice, email notice and reverse look-up costs are an estimate and are based upon volume, number of pages or other parameters.  Pricing may increase or decrease if the volume, number of pages or other variable factors are altered.

The estimated hours listed in this proposal for services performed are minimum hourly estimates.  Any additional time will be billed at the rates quoted in this proposal.

Postcards are printed in one lot to achieve preferred/bulk rate pricing

*Postage is an estimate.