**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

AARON HIRSCH, individually and on behalf
of all others similarly situated,

       Plaintiff,

v.

USHEALTH ADVISORS, LLC and
USHEALTH GROUP, INC.,

       Defendants.

**CASE NO.:** 4:18-cv-00245-P

**CLASS ACTION**

**DEFENDANTS' OPPOSITION**
**TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................................................... ii

PRELIMINARY STATEMENT ................................................................................................... 1

SUMMARY OF THE EVIDENCE ............................................................................................... 3

A.  Defendants ....................................................................................................................... 3

B.  USHA Independent Insurance Advisors .......................................................................... 3

C.  USHA TCPA Compliance/IDNC Lead Lists ................................................................... 4

D.  Independent Insurance Advisor CRM Records ................................................................. 4

E.  USHA Consent and Permission Based Leads ................................................................... 6

F.  Independent Insurance Advisors' Consent and Permission Based Leads ........................... 6

G.  Plaintiff ............................................................................................................................. 7

H.  The Hirsch Telephone Calls ............................................................................................. 7

ARGUMENT .............................................................................................................................. 8

I.      HIRSCH FAILED TO TIMELY SEEK CLASS CERTIFICATION ............................... 8

II.     HIRSCH LACKS ARTICLE III STANDING ................................................................ 8

III.    THE PROPOSED CLASS FAILS TO SATISFY RULE 23 ............................................ 9

A.  Overbreadth and Ascertainability .................................................................................... 10

B.  The Class Cannot Satisfy the Commonality Requirement ................................................ 11

        1.  Is the Class Member a *Residential* Telephone Subscriber? ........................................ 11

        2.  Who Has Standing? ...................................................................................................... 14

        3.  Did a Class Member Register Their Number on a "Do-Not-Call" List? ..................... 15

        4.  Was There Consent, Permission, an Established Business Relationship, or a Personal Relationship? .................................................................................................................. 16

        5.  Did a Class Member Revoke Consent? ......................................................................... 19

        6.  Are Some Class Members Required to Arbitrate? ........................................................ 20

        7.  Were the Calls at Issue Even Telephone Solicitations? ............................................... 20

        8.  Vicarious Liability ........................................................................................................ 21

C.  Typicality ......................................................................................................................... 23

D.  Adequacy of Hirsch and Class Counsel ........................................................................... 23

E.  Individual Issues Predominate .......................................................................................... 24

F.  A Class Action Would Not be Superior – it Would be Unmanageable ............................. 25

CONCLUSION ........................................................................................................................... 25

## TABLE OF AUTHORITIES

Cases

*Abante Rooter & Plumbing, Inc. v. Arashi Mahalo, LLC*,
  No. 18-CV-07311-VC, 2019 WL 6907077 (N.D. Cal. Dec. 19, 2019) .................................... 22
*Amchem Prods. Inc. v. Windsor*,
  521 U.S. 591 (1997) .................................................................................................................. 24
*AMP Auto., LLC v. B F T, LP*,
  No. CV 17-5667, 2018 WL 4028459 (E.D. La. Aug. 23, 2018) ............................................... 23
*Avilez v. Pinkerton Gov't Servs., Inc.*,
  596 F. App'x 579 (9th Cir. 2015) ............................................................................................. 23
*Baricuatro v. Indus. Pers. & Mgmt. Servs., Inc.*,
  No. CIV.A. 11-2777, 2013 WL 6072702 (E.D. La. Nov. 18, 2013) ........................................ 20
*Berger v. Compaq Computer Corp.*,
  257 F.3d 475 (5th Cir. 2001) .................................................................................................... 24
*Bolin Farms v. Am. Cotton Shippers Ass'n*,
  370 F. Supp. 1353 (W.D. La 1974) ........................................................................................... 23
*Brodsky v. HumanaDental Ins. Co.*,
  910 F.3d 285 (7th Cir. 2018) .................................................................................................... 19
*Chavez v. Plan Benefit Servs., Inc.*,
  No. 19-50904, 2020 WL 2046545 (5th Cir. Apr. 29, 2020) ........................................... 9, 10, 11
*Chinitz v. NRT W., Inc.*,
  No. 18-CV-06100-NC, 2019 WL 4142044 (N.D. Cal. Aug. 30, 2019) ............................. 21, 22
*Coleman v. Colorado Technical University*,
  No. 16-4237, 2017 WL 2377714 (E.D. Penn. Jun. 1, 2017) ..................................................... 19
*Comcast Corp. v. Behrend*,
  569 U.S. 27 (2013) .................................................................................................................... 10
*Conrad v. General Motors Acceptance Corp.*,
  283 F.R.D. 326 (N.D. Tex. 2012) ............................................................................................. 18
*Cordoba v. DIRECTV, LLC*,
  942 F.3d 1259 (11th Cir. 2019) .......................................................................................... 14, 15
*Creative Montessori Learning Centers v. Ashford Gear LLC*,
  662 F.3d 913 (7th Cir. 2011) .................................................................................................... 24
*Cruson v. Jackson Nat'l Life Ins. Co.*,
  954 F.3d 240 (5th Cir. 2020) .................................................................................................... 25
*Cunningham v. Politi*,
  No. 18-cv-00362-ALMCAN, 2019 WL 2517085 (E.D. Tex. Apr. 30, 2019) .......................... 12
*Danehy v. Time Warner Cable Enters.*,
  No. 5:14-CV-133-FL, 2015 WL 5534094 (E.D.N.C. Aug. 6, 2015) ........................................ 21
*Davis v. AT&T Corp.*,
  No. 15CV2342-DMS (DHB), 2017 WL 1155350 (S.D. Cal. Mar. 28, 2017) .......................... 19
*Denney v. Deutsche Bank AG*,
  443 F.3d 253 (2d Cir. 2006) ..................................................................................................... 14

*Durrett v. John Deere Co*.,
   150 F.R.D. 555 (N.D. Tex. 1993) ............................................................................................ 23

*E&G, Inc. v. Mount Vernon Mills, Inc.*,
   No. 6:17-cv-318-TMC, 2019 WL 4034951 (D.S.C. Aug. 22, 2019) ........................................ 19

*Eldridge v. Pet Supermarket Inc.*, --- F.Supp.3d ---, No. 18-22531-CIV,
   2020 WL 1475094 (S.D. Fla. Mar. 10, 2020) ........................................................................... 14

*Espejo v. Santander Consumer USA, Inc.*,
   No. 11 C 8987, 2016 WL 6037625 (N.D. Ill. Oct. 14, 2016) .................................................... 19

*Flecha v. Medicredit, Inc*.,
   946 F.3d 762 (5th Cir. 2020) ........................................................................................... 9, 10, 14

*Gartin v. S & M NuTec LLC*,
   245 F.R.D. 429 (C.D. Cal. 2007) .............................................................................................. 25

*Gene and Gene LLC v. BioPay LLC*,
   541 F.3d 318 (5th Cir. 2008) ................................................................................... 11, 18, 24, 25

*Gordon v. Caribbean Cruise Line, Inc.*, No. 14 C 5848,
   2019 WL 498937 (N.D. Ill. Feb. 8, 2019) ................................................................................ 24

*Halvorson v. Auto-Owners Ins. Co.*,
   718 F.3d 773 (8th Cir. 2013) .................................................................................................... 14

*Hamilton v. Spurling*,
   No. 3:11CV00102, 2013 WL 1164336 (S.D. Ohio Mar. 20, 2013) .......................................... 17

*In re Checking Account Overdraft Litig*.,
   780 F.3d 1031 (11th Cir. 2015) ................................................................................................ 20

*In re Chevron U.S.A., Inc.*,
   109 F.3d 1016 (5th Cir. 1997) .................................................................................................. 25

*In re Deepwater Horizon*,
   732 F.3d 326 (5th Cir. 2013) .................................................................................................... 10

*In re Fibreboard Corp.*,
   893 F.2d 706 (5th Cir. 1990) .................................................................................................... 25

*In re Kosmos Energy Ltd. Sec. Litig.*,
   299 F.R.D. 133 (N.D. Tex. 2014) ........................................................................................ 10, 17

*In Re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*,
   18 F.C.C. Rcd. 14014 (2003) .................................................................................................... 12

*In re Rules & Regulations Implementing the Telephone Consumer Protection Act of 1991*,
   30 F.C.C. Rcd. 7961 (July 10, 2015) ........................................................................................ 19

*In re Wells Fargo Home Mortg. Overtime Pay Litig*.,
   268 F.R.D. 604 (N.D. Cal. 2010) .............................................................................................. 17

*In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*,
   27 FCC Rcd. 1830 (2012) ......................................................................................................... 16

*Jia v. Nerium Int'l LLC*,
   No. 3:17-CV-03057-S, 2018 WL 4491163 (N.D. Tex. Sept. 18, 2018) .................................... 20

*Jones v. Royal Admin. Servs., Inc*.,
   887 F.3d 443 (9th Cir. 2018) .................................................................................................... 22

*Joseph N. Main P.C. v. Elec. Data Sys. Corp.*,
168 F.R.D. 573 (N.D. Tex. 1996) ............................................................................................. 8
*Karnes v. Fleming*,
No. CIV.A. H-07-0620, 2008 WL 4528223 (S.D. Tex. July 31, 2008) .................................... 20
*Kohen v. Pac. Inv. Mgmt. Co.*,
571 F.3d 672 (7th Cir. 2009) .................................................................................................... 14
*Kostmayer Constr., LLC v. Port Pipe & Tube, Inc.*,
No. 16-CV-1012, 2019 WL 1523045 (W.D. La. Apr. 8, 2019) ............................................... 19
*Krakauer v. Dish Network L.L.C.*,
311 F.R.D. 384 (M.D.N.C. 2015) ................................................................................... 9, 12, 13
*Lee v. Loandepot.com, LLC*,
No. 14-CV-01084-EFM, 2016 WL 4382786 (D. Kan. Aug. 17, 2016)............................. 12, 13
*Legg v. PTZ Insurance Agency, Ltd.*,
321 F.R.D. 572 (N.D. Ill. 2017)......................................................................................... 14, 16
*Leyse v. Bank of Am., Nat'l Ass'n*,
No. CV117128SDWSCM, 2020 WL 1227410 (D.N.J. Mar. 13, 2020)..................................... 9
*Licari Family Chiropractic Inc. v. eClinical Works, LLC*,
No. 8:16-CV-3461-MSS-JSS, 2019 WL 7423551 (M.D. Fla. Sept. 16, 2019) ........................ 19
*London v. Wal-Mart Stores, Inc.*,
340 F.3d 1246 (11th Cir. 2003) ................................................................................................ 24
*Mattson v. Quicken Loans Inc.*,
No. 3:18-CV-00989-YY, 2019 WL 7630856 (D. Or. Nov. 7, 2019) ............................. 9, 12, 13
*Mazza v. Am. Honda Motor Co.*,
666 F.3d 581 (9th Cir. 2012) .................................................................................................... 14
*McGowan v. Faulkner Concrete Pipe Co.*,
659 F.2d 554 (5th Cir. 1981) .................................................................................................... 23
*Morris v. Unitedhealthcare Ins. Co.*,
No. 415CV00638ALMCAN, 2016 WL 7115973 (E.D. Tex. Nov. 9, 2016) ........................... 21
*Orsatti v. Quicken Loans, Inc.*,
No. 215CV09380SVWAGR, 2016 WL 7650574 (C.D. Cal. Sept. 12, 2016).......................... 10
*Revitch v. Citibank, N.A.*,
No. C 17-06907 WHA, 2019 WL 1903247 (N.D. Cal. Apr. 28, 2019).................................... 19
*Rosen v. Chrysler Corp.*,
No. 97-CV-60374-AA, 2000 WL 34609135 (E.D. Mich. July 18, 2000) ................................ 25
*Salcedo v. Hanna*,
936 F.3d 1162 (11th Cir. 2019) ................................................................................................ 14
*Sandusky Wellness Ctr., LLC v. ASD Specialty Healthcare, Inc.*,
863 F.3d 460 (6th Cir. 2017) .................................................................................................... 19
*Saulsberry v. Meridian Fin. Servs., Inc.*,
No. CV-14-6256-JGB (JPRx), 2016 WL 3456939 (C.D. Cal. Apr. 14, 2016)........................ 20
*Shelton v. Target Advance LLC*,
No. CV 18-2070, 2019 WL 1641353 (E.D. Pa. Apr. 16, 2019) .......................................... 9, 13

*Smith v. State Farm Mutual Automobile Ins. Co.*,
  30 F. Supp. 3d 765 (N.D. Ill. 2014) ........................................................................................ 22
*Southwell v. Mortg. Inv'rs Corp. of Ohio*,
  No. C13-1289 MJP, 2014 WL 3956699 (W.D. Wash. Aug. 12, 2014) .................................... 10
*Spokeo, Inc. v. Robins*,
  136 S. Ct. 1540 (2016) ............................................................................................................... 9
*Stevens-Bratton v. TruGreen, Inc.*,
  No. 2:15-2472, 2020 WL 556405 (W.D. Tenn. Feb. 4, 2020) .......................................... 12, 13
*Super Future Equities, Inc. v. Wells Fargo Bank Minn., N.A.*,
  No. 3: 06-CV-0271-B, 2006 WL 8437810 (N.D. Tex. Aug. 28, 2006) ...................................... 8
*Thomas v. Taco Bell Corp.*,
  582 Fed. Appx. 678 (9th Cir. 2014) ......................................................................................... 22
*Tyson Foods, Inc. v. Bouaphakeo*,
  136 S. Ct. 1036 (2016) .............................................................................................................. 14
*Van Patten v. Vertical Fitness Group, LLC*,
  847 F.3d 1037 (9th Cir. 2017) .................................................................................................. 19
*Vigus v. S. Illinois Riverboat/Casino Cruises, Inc.*,
  274 F.R.D. 229 (S.D. Ill. 2011) ............................................................................................... 23
*Villagran v. Cent. Ford, Inc.*,
  524 F. Supp. 2d 866 (S.D. Tex. 2007) ...................................................................................... 23
*Wal-Mart Stores, Inc. v. Dukes*,
  564 U.S. 338 (2011) ..................................................................................................... 10, 11, 21
*Warth v. Seldin*,
  422 U.S. 490 (1975) .................................................................................................................. 14
*Wolfkiel v. Intersections Ins. Servs., Inc.*,
  303 F.R.D. 287 (N.D. Ill. 2014) ............................................................................................... 20
*Woods v. Google LLC*,
  No. 11-CV-01263-EJD, 2018 WL 4030570 (N.D. Cal. Aug. 23, 2018) .................................. 24
*WorldVentures Mktg., LLC v. Rogers*,
  No. 4:18-CV-00522, 2018 WL 7138387 (E.D. Tex. Dec. 10, 2018) ....................................... 20
*Zachery v. Texaco Expl. & Prod., Inc.*,
  185 F.R.D. 230 (W.D. Tex. 1999) ............................................................................................ 23

## Statutes

15 U.S.C. § 6155 ........................................................................................................................ 15
15 U.S.C. § 7001 ........................................................................................................................ 17
26 U.S.C. § 262 .......................................................................................................................... 13
47 U.S.C. § 227(c) .............................................................................................................. 9, 12, 13
47 U.S.C. § 227(c)(5) ................................................................................................................. 10

## Regulations

47 C.F.R. § 64.1200(c)(2)(ii) ..................................................................................................... 16

47 C.F.R. § 64.1200(c)(2)(iii) .......................................................................................................... 16

47 C.F.R. § 64.1200(d)(3) ............................................................................................................... 10

47 C.F.R. § 64.1200(f)(5) .......................................................................................................... 16, 17

47 C.F.R. § 64.1200(f)(14) .............................................................................................................. 16

47 C.F.R. § 64.1200(f)(16) .............................................................................................................. 16

47 C.F.R. §§ 64.1200(c) & (d) ........................................................................................................ 21

47 C.F.R. §§ 64.1200(c)(2) & 64.1200(d) .................................................................................... 9, 12

47 C.F.R. §§ 64.1200(f)(12) & (14) ................................................................................................ 21

Other Authorities

73 FCC Rcd. 40183 (2008) .............................................................................................................. 15

## PRELIMINARY STATEMENT

Claiming to be the exception to the rule, Hirsch's Motion for Class Certification offers an intentionally myopic presentation, pretending a class action in this case can take place with laser beam-like precision with only two data points – "call logs" that are not actually call logs, to establish liability,[1] and "Agent Agreements." Not so. Indeed, *using his own expert's purported "methodology" of "just look at the call logs," **Hirsch is not identified***. Regardless, a "call log" could not establish anything other than the fact that a particular telephone number appears – no call log could ever "establish liability." And an "Agent Agreement," particularly one that clearly defines the insurance advisor as an independent contractor, cannot prove the vicarious liability of either Defendant USHEALTH Advisors, LLC ("USHA") or USHEALTH Group, Inc. ("USHG"), the latter of which is not even a party to the Agreement, for the conduct of more than 20,000 independent insurance advisors over a six year period.

Far from a laser-like focus that could be applied across the hundreds of thousands of class claims (if not more), a class trial would involve a kaleidoscopic array of individualized evidence and determinations specific to *each* class member to *answer* at least the following questions:

(1)    Is a telephone number on the NDNC?
(2)    If so, is the telephone number, as is required, a subscribed "residential telephone" number – or, for instance, is it a cellular telephone subscriber or a telephone number used for business purposes?
(3)    Did the "residential telephone subscriber" receive two or more "telephone solicitations" – not just calls – in a 12-month period?
(4)    Is the person who registered the telephone number on the NDNC the current subscriber of the telephone number?
(5)    Did the residential telephone subscriber suffer a concrete injury?
(6)    For anyone who purports to have received a telephone call after requesting to be

---

[1] The records reflect customer relationship management ("CRM") data, *i.e.*, notes of all interactions with a customer or potential customer. *See* App.1257. *See also* App.917, 1037. The CRM data for almost half – 713 – of the 1,591 NDNC telephone numbers identified by Plaintiff's expert as supposedly receiving at least two potentially violative calls actually ***do not reflect any telephone calls*** to those numbers. App.2928. No list of alleged IDNC violation telephone numbers was provided, despite Defendants' request. *See* App.1382.

placed on the IDNC, what are the answers to all of the foregoing questions?

(7)     For an IDNC claim, did the residential telephone subscriber actually request to be placed on the IDNC, or was their telephone number included on the list for one of a host of other highly subjective reasons?

(8)     Was there consent, permission, an established business relationship, or a personal relationship that would render any such telephone calls to a residential telephone subscriber non-violative?

(9)     Did the consent include a class action waiver and agreement to arbitrate?

(10)    Was consent to be called effectively and sufficiently revoked?

(11)    Were the telephone calls, such as Hirsch's telephone calls from "Dosys" to simply schedule a telephone call which he expressed interest in arranging, even "telephone solicitations"?

(12)    How is USHA vicariously liable for each of the hundreds of thousands of telephone calls and the thousands of "downstream" insurance advisor-lead generator relationships such as the one that Hirsch's calls relate to?  And, finally,

(13)    How is USHG, a holding company, vicariously liable?

Hirsch puts the blinders on to the realities of this case, both from the varied factual circumstances of each of the calls to, and claims of, the class members but also the numerous individualized factual and legal issues that would have to be decided at trial.  There are no shortcuts, data, or records that will allow for classwide answers to be generated "in one stroke."  A simple look at Hirsch reveals the flaws.  His telephone number is not "residential," but is cellular and has been used for the last 17 years as his exclusive business telephone number.[2]  He repeatedly consented, "revoked," and then consented again, telling lies to gather information and even calling the marketer back in the hopes of getting more calls in the future.  He welcomes the calls and then shares the information, in real time, with his good friend and lawyer.  Hirsch is not "representative," common or typical of the proposed class.  Everything about his situation is unique.

A resolution of Hirsch's claims cannot resolve those of a single other putative class member – certainly not as it relates to the issues of "residential telephone subscriber," consent, established

---

[2] *Only* "residential telephone subscribers" have a potential right of action under Section 227(c). Although Hirsch's expert tried to include only residential numbers in her "sample" class list, her methodology miserably failed – 80.7% of called numbers were business or government numbers.

business relationships ("EBR") or other personal or permission based relationships with prospective customers and independent insurance advisors. And for vicarious liability, how could a resolution that either Defendant is responsible for the actions of one of the few insurance advisors (and the single third party lead generator with whom neither Defendant has a relationship) that called Hirsch establish liability for the disparate actions of any of the more than 20,000 independent insurance advisors or other lead generators that never made a call to Hirsch?

Obtaining answers just for the calls that Hirsch himself complains of shows the need for individualized inquiries with evidence specific to each telephone call and purported agency (or sub-agency) relationship. Multiplying the inquiries for each class member only further undercuts the case for class certification. Trial of this class action would breach the limits of what a district court or a jury could humanly do, would exceed what due process would allow, and makes clear there is no way a class can be certified in this case.

**SUMMARY OF THE EVIDENCE**

### A.      Defendants

USHG is an insurance holding company. It does not market, sell, or underwrite any insurance products. App.1398. USHA is a licensed insurance agency and a wholly owned subsidiary of USHG. *Id.*

### B.      USHA Independent Insurance Advisors

Over the last six years, USHA has contracted with more than 20,000 individuals who signed a USHEALTH Advisors Agent Agreement ("Agent Agreement"). App.116. The Agent Agreement makes clear that the advisors are independent contractors and that each "is free to exercise his/her own judgment as to the time and manner for performing services required under this Agreement." *See, e.g.*, App.48. Independent advisors are aware that they must comply with the law, including the TCPA. App.45-46, 1001, 1029, 1120, 1151, 1179, 1207, 1234, 1420, 1499. USHA does not

3

supervise or control the day-to-day conduct of the independent insurance advisors, other than to require that they follow the law and accurately describe the products being sold.[3]  *Id.*[4]

## C.   USHA TCPA Compliance/IDNC Lead Lists

USHA provides independent insurance advisors with training, information, and assistance (such as free scrubbing of leads against "do-not-call" lists) relating to compliance with the TCPA and all applicable regulations.  App.47-48, 745-81, 832-74.[5]  USHA maintains an internal do not call list (the "IDNC"), which it updates with information provided by the independent insurance advisors. App.49, 746-750, 921, 1041, 1152, 1511; Pl.'s App.13-14.  The IDNC maintained by USHA does not consist only of consumers who request to no longer be called.  The IDNC is populated with countless telephone numbers that never asked to be added, *i.e.*, known TCPA litigants who are screened out, lists from outside lead generators, or telephone numbers added for any other subjective reason an insurance advisor decided warranted a "do-not-call" code.  App.750-752, 875-906, 919-20, 1039-40, 1121, 1152, 1208, 1235-36, 1431-32, 1510.

## D.   Independent Insurance Advisor CRM Records

Some independent insurance advisors utilize the services of a CRM platform, such as VanillaSoft.[6]  A CRM is a tool used to manage customer information.  App.1256-57.  VanillaSoft

---

[3] Plaintiff attached some "scripts" without authentication or explanation.  USHA did not provide or force the use of any scripts.  App.31, 53, 55, 87, 100, 1001, 1029-30, 1117, 1204, 1148, 1176, 1420, 1499.  Nor is Plaintiff's reference to a response to a document request, (Pl.'s App.285), proof of anything.  The response simply means "[s]ome may use the telephone as part of their marketing, others do not."  App.2891-92.  *See also* App.1005, 1036, 1428.

[4] *See also* App.42, 997-1003, 1025-1030, 1036, 1114-1117, 1120-1121, 1145-1149, 1151, 1173-1176, 1179-1180, 1201-1204, 1207, 1228-1232, 1234-1235, 1416-421, 1495-1500.

[5] The Declaration of Larry Wilford, (App.744-752), accompanying exhibits, and insurance advisors declarations (App.997, 1025, 1114, 1145, 1173, 1201, 1228, 1416, 1495) that accompany this Opposition negate both the Freeman Declaration and the preferred "expert" report of R. Horack. Neither of those Declarations submitted by Plaintiff have any bearing on class certification issues so they are not directly addressed.

[6] Many use other telephones like a "soft phone" or their personal cellular telephones to make calls.

4

has produced records associated with four "Administrator Accounts." App.1257. The VanillaSoft CRM records not just telephone calls made, but *every* interaction with a customer (such as an e-mail or claims inquiry) or any entry made by an advisor on their "file," such as one made for Hirsch on a day that he never claims he was called. App.1257-58, 2908, 2910-12, 2927-31. Each of those "Administrator Accounts" has hundreds of independent insurance advisors "linked" to it, which allows any linked accounts to share information.[7] The VanillaSoft platforms are customizable and used in different ways so that *no two platforms are alike*. App.1258. *See also* App.911, 918, 1030-31, 1037-38, 1421, 1429, 1500, 508.

"Do-not-call" codes that may appear in the CRM records are subjective and do not necessarily mean that a person actually made a request to be put on the "DNC" list. App.750-52, 813, 875-908, 919-20, 1039-40, 1121, 1152, 1208, 1235-36, 1431, 1509-10. For example, leads dispositioned as DNC may include (a) individuals who asked; (b) individuals who used swear language, or were angry or irate but did not request not to be called; (c) leads that are sold but are still receiving telephone calls; (d) leads that have been called upon a lot of times but have not resulted in a sale; and (e) any other reason an insurance advisor deems appropriate short of an actual request to be added to a do-not-call list. *Id.* Once, USHA received a misdirected complaint about a completely different company, but added those people, too, to its IDNC list. App.57-58. Thus, one cannot divine the reason for the "do-not-call" disposition from the face of the CRM records alone. App.752, 906. The "Result Codes" relied upon by Plaintiff's expert, too, are subjective, differ, and used differently in the Priovolos, Herndon, Brown, and Laughlin records; advisors using even the same results codes do not do so uniformly. App.918-21, 1030-31, 1037-40, 1429-31, 1500, 1508-

---

App.33, 84, 89, 121, 191, 1151.

[7] According to VanillaSoft, there are 47 Administrator Accounts with more than 2,000 users linked to those Administrator Accounts. App.1260.

09, 2930, 2932-33.  Additionally, many of these codes indicate an EBR between the lead and the advisor making the CRM entry (like appointment, presentation, quote given and others reflecting an inquiry).  *Id.*

### E.   USHA Consent and Permission Based Leads

USHA procures only TCPA-compliant consent-based leads from different lead generation vendors.  App.44, 47, 108-16, 120-21, 138-39, 144, 152, 170-71, 174, 178, 184, 191, 195-96, 199, 221, 227-28, 241, 243.  A comprehensive chart with examples of landing pages, consent language, and applicable arbitration agreements for leads that USHA purchases is located at App.321-541. USHA also works with two different lead *verification* vendors.  App.115, 542-646.[8]  USHA makes the leads of people who consented available to independent insurance advisors.  App.107-108. USHA itself does not make outbound telephone calls to potential purchasers and does not use third party lead generators that do so.  App.43, 108.

### F.   Independent Insurance Advisors' Consent and Permission Based Leads

The independent insurance advisors may acquire leads through a wide variety of methods: express consent being provided directly from a prospective customer, purchasing a lead from a third party lead generator (TCPA-compliant consent based leads), through a referral from an existing client, through a referral from a friend, family member, business relationship, business networking group, or other personal relationship, meeting someone at a trade show, social event, or other social setting, hosting seminars, an inbound inquiry, or a host of other ways.[9]   Indeed, the CRM records produced for just four administrator accounts reveal nearly *a thousand lead sources*.  App.911, 1031,

---

[8] A link to view consent verification videos for leads purchased by USHA is at App.115, ¶ 31.
[9] *See* App.32-33, 50-51, 54, 56, 60-66, 69, 74, 79-80, 88-90, 100, 911-20, 922-27, 961-96, 1002-05, 1031-39, 1060-61, 1118-20, 1140-1142, 1149-53, 1177-79, 1201-04, 1205-07, 1232-35, 1385-95, 1421-31, 1452-1455, 1495-1500.

1453-55, 1500.  The independent insurance advisors only call people who want to be called and target small businesses and the self-employed.  App.35, 40, 64, 71-72, 82, 84-85, 91, 94-97, 99-100, 911-20, 922-27, 961-96, 1001-03, 1005, 1029-37, 1060-61, 1118-21, 1140-421149-51, 1177-80, 1205-07, 1232-34, 1420-31, 1452-55, 1486-94, 1499-1510, 1564-79.

### G.    Plaintiff

Hirsch has filed multiple TCPA lawsuits and welcomes telephone calls so he can file more; he shares a spreadsheet, in real time, with his lawyer and close friend, Max Maccoby, Esq.  App. 5-6, 22, 2883-920.  In addition to his cellular telephone number, he has two landlines at his home, one of which he uses solely to receive calls he believes violate the TCPA.  App.8-9.  Hirsch has been a real estate developer since 1999 and a real estate agent since 2009.  App.6.  He has had the same cellular telephone number ending 8313 for 15-20 years (the "Business Cell Number").  App.7-9. *Hirsch has used the Business Cell Number as his exclusive business telephone number, repeatedly and intentionally held out the Business Cell Number to the world, and deducts the cost as a business expense for tax purposes*, (App.6-16, 1261-1381, 1396-97, 1400-1403, 1618-20, 1622-1749, 2914-2917, 3520),[10] all of which refute his declaration testimony that "I have only used my 8313 cellular number as my residential line."  Pl.'s App.335, ¶ 4.

### H.    The Hirsch Telephone Calls

Hirsch complains about telephone calls and text messages to his Business Cell Number.  App.6, 8.  Hirsch admits he had looked for health insurance coverage.  App.10.  On November 10, 2017, Hirsch received a telephone call from a telephone number he associates with a company called "Dosys."  The caller did not offer to sell anything to Hirsch, but instead asked if he wanted to schedule a telephone call with a licensed health insurance advisor.  Hirsch consented, and scheduled

---

[10] App.1622-82 – Business Cell Number listed on his property development website since *2003*.

a telephone call for November 13.  The recording of the call is available [here](#),[11] and Hirsch admits the recording is accurate, (App.1404-05), though much of what he says to the caller is inaccurate so he can entice more calls.  *Compare* recording to App.110.  *See* App.2895.  Upon obtaining Hirsch's consent, Dosys sold that "lead" to George Priovolos.  App.71, 917.  Dosys does not have any relationship with USHA or USHG.  App.54.  The information from Dosys was added to Priovolos's CRM for use by his "region."  App.46, 74-75, 92-93.  On November 13, 2017, Hirsch received the requested telephone call.  App.1123, 1408.  At its conclusion, Hirsch asked to be placed on USHA's IDNC, which was done.  App.1123.  Hirsch never requested that Dosys place him on *its* IDNC, and he apparently received additional telephone calls from Dosys on December 1, 2017, May 15, 2018, July 14, 2018, November 8, 2018, and March 2, 2019.  During three of those calls, Hirsch, overriding his prior request to not be contacted, expressly consented to additional telephone calls.  App.17, 1408.  When contacted, he would ask not to be called again (only to once again later schedule a call with an insurance advisor).[12]  App.1581-84.  This sequence was Hirsch's litigation strategy.

## ARGUMENT

### I.  HIRSCH FAILED TO TIMELY SEEK CLASS CERTIFICATION

Hirsch and his counsel unquestionably failed to comply with Local Rule 23.2.  That alone merits denial without any showing of prejudice required.[13]

### II.  HIRSCH LACKS ARTICLE III STANDING

The "standing issue must be addressed first, before deciding class certification.  After all, if

---

[11] [https://spaces.hightail.com/space/xoqpFt9rp9](https://spaces.hightail.com/space/xoqpFt9rp9).  The password to access the link is "18-cv-245".

[12] App.17-28, 36-39, 75-78, 92-93, 1408-15, 2917-19.  *See* n. 11.  Hirsch also received a few follow up text messages and engaged in communication with those insurance advisors via text.  App.1581-84; Pl.'s App.310-13.

[13] *See, e.g., Super Future Equities, Inc. v. Wells Fargo Bank Minn., N.A.*, No. 3: 06-CV-0271-B, 2006 WL 8437810, *1 (N.D. Tex. Aug. 28, 2006); *Joseph N. Main P.C. v. Elec. Data Sys. Corp.*, 168 F.R.D. 573, 575-77 (N.D. Tex. 1996).

the class representative lacks standing, then there is no Article III suit to begin with—class certification or otherwise." *Flecha v. Medicredit, Inc*., 946 F.3d 762, 769 (5th Cir. 2020). The injury-in-fact component of "Article III standing requires a concrete injury even in the context of a statutory violation," meaning that if a bare procedural violation results in no "harm" and no "material risk of harm," it is not concrete. *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1549, 1550 (2016).

For Hirsch, far from a nuisance, the ringing of his phone is akin to the sound of a cash register. He admits to "wanting" and engineering the calls he now sues over; they don't bother him. He consents, revokes, consents again (and so on). He keeps contemporaneous notes, sharing them in real time with his lawyer. App.2, 3, 21, 22, 2883-90, 2900. He literally *pays to keep a telephone* line just so he can file TCPA lawsuits. App.9. *See* Summ. Evid., § G, *supra*. The facts in this case are substantially the same as in a recent decision where the court found a repeat TCPA litigant had not suffered any concrete harm or injury. *See Leyse v. Bank of Am., Nat'l Ass'n*, No. CV117128SDWSCM, 2020 WL 1227410, \*4 (D.N.J. Mar. 13, 2020). Hirsch's extensive use of his Business Cell Number for business–not residential–purposes is also preclusive of any concrete injury because the "do-not-call" protections relevant regulations apply *only* to "residential telephone subscribers." *See* 47 U.S.C. § 227(c); 47 C.F.R. §§ 64.1200(c)(2) & 64.1200(d).[14] *Cf. Shelton v. Target Advance LLC*, No. CV 18-2070, 2019 WL 1641353, \*6 (E.D. Pa. Apr. 16, 2019).

## III.    THE PROPOSED CLASS FAILS TO SATISFY RULE 23

"A party seeking class certification must ***affirmatively demonstrate*** his compliance with the Rule—that is, he must be prepared to ***prove*** that there are in fact sufficiently numerous parties, common questions of law or fact,' and so on." *Chavez v. Plan Benefit Servs., Inc*., No. 19-50904,

---

[14] *See also Mattson v. Quicken Loans Inc.*, No. 3:18-CV-00989-YY, 2019 WL 7630856, \*4 (D. Or. Nov. 7, 2019) (no claim where calls were made to published business cell number); *Krakauer v. Dish Network L.L.C*., 311 F.R.D. 384, 387 (M.D.N.C. 2015) (calls to business are not actionable.).

2020 WL 2046545, \*2 (5th Cir. Apr. 29, 2020) (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350–51 (2011)) (emphasis added).  *See also Flecha*, 946 F.3d at 768; *In re Kosmos Energy Ltd. Sec. Litig.*, 299 F.R.D. 133, 139 (N.D. Tex. 2014).  Further, the inquiry on class certification may overlap with the merits of the plaintiff's underlying claim.  *Comcast Corp. v. Behrend*, 569 U.S. 27, 33-34 (2013).  The Fifth Circuit recently stressed and explained the *need for a district court to engage in a **rigorous, proof-based analysis**, directing that a "court should respond to the defendants' legitimate protests of individualized issues that could preclude class treatment" and explaining that the "'rigorous analysis' mandate is not some pointless exercise that we foist on this circuit's hardworking and conscientious district judges," but "[i]t matters" given the possibly coercive effect of class certification."  Chavez*, 2020 WL 2046545 at \*2–3.  "No less than due process is implicated, so a careful look is necessary."  *Id.*

### A.   Overbreadth and Ascertainability

The proposed Class includes people who "received *one* or more calls after registering the . . . number . . . with USHealth's Internal Do-Not-Call list."  Mot. at 6.  But, assuming an IDNC claim is cognizable under 47 U.S.C. § 227(c)(5), the claimant must have received *more than one* telephone call within a 12-month period following "a reasonable time from the date such request is made," which "may not exceed thirty days from the date of such request."  47 C.F.R. § 64.1200(d)(3).  Hirsch's proposed Class ignores both requirements, and thus includes people for whom there is no such injury or claim under the TCPA (along with other uninjured members as discussed below).[15]

---

[15] *Accord In re Deepwater Horizon*, 732 F.3d 326, 343 (5th Cir. 2013).  *See also*, *e.g.*, *Orsatti v. Quicken Loans, Inc.*, No. 215CV09380SVWAGR, 2016 WL 7650574, \*7 (C.D. Cal. Sept. 12, 2016) (dismissing complaint where request to no longer be called and all subsequent calls took place in same month); *Southwell v. Mortg. Inv'rs Corp. of Ohio*, No. C13-1289 MJP, 2014 WL 3956699, \*4 (W.D. Wash. Aug. 12, 2014) (denying class certification where plaintiff's expert was unable to "ascertain" for IDNC registrant class members "whether the 30–day grace period for compliance had passed when the call was made").

Hirsch's reliance upon the CRM data *qua* "call logs" also renders the Class unascertainable. Given the nature of the CRM data and the fact that not every advisor used one, (App.33, 1121, 1151), many members who fall under the definition cannot be identified as having received a potentially violate telephone call from the CRM data or any other "objective criteria," such as Hirsch himself. App.2940-42.

### B.     The Class Cannot Satisfy the Commonality Requirement

The Supreme Court clarified in *Dukes* that ***"[w]hat matters to class certification is not the raising of common questions—even in droves—but rather, the capacity of a class-wide proceeding to generate common answers apt to drive the resolution of the litigation."*** 564 U.S. at 350 (emphases added). The "common contention . . . must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of *each one of the claims in one stroke*." *Id.* To conduct a rigorous analysis of commonality, "the district court must explain how that standard is met. It should do so with specific reference to the claims, defenses, relevant facts, and applicable substantive law raised by the class claims, and it must address actual or potential differences in purported class members' individual circumstances and claims." *Chavez*, 2020 WL 2046545 at *3 (internal citations and quotations omitted). The Fifth Circuit has instructed that "plaintiffs must advance a viable theory employing generalized proof to establish liability with respect to the class involved, and it means too that district courts must only certify class actions filed under the TCPA when such a theory has been advanced." *Gene and Gene LLC v. BioPay LLC*, 541 F.3d 318, 328 (5th Cir. 2008).

### 1.     Is the Class Member a *Residential* Telephone Subscriber?

Although Hirsch conveniently failed to inform the Court, the do-not-call regulations upon which this case is entirely based apply *only* to "***residential*** telephone subscribers." *See* 47 U.S.C. §

227(c); 47 C.F.R. §§ 64.1200(c)(2) & 64.1200(d).  His own approach of identifying class members concedes this.  There is authority that calls to cellular telephones categorically fail to satisfy the "residential telephone subscriber" element of the TCPA and its regulations.  *See Cunningham v. Politi*, No. 18-cv-00362-ALMCAN, 2019 WL 2517085, \*4 (E.D. Tex. Apr. 30, 2019) (collecting cases).  Even if the statute applies to cell phones, it does not apply to businesses and "***the complainant ha[s] the burden to prove that the wireless number was used as a residential number***."  *Lee v. Loandepot.com, LLC*, No. 14-CV-01084-EFM, 2016 WL 4382786, \*6 (D. Kan. Aug. 17, 2016) (citing *In Re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 18 F.C.C. Rcd. 14014, 14039 (2003)).  *See also Stevens-Bratton v. TruGreen, Inc*., No. 2:15-2472, 2020 WL 556405, \*4 (W.D. Tenn. Feb. 4, 2020).[16]  Thus, the Court would first need to determine – *with each class member carrying the burden of proof on this "fact-intensive" inquiry* – whether a class member's telephone number, even if a landline number, is a "residential number."  *Mattson*, 2019 WL 7630856 at \*4.  *See also Krakauer*, 311 F.R.D. at 387.

As detailed in Defendants' expert report, Hirsch's approach to somehow identify and exclude business numbers by looking at some database fails for many reasons.  ***More than four out of five (80.7%)*** of the 576 NDNC telephone numbers that actually received telephone calls and were supposedly already screened by LexisNexis ***are in fact for businesses or government agencies***. App.2935-39.  The method Hirsch proposes to exclude business and government numbers clearly is not reliable.  Speaking to the unreliability of LexisNexis, for Defendants' expert, it associated 204 – or 35.4% – of the 576 telephone numbers as business or government agency numbers, even though

---

[16] The large number of disqualifying non-residential telephone numbers in the Class is not idle speculation.  USHA, the advisors, and the lead generators target self-employed individuals or small business owners and look for publicly posted business telephone numbers.  App.63-67, 71, 80, 82, 98, 916-917, 1001, 1004, 1029, 1120, 151, 1180, 1207, 1234, 1420, 1499.

it reported the opposite for Hirsch's expert (one assumes she did not misread the report results, meaning the results had to be inconsistent). *Id*. This unreliability extends to Hirsch, too, as another resource accurately identifies the Business Cell Number as a business number. App.1396-97.[17] Not only is there no reliable "source," *nothing can replace the "subscriber's" burden to prove this essential element of the claim; and Defendants cannot be deprived of their rights to challenge it*. That Hirsch would supposedly not be captured in his expert's "exclusionary" search is telling; there can be no dispute that his Business Cell Number is not residential (at worse it is a decision for the fact-finder).[18] Thus, some kind of fact-intensive class-wide inquiry must be conducted for every class member and such an individualized inquiry obviously cannot be done "in one stroke."[19] *See Stevens-Bratton*, 2020 WL 556405, at \*6 ("whether any particular wireless subscriber is a 'residential subscriber' is [a] fact-intensive" inquiry)). This is foundational, as there is no section 227(c) violation without it.[20]

---

[17] The IDNC claimholders are no different. A manual and individualized investigation of a random sampling of 376 telephone numbers that, using Hirsch's proposed approach, he would regard as IDNC class members showed that 27.4% were business numbers misclassified by LexisNexis as residential. *See* App. 2938.

[18] The Business Cell Number has been the exclusive telephone number for his businesses *for the last two decades*. *See* Summ. of Evid., § G, *supra*. Having held his "Phone Number out to the world as a business phone number," it cannot be a residential number. *Shelton*, 2019 WL 1641353 at \*6. That some personal calls may have been made on his cellular telephone is irrelevant. *Id.; Mattson*, 2019 WL 7630856 at \*6. This is especially so when Hirsch "deducts the cost of his phone and phone service as business expenses," a fact that "is irreconcilable with his assertion that the phone is for personal use." *Id.* at \*5 (citing 26 U.S.C. § 262 (prohibiting tax deductions for personal expenses)).

[19] *There are hundreds of examples of telephone numbers in the produced CRM records, and Plaintiff's own Expert's sample "class list", being published and used for business purposes. Compare* Exhibit I to Verkhovskaya's report *with* App.2046-2882. *See also* App.3507-3518.

[20] Furthermore, evidence that a class member, like Hirsch, *also maintains a landline* telephone number precludes the latter from being "residential". *See Stevens-Bratton*, 2020 WL 556405 at \*3 & 5; *Lee*, 2016 WL 4382786 at \*6. Hirsch, however, proposes no classwide methodology to determine if any of the class members have both landline and cell numbers.

## 2.      Who Has Standing?

As shown with Hirsch, not all violations of the TCPA result in concrete injury, and the analysis of injury depends on the qualitative nature of the alleged harm.  *See Salcedo v. Hanna*, 936 F.3d 1162, 1169-72 (11th Cir. 2019); *Eldridge v. Pet Supermarket Inc.*, --- F.Supp.3d ---, No. 18-22531-CIV, 2020 WL 1475094, \*5-7 (S.D. Fla. Mar. 10, 2020); *cf. Flecha*, 946 F.3d at 768.

The Court must be able to sort out putative class members who have been injured and those that have not.  *See id*.[21]  Thus, a "district court must consider . . . whether the individualized issue of standing will predominate . . ., when it appears that a large portion of the class does not have standing, as it seems at first blush here, and making that determination for these members of the class will require individualized inquiries."  *Cordoba v. DIRECTV, LLC*, 942 F.3d 1259, 1277 (11th Cir. 2019).  *See also Legg v. PTZ Insurance Agency, Ltd*., 321 F.R.D. 572, 577 (N.D. Ill. 2017) (finding individual questions of whether a class member had "been injured in any way, even if defendants technically violated a procedural requirement of the TCPA," predominated).  CRM data such as VanillaSoft records will not answer this question and Hirsch has no way to do so.[22]

---

[21] *See also Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1053 (2016) (Roberts, C.J., concurring) ("Article III does not give federal courts the power to order relief to any uninjured plaintiff, class action or not."); *Mazza v. Am. Honda Motor Co*., 666 F.3d 581, 594 (9th Cir. 2012) (same); *Halvorson v. Auto-Owners Ins. Co.*, 718 F.3d 773, 778 (8th Cir. 2013); *Kohen v. Pac. Inv. Mgmt. Co.*, 571 F.3d 672, 677 (7th Cir. 2009); *Denney v. Deutsche Bank AG*, 443 F.3d 253, 264 (2d Cir. 2006).

[22] Hirsch takes out of context the settled principle that a named plaintiff "must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent." Mot. at 7 *citing Warth v. Seldin*, 422 U.S. 490, 502 (1975).  That principle presumes, consistent with the above-cited cases, **including the recent pronouncement by all three Fifth Circuit judges in *Flecha*, that absent class members *also* must have standing**.  *See* 946 F.3d at 768; *id.* at 770 (Oldham, J., concurring) ("I . . . agree with the Court's conclusion that '[c]ountless unnamed class members lack standing.' In my view, that lack of standing is sufficient to decide the case.").

14

### 3.    Did a Class Member Register Their Number on a "Do-Not-Call" List?

The Class definition includes only those "natural persons" who received telephone calls "after registering [their] . . . telephone number . . . with the [NDNC] Registry" or "with USHealth's [IDNC] list."  Mot. at 6.  Because the TCPA protects residential subscribers from solicitation calls "to which they object," a residential subscriber who has not made any such request has no cognizable claim and suffered no concrete harm.  *See Cordoba*, 942 F.3d at 1271-72.

With respect to the NDNC claims, Hirsch has provided no way to confirm that the class member – the current subscriber – is the person who *registered* the telephone number on the NDNC registry (as opposed to a previous subscriber).[23] App.2947-48..  A person who never registered their telephone number on the NDNC has no concrete injury fairly traceable to a violation of the NDNC rules.  The IDNC component of the Class fares no better.  Plaintiff's expert unilaterally assigned certain CRM entries as "requests to not be called again."  Pl.'s App.406, ¶ 79.  She is wrong.  As detailed above, a CRM entry of a code *suggestive* of a request not to be called does not necessarily mean that the called party *asked*, and individualized inquiries would be required for each person. *See* Summ. of Evid., §§ C & D, *supra*.  The disposition codes are selected without uniformity and for reasons having nothing to do with an IDNC request.  *See* App.750-52, 875-906, 908, 918-21, 1037-40, 1121, 1152, 1208, 1235-36, 1429-31, 1508-09.).  The insurance advisors do not want to waste their time calling people who are not interested, serial TCPA filers, angry, irate, threatening, or unreceptive.  App.65, 919-20, 1039-40, 1121, 1152, 1208, 1235-36, 1431-32, 1510.  The CRM disposition code is a proxy for nothing.  To determine if a person *actually* requested not to be called requires individualized evidence about why CRM entries were made and what they mean.  *Accord*

---

[23] *See* 15 U.S.C. § 6155 (requiring removal of "reassigned" telephone numbers from NDNC registry).  The TCPA regulations were amended to conform.  73 FCC Rcd. 40183, 40186 (2008).

*Cordoba*, 942 F.3d at 1277.

### 4. Was There Consent, Permission, an Established Business Relationship, or a Personal Relationship?

Also raising individualized inquiries, are the defenses of consent or permission to call, including the presence of an EBR or personal relationship.[24]  And even if the consent, permission, or invitation to be called is not perfectly compliant with the TCPA, it would preclude the called class member from having "suffered a concrete injury."  *Legg*, 321 F.R.D. at 577, 578.

The record abounds with evidence of numerous variations of consent.  *See, e.g.*, App.656-743.  Neither USHA nor independent insurance advisors make cold-calls.  *See, e.g.*, App.1039, 1119, 1177-78, 1206, 1233, 1431, 1509-10.  In fact, based on the testimony from USHA and the independent insurance advisors, it would appear that all of the calls at issue were based upon prior consent, an EBR, a personal relationship, or opt-ins or requests to be called by an insurance advisor working with USHA, including all leads generated through the thousands of commercial lead sources that the 20,000+ insurance advisors used as well as through networking referrals, trade shows, personal relationships, and the like, all of which fall under the consent, EBR and personal relationship exemptions of the regulations.  *See* Summ. of Evid., §§ E & F, *supra*.  The vast majority of the purchased leads were obtained via online consent.  *Id.*[25]

---

[24] There is no liability when the called party gives consent or permission or where there is an EBR or personal relationship.  *See* 47 C.F.R. § 64.1200(c)(2)(ii); 47 C.F.R. § 64.1200(f)(14).  An "established business relationship" includes not only a prior or existing relationship based on a subscriber's purchase or transaction, *but also* based on the subscriber's inquiry or application regarding a company's products or services within the three months immediately before the telephone call.  *See* 47 C.F.R. § 64.1200(f)(5) (emphasis added).  For NDNC claims, the regulations also exempt communications to a recipient with whom there was a personal relationship.  47 C.F.R. § 64.1200(c)(2)(iii) such as "any family member, friend, or acquaintance".  47 C.F.R. § 64.1200(f)(16).  *See also* App.102-04.

[25] Prior express written consent is permitted using any medium or format permitted by the E-Sign Act, including "email, website form, text message, telephone keypress, or voice recording."  *In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 27 FCC Rcd.

16

There is no single answer here.  The Court is obliged to consider whether a telephone call was made with consent or permission, or to a person with whom there was an EBR or personal relationship, all of which are exempt from liability under the TCPA.  Hirsch has presented no way to do that.[26]  Hirsch relegates this pivotal issue to a footnote, observing he "excluded calls with notations indicating that a consumer was a current or past customer."  Mot. at 21 n.15.  What about where there is no such notation?  Hirsch does not even attempt to identify class members, *including Hirsch*, who have such an exempt status, perhaps because he knows there is no generalized, classwide evidence to that effect.[27]  What's more, Hirsch's expert includes telephone numbers associated with dozens of "Result Codes" that not only facially suggest, but in fact evidence, an EBR.  App.917-19, 1037-39, 1429-31, 1508-10, 2913.  The methodology ignores instances where there was consent, permission, or a personal relationship (such as through an insurance advisor's personal networking), which common sense, and insurance advisor testimony, tells us happens all the time.  App.1004-05, 1036-37, 1118-20, 1149-51, 1177-79, 1206-07, 1232-34, 1428-29, 1507-08.

A common form of express consent is created by completing an online form inquiring about health insurance.  *See, e.g.*, App.321-541 (chart of landing pages used by lead generators from which USHA and many insurance agents purchase leads).  *See also* App.1421-28, 1477-94.  In the

---

1830, 1844 (2012) (emphasis added).  Hirsch consented at least twice in accordance with the E-Sign Act, 15 U.S.C. § 7001 *et seq*.  *See* n. 11, *supra*.

[26] Indeed, it is Hirsch's unique facts that demonstrate why a class cannot resolve these issues for *everyone*.  Hirsch bears the burden of establishing that defenses can be decided consistent with the requirement of commonality and would not result in the predominance of individual questions or otherwise preclude certification.  *See*, *e.g.*, *Kosmos Energy*, 299 F.R.D. at 154; *In re Wells Fargo Home Mortg. Overtime Pay Litig*., 268 F.R.D. 604, 612 (N.D. Cal. 2010).

[27] Hirsch himself figures into one other form of EBR his expert ignores (as it cannot be filtered "in one stroke"): a "subscriber's inquiry . . . within the three months immediately preceding the date of the call."  47 C.F.R. § 64.1200(f)(5).  Each time Hirsch scheduled a follow-up call, "he created an EBR."  *Hamilton v. Spurling*, No. 3:11CV00102, 2013 WL 1164336, \*10 (S.D. Ohio Mar. 20, 2013).

short amount of time since Plaintiff filed his Motion, USHA was able to obtain consent records for fifteen consumers on Plaintiff's expert's sample "class list" who consented in this manner. *Compare* Exhibit I to Verkhovskaya's report *with* App.116, 647-54.[28]   Others submitted applications and proceeded through the application process, providing consent.   App.1385-95. Plaintiff's proffered methodology, however, does not properly account for published business telephone numbers and does not identify (or analyze) the existence of any other exempt status (even when reflected in the CRM data that she relies upon, which provides evidence of EBRs and other exemptions, (App.917-19, 923-927)).   For example, while Hirsch's expert was quick to (erroneously) assume codes that she thought signified requests not to be called, she overlooked 27 codes that, as their names suggest, were used to reflect communications with existing customers or with consumers who had begun the process of purchasing a policy, which would qualify as an EBR. App.2943-45 (discussing codes such as "SET APPT" and "CALL BACK").

As the Fifth Circuit explained in *Gene and Gene*, there is no "class-wide proof of consent" where a defendant "culled . . . numbers from a variety of sources over a period of time," as each would have to be individually investigated.   541 F.3d at 328-29.   The same is true here.   And in *Conrad v. General Motors Acceptance Corp.*, 283 F.R.D. 326, 329-30 (N.D. Tex. 2012), plaintiff's reliance upon "certain fields in [defendant's] database" as generalized proof of consent was misplaced because plaintiff "presumes that consent is denoted at all in [the] database and that if it is, such information is correct."   Hirsch makes the same fatal error.   Moreover, as in *Conrad*, the possibility that class members could have "withdrawn and re-granted consent during the course of their business with" the defendant without any documentation in a database–***which is certainly the***

---

[28] *See also* App.655 (consent record for another consumer from Verkhovskaya's Exhibit I), 600-46, 961-996, 1427-28, 1486-88, 1492-94 (consent records for leads that likely appear in the VanillaSoft CRM records).

*case with Hirsch*–precludes any generalized proof of consent. *Id. Gene and Gene* and *Conrad* are just two of many examples of courts denying certification where issues of consent required individualized inquiries.[29]  "As these cases explain, this result [denial of class certification] is compelled especially where (as here) the defendant produces evidence of a practice of obtaining prior consent . . . ." *Espejo v. Santander Consumer USA, Inc.*, No. 11 C 8987, 2016 WL 6037625, \*10 (N.D. Ill. Oct. 14, 2016).  The same is true here.

### 5.    Did a Class Member Revoke Consent?

To revoke consent to be called, the called party must "clearly express his or her desire not to receive further calls." *In re Rules & Regulations Implementing the Telephone Consumer Protection Act of 1991*, 30 F.C.C. Rcd. 7961, 7997 (July 10, 2015).  It is the called party's burden to prove revocation of consent – *another* requirement completely ignored by Plaintiff's Motion.  This is not an easy standard to satisfy, and in this case, it is not determinable through anything other than asking the class member.[30]Analyzing the circumstances, sufficiency, and timing of whether each class member revoked consent and whether it was effective is impossible on a class-wide basis.  As is determining whether, after revoking that consent, a putative class member again consented, like Hirsch did.  An independent insurance advisor's subjective entry in CRM data – the so-called call

---

[29] *See also*, *e.g.*, *Brodsky v. HumanaDental Ins. Co*., 910 F.3d 285, 291 (7th Cir. 2018); *Sandusky Wellness Ctr., LLC v. ASD Specialty Healthcare, Inc*., 863 F.3d 460, 469 (6th Cir. 2017); *Licari Family Chiropractic Inc. v. eClinical Works, LLC*, No. 8:16-CV-3461-MSS-JSS, 2019 WL 7423551, \*8 (M.D. Fla. Sept. 16, 2019); *E&G, Inc. v. Mount Vernon Mills, Inc.*, No. 6:17-cv-318-TMC, 2019 WL 4034951, \*6-7 (D.S.C. Aug. 22, 2019); *Revitch v. Citibank, N.A.*, No. C 17-06907 WHA, 2019 WL 1903247, \*4 (N.D. Cal. Apr. 28, 2019); *Kostmayer Constr., LLC v. Port Pipe & Tube, Inc*., No. 16-CV-1012, 2019 WL 1523045, \*3 (W.D. La. Apr. 8, 2019); *Davis v. AT&T Corp*., No. 15CV2342-DMS (DHB), 2017 WL 1155350, \*6 (S.D. Cal. Mar. 28, 2017).

[30] Courts have found that the cancelation of a membership, (*Van Patten v. Vertical Fitness Group, LLC*, 847 F.3d 1037, 1048 (9th Cir. 2017)), a person saying they do not need the product, (*Advantage Healthcare, Ltd. v. DNA Diagnostics Center, Inc.*, No. 17-cv-9001, \*1-4 (N.D. Ill. Jul. 17, 2019)), or even informing a seller they are "not interested," (*Coleman v. Colorado Technical University*, No. 16-4237, 2017 WL 2377714, \*3-4 (E.D. Penn. Jun. 1, 2017)), are not sufficient to revoke consent.

logs – cannot provide a classwide answer.  App.750-52, 813, 875-908, 918-21, 1030-31, 1037-40, 1121, 1152, 1208, 1235-36, 1429-31, 1508-10, 2901, 2904, 2912-13, 2930, 2932-33.  Individualized inquiries are needed to determine if the requisite clear expression of a desire not to receive further calls was made.[31]

### 6. Are Some Class Members Required to Arbitrate?

Many class members agreed to arbitration and waived class action treatment.  *See*, *e.g.*, App.110, 113-14, 342-347, 1033-35, 1422-24, 1490-91.  Such arbitration agreements are routinely enforced.  *See WorldVentures Mktg., LLC v. Rogers*, No. 4:18-CV-00522, 2018 WL 7138387 (E.D. Tex. Dec. 10, 2018); *Jia v. Nerium Int'l LLC*, No. 3:17-CV-03057-S, 2018 WL 4491163 (N.D. Tex. Sept. 18, 2018).  Given the variance in the language of the arbitration clauses, (App.342-347), the ways in which the websites were configured, and the circumstances of assent by class members – unsurprising given the legion of different lead generators that had been used – the Court cannot make a common, generalized determination on whether those class members are required to arbitrate any TCPA claims against USHA and USHG.[32]  Such a necessarily individualized inquiry clearly "would undermine-not promote-the type of efficiency contemplated by Rule 23(b)(3)."  *Karnes*, 2008 WL 4528223 at *8.[33]

### 7. Were the Calls at Issue Even Telephone Solicitations?

---

[31] *See Wolfkiel v. Intersections Ins. Servs., Inc.*, 303 F.R.D. 287, 293-94 (N.D. Ill. 2014) (determining whether consent was revoked is necessarily individualized); *Saulsberry v. Meridian Fin. Servs., Inc.*, No. CV-14-6256-JGB (JPRx), 2016 WL 3456939, *10-11 (C.D. Cal. Apr. 14, 2016); (denying class certification because of revocation issue).

[32] *See*, *e.g.*, *Baricuatro v. Indus. Pers. & Mgmt. Servs., Inc*., No. CIV.A. 11-2777, 2013 WL 6072702, *9 (E.D. La. Nov. 18, 2013); *Karnes v. Fleming*, No. CIV.A. H-07-0620, 2008 WL 4528223, *8 (S.D. Tex. July 31, 2008).

[33] Moreover, as Hirsch did not consent in this fashion, he cannot defend the rights of class members who agreed to arbitrate.  *Accord In re Checking Account Overdraft Litig*., 780 F.3d 1031, 1039 (11th Cir. 2015).

A communication violates section 227(c) only if it was a "telephone solicitation" for NDNC claims or a "telemarketing" call for IDNC claims. 47 C.F.R. §§ 64.1200(c) & (d).[34]  At least some of the telephone calls that Hirsch received do not qualify as no goods or services were offered for sale or encouraged to be purchased. App. 1409-13; n. 11, *supra*, for two call recordings. ("HIRSCH: You said you're not selling insurance?  CALLER:  No.  I'm just an appointment setter, sir.  We're just providing free information.").  Similar scheduling calls have been found not to constitute "telemarketing."[35]  Moreover, advisors have, and the CRM data reveals, everyday communications, none of which would constitute telephone solicitations or telemarketing.  App.1005, 1040, 1385-95, 1432, 1510.  There is no way to identify the calls that fall into these categories by common evidence.

### 8.    Vicarious Liability

There is no common or generalized evidence to establish vicarious liability for ***all*** of the calls made by over 20,000 insurance advisors and an unknown number of lead generators hired by the independent insurance advisors.  The decision in *Chinitz v. NRT W., Inc*., No. 18-CV-06100-NC, 2019 WL 4142044, *5 (N.D. Cal. Aug. 30, 2019), is directly on point.  There, the court found that commonality was lacking as to the determination of an agency relationship because the fact that "each class member was called by different . . . associates . . .  has 'the potential to impede the generation of common answers.'"  2019 WL 4142044 at *5 (quoting *Dukes*, 564 U.S. at 350).  The court explained that individualized inquiries regarding over 100 real estate agents would be necessary because, as in this case with the insurance advisors, they each had their own methods of

---

[34] These terms are defined almost identically as "the initiation of a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services, which is transmitted to any person."  47 C.F.R. §§ 64.1200(f)(12) & (14).

[35] *See Morris v. Unitedhealthcare Ins. Co*., No. 415CV00638ALMCAN, 2016 WL 7115973, *11 (E.D. Tex. Nov. 9, 2016) (internal quotation omitted) ; *Danehy v. Time Warner Cable Enters.*, No. 5:14-CV-133-FL, 2015 WL 5534094, *10 (E.D.N.C. Aug. 6, 2015).

generating leads and the defendant "may exert different levels of supervisory control over its associates, such that it is vicariously liable for the actions of some associates, but not others." *Id.* The exact same issues apply here, only to a much greater magnitude (by a factor of more than 200).

Control, authorization, and knowledge are the primary elements and highly individualized inquiries would need to be undertaken with respect to each of the differing "downstream" relationships.[36]  Hirsch has not proposed a way to answer whether USHA or USHG "actually granted" the handful of advisors and the only lead generator – Dosys – known to have called him "the authority to . . . call [people] on the Do-Not-Call Registry," (*Abante Rooter & Plumbing, Inc. v. Arashi Mahalo, LLC*, No. 18-CV-07311-VC, 2019 WL 6907077, \*1 (N.D. Cal. Dec. 19, 2019)), never mind as to the 20,000+ other independent insurance advisors and any other third party lead generators who called putative class members. *See Chinitz*, *supra*.  *See also* App.1508.

Hirsch seeks to use the Agent Agreements, but nothing in them – not even the language that Hirsch focuses upon, (*see* Mot. at 21-22) – gives USHA the right to control an insurance advisor's actions with respect to telemarketing.  To the contrary, the Agent Agreement specifies an independent contractor relationship and does not assert any control over the independent insurance advisor, other than arguably that they comply with all applicable laws and regulations.  *See* Pl.'s App.65.  That, coupled with the record evidence on this issue, (App.32-34, 42, 51, 61, 67-70 72-73 88-89, 100, 997-1003, 1025-1030, 1036, 1114-1117, 1120-1121, 1145-1149, 1151, 1173-1176, 1179-1180, 1201-1204, 1207, 1228-1232, 1234-1235, 1416-421, 1495-1500), refutes any possibility of generating a common answer on vicarious liability as Hirsch proposes.[37]

---

[36] *Accord Smith v. State Farm Mutual Automobile Ins. Co*., 30 F. Supp. 3d 765, 777 (N.D. Ill. 2014).
[37] *Accord Jones v. Royal Admin. Servs., Inc*., 887 F.3d 443, 449-50 (9th Cir. 2018); *Thomas v. Taco Bell Corp*., 582 Fed. Appx. 678, 679 (9th Cir. 2014); *Chinitz*, 2019 WL 4142044, \*5 ("The sample sales associate agreements . . . shines no light on the level of control exercised by NRT.").

### C.    Typicality

Typicality fails for the same reasons as commonality.  Typicality requires that "the class representative's claims have the same essential characteristics of those of the putative class." *Villagran v. Cent. Ford, Inc*., 524 F. Supp. 2d 866, 883 (S.D. Tex. 2007).  ***Hirsch "must establish the bulk of the elements of each class members' claims when [he] prove[s] [his] own." Durrett v. John Deere Co*.**, 150 F.R.D. 555, 558 (N.D. Tex. 1993).  Resolution of the numerous facts unique to Hirsch regarding his calls and telephone number will not resolve the claims of other class members.

Hirsch is also subject to unique defenses and credibility challenges – lack of Article III standing, consent, EBR, and business use – that separate him from the class he proposes to represent. Reconciling these glaring differences would dominate the proceedings.  *Accord Zachery v. Texaco Expl. & Prod., Inc*., 185 F.R.D. 230, 240 (W.D. Tex. 1999); *Vigus v. S. Illinois Riverboat/Casino Cruises, Inc*., 274 F.R.D. 229, 236 (S.D. Ill. 2011).  And Hirsch has to defend a fraud counterclaim, (Dkt. No. 43 at 18-19), which is a "point of contention unique to [Hirsch's] case, and not typical of the class as a whole." *AMP Auto., LLC v. B F T, LP*, No. CV 17-5667, 2018 WL 4028459, *3 (E.D. La. Aug. 23, 2018).[38]  Finally, Hirsch's inability to oppose the enforcement of arbitration agreements further renders his claims atypical.  *See*, *e.g.*, *Avilez v. Pinkerton Gov't Servs., Inc.*, 596 F. App'x 579 (9th Cir. 2015).

### D.    Adequacy of Hirsch and Class Counsel

Hirsch and his counsel's failure to "protect the interest of the class members" by ignoring Local Rule 23.2 "bears strongly on the adequacy of the representation."  *McGowan v. Faulkner Concrete Pipe Co*., 659 F.2d 554, 559 (5th Cir. 1981).  Moreover, Hirsch's close association with

---

[38] *See also Bolin Farms v. Am. Cotton Shippers Ass'n*, 370 F. Supp. 1353, 1357 (W.D. La 1974) ("Surely, a person who . . . has incurred counterclaims thereby can in no sense be regarded as 'typical' . . . of a class of persons who have not . . . .").

one of the attorneys of record, Max F. Maccoby, creates a conflict rendering both inadequate. *Berger v. Compaq Computer Corp*., 257 F.3d 475, 479 (5th Cir. 2001); *Woods v. Google LLC*, No. 11-CV-01263-EJD, 2018 WL 4030570, *4 (N.D. Cal. Aug. 23, 2018).[39]

Curiously, even though Maccoby has been extensively involved in this litigation, only Berger Montague is seeking to be appointed class counsel. At the same time, however, "Plaintiff's counsel agreed to share any fees awarded by the court based on their relative lodestars" with, among others, Maccoby's law firm. *See* Mot. at 25 & n.17. The obvious effort to hide troubling facts from the Court by not presenting Hirsch's good friend as class counsel, even though he intends to share in fees from any class award, demonstrates "a lack of integrity" and the further inadequacy of Hirsch and his counsel as class representatives. *Creative Montessori Learning Centers v. Ashford Gear LLC*, 662 F.3d 913, 918 (7th Cir. 2011).

### E.     Individual Issues Predominate

"The predominance requirement of Rule 23(b)(3), . . . is 'far more demanding' because it 'tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation.'" *Gene and Gene*, 541 F.3d at 326 (quoting *Amchem Prods. Inc. v. Windsor*, 521 U.S. 591, 623-24 (1997)). The Court must consider what a trial would look like:

> At bottom, the [predominance] inquiry requires the trial court to weigh common issues against individual ones and determine which category is likely to be the focus of a trial. The court must go[ ] beyond the pleadings to understand the claims, defenses, relevant facts, and applicable substantive law. This, in turn, entails identifying the substantive issues that will control the outcome, assessing which

---

[39] The circumstances that led to denial of certification in *Gordon v. Caribbean Cruise Line, Inc.*, No. 14 C 5848, 2019 WL 498937, *9 (N.D. Ill. Feb. 8, 2019), are identical. Hirsch and Maccoby are "good friend[s]" who socialize and "have dinner, have [each other's] kids over," "Max and his family [come] over to [Hirsch's] house . . . . regularly," their "daughters are good friends," they live nearby each other, met "through our neighborhood school," and vacation together. App.4-6. Hirsch "want[s] to see [Maccoby] do well," even to the extent that he tries to drum up business for Maccoby, with his knowledge, trying to "create a class" and "sell it" to his friend. App.5, 29, 2899. *Cf. London v. Wal-Mart Stores, Inc*., 340 F.3d 1246, 1254-55 (11th Cir. 2003).

issues will predominate, and then determining whether the issues are common to the class, a process that ultimately prevents the class from degenerating into a series of individual trials.

*Cruson v. Jackson Nat'l Life Ins. Co.*, 954 F.3d 240, 253–54 (5th Cir. 2020) (internal quotations and citations omitted).

Hirsch exemplifies the most cumbersome of individualized inquiries and defenses so as to demonstrate the "predominance of individual issues . . . [that] may preclude class certification.'" *Gene & Gene*, 541 F.3d at 327. A trial cannot ignore the many unique individualized questions above, particularly those for which the called party carries the burden and the significantly different calls and relationships of more than 20,000 independent advisors. Trying "discrete claims as fungible claims," which Hirsch seeks to do, would infringe Defendants' due process rights to confront the unique and divergent facts and circumstances of individual class members. *In re Fibreboard Corp.*, 893 F.2d 706, 712 (5th Cir. 1990) (overturning trial plan based on trying the claims of a small subset of "representative" plaintiffs only). *See also In re Chevron U.S.A., Inc.*, 109 F.3d 1016, 1020 (5th Cir. 1997); *Gartin v. S & M NuTec LLC*, 245 F.R.D. 429, 442 (C.D. Cal. 2007).

### F.    A Class Action Would Not be Superior – it Would be Unmanageable

The Priovolos CRM data is not representative. Nor is it reliable. Hirsch isn't identified in it. The Court will have to sort through millions of different data points and hear testimony of every class member to decide the claims and defenses. There is no answer to Defendants' due process rights, and "a class action is not manageable" with mini-trials and so many "individual fact issues" that a "trial of this case would become this court's life work." *Rosen v. Chrysler Corp.*, No. 97-CV-60374-AA, 2000 WL 34609135, *16 (E.D. Mich. July 18, 2000).

### CONCLUSION

Plaintiff Aaron Hirsch's Motion for Class Certification (Dkt. No. 177) must be denied.

Dated: May 22, 2020                GREENSPOON MARDER LLP

*/s/Jeffrey A. Backman*
JEFFREY A. BACKMAN
Florida Bar No. 662501 (*pro hac vice*)
GREGG I. STROCK
Florida Bar No. 1010140 (*pro hac vice*)
jeffrey.backman@gmlaw.com
khia.joseph@gmlaw.com
gregg.strock@gmlaw.com
lisa.webster@gmlaw.com
200 East Broward Blvd., Suite 1800
Fort Lauderdale, FL  33301
Tel:  (954) 491-1120; Fax: (954) 213-0140

DANIEL L. BATES
State Bar No. 01899900
dbates@deckerjones.com
**DECKER JONES, P.C.**
801 Cherry Street, Unit #46
Burnett Plaza, Suite 2000
Fort Worth, Texas 76102
(817) 336-2400
(817) 336-2181 (Fax)

***ATTORNEYS FOR DEFENDANTS***

## CERTIFICATE OF SERVICE

I hereby certify that on May 22, 2020, a true and correct copy of the foregoing document was

served upon counsel of record in accordance with the Federal Rules of Civil Procedure.

*/s/Jeffrey A. Backman*
JEFFREY A. BACKMAN

26