**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS (FORT WORTH)**

AARON HIRSCH, individually and on behalf of all others similarly situated,

Plaintiff,

v.

USHEALTH ADVISORS, LLC and USHEALTH GROUP, INC.,

Defendants.

**CASE NO.:** 4:18-cv-00245-P

**CLASS ACTION**

# BRIEF IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT[1]

[1] This Motion is being filed in accordance with the Court's Amended Scheduling Order [DE 121]. Plaintiff's Motion for Class Certification was filed on May 1, 2020. Defendants' Opposition was just filed on May 22. No ruling on class certification has been issued. Thus, this Motion only addresses (and can only address) the claims of the named Plaintiff. The rule against one-way intervention precludes determination of the merits prior to a determination as to whether or not a class will be certified. *See, e.g., Am. Pipe & Constr. Co. v. Utah*, 414 U.S. 538 (1974); *Peritz v. Liberty Loan Corp.*, 523 F. 2d 349 (7th Cir. 1975); *La Union Del Pueblo Entero v. Fed. Emergency Mgmt. Agency*, No. 1:08-CV-487, 2017 WL 25351, at *21 (S.D. Tex. Feb 15, 2017). By filing this Motion, Defendants are not waiving their right to raise that argument or to seek summary judgment as to the class as whole in the event a class is certified.

# TABLE OF CONTENTS


TABLE OF AUTHORITIES ..... ii

I. PRELIMINARY STATEMENT ..... 1

II. FACTUAL BACKGROUND ..... 3

A. The Parties ..... 3

B. Hirsch's Cellular Telephone ..... 4

C. Hirsch Calls & Consent ..... 7

D. Hirsch Text Messages & Consent ..... 11

E. USHA and Independent Insurance Advisors' Contractual Relationship ..... 12

F. The Independent Insurance Advisor Activity ..... 13

III. ARGUMENT ..... 19

A. Legal Standard ..... 19

B. The Undisputed Facts Show That Plaintiff is Not A Residential Telephone Subscriber ..... 19

C. Plaintiff Has No Standing ..... 24

D. TCPA (and the Maryland TCPA) do not Provide a Private Right of Action Under 47 C.F.R. § 64.1200(d), and Therefore, Plaintiff's Causes of Action Under That Theory Must Fail ..... 27

E. Calls Received From Third-Party Scheduling Companies are not "Telephone Solicitations" ..... 29

F. Plaintiff Expressly Consented to and/or Created an Established Business Relationship for Four of the Telephone Calls he Received From Independent Insurance Advisors ..... 30

G. The Undisputed Facts Show no Direct Liability Under the TCPA and no Theory Of Vicarious Liability is Pleaded ..... 33

H. Plaintiff Lacks Evidence of any Relationship That Would Give Rise to any Theory of Vicarious Liability Against Either USHA or USHG ..... 34

i. No agency relationship exists ..... 36

ii. Defendants did not provide any advisor with actual authority to make any of the telephone calls or texts in violation of the TCPA ..... 40

iii. Dosys did not have apparent authority ..... 41

iv. Defendants did not ratify any TCPA violations. ..... 43

IV. CONCLUSION ..... 45

**TABLE OF AUTHORITIES**

Cases

2019 WL 7630856 (D. Or. Nov. 7, 2019)........ 23

*Abante Rooter & Plumbing, Inc. v. Arashi Mahalo, LLC*,
No. 18-CV-07311-VC, 2019 WL 6907077 (N.D. Cal. Dec. 19, 2019)........ 34, 41, 43

*Affordable Power, L.P. v. Buckeye Ventures, Inc.*,
347 S.W.3d 825 (Tex. App. 2011)........ 36

*Am. Pipe & Constr. Co. v. Utah*,
414 U.S. 538 (1974)........ 1

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)........ 19

*Bank v. Indep. Energy Grp. LLC*,
No. 12-CV-1369 JG VMS, 2015 WL 4488070 (E.D.N.Y. July 23, 2015)........ 21

*Braver v. NorthStar Alarm Servs.*, LLC,
No. CIV-17-0383-F, 2019 WL 3208651 (W.D. Okla. July 16, 2019)........ 28

*Bridgeview Health Care Center, Ltd. v. Clark*,
816 F.3d 935 (7th Cir. 2016)........ 42

*Burdge v. Assn. Health Care Mgmt., Inc.*,
No. 1:10-cv-00100, 2011 WL 379159 (S.D. Ohio Feb. 2, 2011)........ 28

*Campbell-Ewald Co. v. Gomez*,
136 S. Ct. 663, (2016)........ 36

*Celotex Corp v. Catrett*,
477 U.S. 317 (1986)........ 19

*Chemtool, Inc. v. Lubrication Techs., Inc.*,
148 F.3d 742 (7th Cir. 1998)........ 37

*Chinitz v. NRT W., Inc.*,
No. 18-CV-06100-NC, 2019 WL 4142044 (N.D. Cal. Aug. 30, 2019)........ 40

*Christiana Tr. v. Riddle*,
911 F.3d 799 (5th Cir. 2018)........ 37

*Coleman v. Klockner & Co. AG*,
180 S.W.3d 577 (Tex. App. 2005)........ 41

*Cunningham v. Capital Advance Sols., LLC*,
No. CV 17-13050 (FLW), 2018 WL 6061405 (D.N.J. Nov. 20, 2018)........ 20

*Cunningham v. Enagic USA, Inc.*,
No. 3:15-0847, 2017 WL 2719992 (M.D. Tenn. June 23, 2017)........ 20

*Cunningham v. Lifestyles Dev., LLC*,
No. 419CV00006ALMCAN, 2019 WL 4282039 (E.D. Tex. Aug. 8, 2019)........ 33

*Cunningham v. Nationwide Sec. Sols., Inc.*,
No. 3:17-CV-00337-M, 2017 WL 10486988 (N.D. Tex. Nov. 2, 2017) .......................... 28, 29

*Cunningham v. Politi*,
No. 18-cv-00362-ALMCAN, 2019 WL 2517085 (E.D. Tex. Apr. 30, 2019) .................. 20, 33

*Cunningham v. Rapid Response Monitoring Servs., Inc.*,
251 F. Supp. 3d 1187 (M.D. Tenn. 2017) .......................................................................... 20

*Cunningham v. Spectrum Tax Relief, LLC*,
No. 3:16-2283, 2017 WL 3222559 (M.D. Tenn. July 7, 2017) .......................................... 20

*Cunningham v. Sunshine Consulting Grp., LLC*,
No. 3:16-2921, 2018 WL 3496538 (M.D. Tenn. July 20, 2018) ........................................ 20

*Danehy v. Time Warner Cable Enterprises*,
No. 5:14-CV-133-FL, 2015 WL 5534094 (E.D.N.C. Aug. 6, 2015) .................................. 30

*Dish Network, LLC*,
28 F.C.C.R. at ¶¶ ............................................................................................................. 36

*ETC Texas Pipeline, Ltd. v. Addison Expl. & Dev., LLC*,
582 S.W.3d 823 (Tex. App. 2019) .................................................................................... 37

*Freyja v. Dun & Bradstreet, Inc.*,
No. CV147831DSFMRWX, 2015 WL 6163590 (C.D. Cal. Oct. 14, 2015) ......................... 30

*Gadelhak v. AT&T Servs., Inc.*,
950 F.3d 458 (7th Cir. 2020) ............................................................................................ 25

*Hamilton v. Spurling*,
No. 3:11CV00102, 2013 WL 1164336 (S.D. Ohio Mar. 20, 2013) .................................... 32

*Henderson v. United Student Aid Funds, Inc.*,
918 F.3d 1068 (9th Cir. 2019) .......................................................................................... 43

*Hodgin v. UTC Fire & Sec. Americas Corp.*,
885 F.3d 243 (4th Cir. 2018) ...................................................................................... 37, 43

*Hollingsworth v. Perry*,
570 U.S. 693 (2013) .......................................................................................................... 40

In *re Joint Petition filed by Dish Network, LLC*,
28 F.C.C.R. 6574 (2013) ............................................................................................ 33, 36

*In Re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*,
18 F.C.C. Rcd. 14014 (2003) ............................................................................................ 19

*In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*,
27 FCC Rcd. 1830 (Feb. 15, 2012) .................................................................................... 31

*Jones v. Royal Admin. Servs., Inc.*,
887 F.3d 443 (9th Cir. 2018) ...................................................................................... passim

*Karl Rove & Co. v. Thornburgh*,
39 F.3d 1273 (5th Cir. 1994) ............................................................................................ 37

*Keating v. Peterson's Nelnet, LLC*,
615 Fed. Appx. 365 (6th Cir. July 21, 2015.) ....................................................... 33, 42, 43

*Kristensen I*,
879 F.3d .......... 43, 44
*Kristensen v. Credit Payment Servs. Inc.*,
No. 2:12-CV-00528-APG, 2015 WL 4477425 (D. Nev. July 20, 2015) .......... 41, 42
*La Union Del Pueblo Entero v. Fed. Emergency Mgmt. Agency*, No. 1:08-CV-487,
2017 WL 25351 (S.D. Tex. Feb 15, 2017) .......... 1
*Lee v. Loanepot.com, LLC*,
No. 14-CV-01084 EFM, 2016 WL 4382786 (D. Kan. Aug. 17, 2016) .......... 21, 22, 23
*Legg v. PTZ Ins. Agency, Ltd.*,
321 F.R.D. 572 (N.D. Ill. 2017) .......... 27
*Leyse v. Bank of Am., Nat'l Ass'n*,
No. cv-117128S(DWS)(CM), 2020 WL 1227410 (D.N.J. Mar. 13, 2020) .......... 27
*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992) .......... 24
*Matter of Groupme, Inc./skype Commc'ns S.A.R.l Petition for Expedited Declaratory Ruling Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*,
29 F.C.C. Rcd. 3442 (2014) .......... 30, 31, 32
*Melito v. Experian Mktg. Sols., Inc.*,
923 F.3d 85 (2d Cir.) .......... 24, 25
*Morris v. Unitedhealthcare Ins. Co.*,
No. 415CV00638 (ALM)(CAN), 2016 WL 7115973 (E.D. Tex. Nov. 9, 2016) .......... 24, 29
*Norwegian Bulk Transp. A/S v. Int'l Marine Terminals Partnership*,
520 F.3d 409 (5th Cir. 2008) .......... 19
*Osorio v. State Farm Bank, F.S.B.*,
746 F.3d 1242 (11th Cir. 2014) .......... 20
*Jenkins v. United States*, Case No.: 4:18-cv-918-P,
2019 WL 6878174 (N.D. Texas, 2019) .......... passim
*FFGGP, Inc. v. Specialized Loan Servicing, LLC*, Case No.: 4:18-cv-00875-P,
2020 WL 109655 (N.D. Texas, 2020) .......... 25
*Palm Beach Golf Ctr.–Boca, Inc. v. John G. Sarris, D.D.S., P.A.*,
781 F.3d 1245 (11th Cir. 2015) .......... 33
*Peritz v. Liberty Loan Corp.*,
523 F. 2d 349 (7th Cir. 1975) .......... 1
*R&M Mixed Beverage Consultants, Inc. v. Safe Harbor Benefits Inc.*,
578 S.W.3d 218 (Tex. App. 2019) .......... 37
*Shelton v. Target Advance LLC*,
No. CV 18-2070, 2019 WL 1641353 (E.D. Pa. Apr. 16, 2019) .......... 21
*Spokeo, Inc. v. Robins*,
136 S. Ct. 1540 (2016) .......... 24, 26

*Stevens-Bratton v. TruGreen, Inc.*,
No. 2:15-2472, 2020 WL 556405 (W.D. Tenn. Feb. 4, 2020) .......... 20, 21
*Susinno v. Work Out World Inc.*,
862 F.3d 346 (3d Cir. 2017).......... 25
*Thomas v. Taco Bell Corp.*,
582 Fed. Appx. 678 (9th Cir. 2014).......... 40
*Van Patten v. Vertical Fitness Grp., LLC*,
847 F.3d 1037 (9th Cir. 2017) .......... 24, 25
*Vessal v. Alarm.com*,
No. 17 C 2188, 2017 WL 4682736 (N.D. Ill. Oct. 18, 2017).......... 33
*Warciak v. Subway Restaurants, Inc.*,
949 F.3d 354 (7th Cir. 2020) .......... 36, 40, 41
*Warnick v. Dish Network LLC*,
301 F.R.D. 551 (D. Colo. 2014) .......... 30
*Worsham v. Ehrlich*,
181 Md. App. 711 (2008) .......... 3
*Worsham v. Travel Opinions, Inc.*,
678 Fed. App'x. 165 (4th Cir. 2017) .......... 28
*Worsham v. Travel Opinions.*,
No. JKB-14-2749, 2016 WL 4592373 (D. Md. Sept. 2, 2016) .......... 28

Statutes

15 U.S.C. § 7001.......... 37
26 U.S.C. § 262.......... 30
47 U.S.C. § 227(b)(3) .......... 34
47 U.S.C. § 227(c)(1).......... 35
47 U.S.C. § 227(c)(5).......... 26, 27
Md. Code Ann., Com. Law § 14-3201 .......... 9
Md. Code Ann., Com. Law § 14-320 .......... 30

Rules

Fed. R. Civ. P. 56(a) .......... 25

Regulations

47 C.F.R. § 64.1200(f)(5) .......... 37, 38
47 C.F.R. § 64.1200(c)(2).......... 26
<u>47 C.F.R. § 64.1200(D)</u> .......... 1, 26, 33, 35
47 C.F.R. § 64.12000(d) .......... 33, 34
47 C.F.R. § 64.1200(c)(2)(ii).......... 36

47 C.F.R. § 64.1200(f)(14) .......... 36
47 C.F.R. §§ 64.1200(c) & (d) .......... 35
47 C.F.R. §§ 64.1200(f)(12) & (14) .......... 35
7 C.F.R. § 64.1200(f)(5) .......... 38

Other Authorities

Restatement (Third) of Agency § 1.01 .......... 43

## I. PRELIMINARY STATEMENT

Plaintiff attempts to hold two separate corporate Defendants, USHEALTH Advisors, LLC ("USHA") and USHEALTH Group, Inc. ("USHG" and together with USHA referred to as "Defendants"), liable for telephone calls made to Plaintiff after he registered his telephone number on the National Do-Not-Call Registry ("NDNC") and after he alleges he requested that Defendants place him on their own Internal Do-Not-Call list ("IDNC"). But simply "registering" a telephone number on either the NDNC or IDNC does not mean that every telephone call to that telephone number is a violation of the TCPA. There are elements to the causes of action, as well as defenses; most obvious is the fact that 227(c) only precludes "telephone solicitations" to properly registered "*residential* telephone subscribers." Plaintiff's telephone number ending 8313 is a cellular telephone number registered with Verizon Wireless. By definition, he is not a "*residential* telephone subscriber." Even if he were, it would not matter because he has used and continues to use his cellular telephone number as his exclusive business number. Telephone calls to businesses are not subject to 227(c).

Ignoring for the moment that the telephone number at which he received the alleged violative calls has been his exclusive business telephone number for at least 15 years, that he has published it in business advertisements, listings for homes or developments he's trying to sell, on his business cards, associated with his professional website profiles, as the contact for business ventures he pursues, and his deduction of the costs associated with his telephone number as a business expense, the undisputed evidence shows that Hirsch wanted the telephone calls he received! Each time he was asked, he consented to a follow up call in the hopes of gathering information he could share with his lawyer for the very purpose of filing this lawsuit. Regardless of his motivation, Hirsch ***consented***. The fact that he lies to the callers and feeds them information

in order to keep the calls going and get what he needs in order to file a lawsuit negates any actual harm in the case. He was not upset or angry; he was happy – and so was his lawyer-friend that would be filing the putative class action. After all, Hirsch and his counsel share the very Google Spreadsheet that Hirsch maintained to "track" the allegedly violative calls he supposedly receives in real time. He consents, "revokes" that consent, and then consents again, over and over, in order to create a record he believes will persuade a court to grant him relief. This is hardly a person that has suffered any injury.

That Hirsch is not a residential telephone subscriber and has not suffered a concrete injury are not the only reasons that summary judgment for Defendants is appropriate. Neither Defendant initiated a single one of the telephone calls to Hirsch. He admits to receiving telephone calls from Dosys – a third-party lead generator utilized by a single "region" of independent insurance advisors (the Priovolos Region). None of the Dosys telephone calls were telephone solicitations, in that they did not offer or encourage the sale of anything. And, during those telephone calls from Dosys, Hirsch expressly consented to schedule appointments with independent insurance advisors. Thus, the consented-to telephone calls from those independent insurance advisors were also not violative of the TCPA (assuming Hirsch was properly registered with the NDNC/IDNC in the first place).

Finally, even if Plaintiff could demonstrate that any telephone call was a violation—which he cannot—Plaintiff has no viable theory of liability against either USHG or USHA, who neither directly made the telephone calls alleged, nor directed any "agent" to do so on their behalf.[2] For

[2] The Complaint alleges only a theory of direct liability against Defendants, i.e, that "the Defendants *made* the telephone calls." No theory of vicarious liability was pleaded.

these reasons, and as elaborated on below, Defendants are entitled to summary judgment on each count in the Complaint.[3]

## II. FACTUAL BACKGROUND

### A. The Parties

1. Defendant USHG is an insurance holding company; it is neither a licensed insurance company nor a licensed insurance agency. App. 826-27 It does not market, sell, or underwrite any insurance products. App. 826. USHG does not contract with insurance advisors. App. 827. USHG operates entirely independent of USHA, and does not direct or control the activities conducted by USHA. App. 0002, 827.

2. Defendant USHA is a licensed insurance agency and is a wholly owned subsidiary of USHG. App. 0014. USHA has contracts with independent insurance advisors—meaning that they are licensed insurance advisors under their respective state laws, not that they act as USHA's agent for purposes of an agency relationship—and these independent insurance advisors sell insurance products underwritten by Freedom Life Insurance Company of America, National Foundation Life Insurance Company and Enterprise Life Insurance Company. App. 0018-19, 27; App 42-43, 45, 54.

3. Plaintiff is a real estate agent and developer living in Glen Echo, Maryland. App. 63. Plaintiff uses his cellular telephone number ending 8313 as his exclusive business line (the "Business Cell Number") to conduct his various real estate and other business. App. 64, 69.

---

[3] The grounds Defendants articulate for summary judgment are equally applicable to all of the counts in the Complaint under the TCPA, as well as the Maryland TCPA, Md. Code Ann., Com. Law § 14-3201 ("Maryland TCPA,"); *Worsham v. Ehrlich*, 181 Md. App. 711, 730 (2008) ("The [Maryland TCPA] does not describe conduct that constitutes a violation of the Maryland statute. It references whatever constitutes a violation of the TCPA.")

4. Plaintiff has filed several TCPA lawsuits, also represented by Max Maccoby, Esq. App. 62. Plaintiff welcomes telephone calls he believes may violate the TCPA, and manufactures interest in perceived solicitations in order to acquire more information about the callers in order to pursue cases against those callers. App. 77. When Plaintiff receives a call he believes to be in violation of the TCPA, he will wait for additional calls before requesting to be added to a "do-not-call" list based on his assessment of what will help a prospective lawsuit. Ex ___ (Copy of "Do-Not-Call" Violations-AH00277).

**B. <u>Hirsch's Cellular Telephone</u>**

5. Hirsch has been a real estate developer since 1999 and a real estate agent since 2009.[4] App. 63. He has had the same Business Cell Number for 15-20 years. App. 64.

6. On June 30, 2003, Hirsch registered his Business Cell Number with the NDNC registry. App. 95. It is his Business Cell Number that he alleges received every telephone call in dispute. App. 63-64.

7. Plaintiff operates his business out of his home office and on the road on his Business Cell Number. App. 63, 69. Plaintiff does not have an office outside his home, and although he is able to use office space at a real estate agency, he does not know the telephone number or address to that office. App. 63-64. Instead, for many years, he has used his Business Cell Number exclusively for all of his business activities. App. 63-64, 69. For example:

*a.* For his work as a real estate agent, he provides his Business Cell Number. App. 64. He publishes his cell number as being associated with real estate listings. App. 69, 96-101.

[4] Ironically, although Hirsch describes the independent insurance advisors as "insurance agents" in a blatant effort to confuse the term and further his argument that they are legal "agents" of Defendants, it does not appear that he would classify himself as a legal "agent" of anyone, including Fairfax Realty, despite the use of the word "agent" in his self-described job title.




2 VASSAR CIR
GLEN ECHO, MD 20812

Price: $2,750,000

Bedrooms: 5

Bathrooms: 4.5

Aaron Hirsch
202- 255-8313

VIEW THIS LISTING

*b.* Hirsch never provides any number other than his Business Cell Number to people he conducts business with. App. 64, 69.

*c.* When he does a real estate development, he forms a limited liability company and uses his Business Cell Number as the contact number for the company. App. 71-72, 102-103.

**Owner**

Aaron Hirsch
Two Vassar, LLC
7317 University Avenue
Glen Echo, Maryland 20812
Day Phone: (202)255-8313

*d.* His Business Cell Number is listed on his real estate development company's website, where it has been since at least 2003. App. 74-75, 104.

FAIRFAX REALTY

Aaron Hirsch

no image available

Office: 301-439-9500
Cell: 202-255-8313
Email: aaron@aaronhirsch.com
Location: Fairfax Realty - Silver Spring

*e.* Hirsch owns another entity that owns apartment units, and he publishes his Business Cell Number when posting apartments for rent. App. 73-74, 105-111

A

Aaron Hirsch (Fairfax Realty,Inc.)

**Phone:**
(202) 255-8313

*f.* When Hirsch registered his company, Kingman Properties, LLC with the United States Securities Exchange Commission ("SEC") to raise money to purchase foreclosed properties; he used his Business Cell Number on the SEC form. App. 72-73, 112-116.

**2. Principal Place of Business and Contact Information**

| | | | |
|---|---|---|---|
| Name of Issuer | | | |
| Kingman Properties, LLC | | | |
| Street Address 1 | | Street Address 2 | |
| 3216 44TH STREET, NW | | | |
| City | State/Province/Country | ZIP/PostalCode | Phone Number of Issuer |
| WASHINGTON | DISTRICT OF COLUMBIA | 20016 | 202-255-8313 |

*g.* In approximately 2011, for another potential business venture, Hirsch had another entity submit a government application for some type of license relating to growing medical marijuana; he used his cell number on the government form. App. 75.

*h.* His website for Kingman Development lists his Business Cell Number, and has done so since at least 2003. App. 74, 117, 649-713.

KINGMAN
DEVELOPMENT

**Real Estate Development**
**US & Bulgaria**

Aaron Hirsch
Washington, DC
ahirsch@kingmandevelopment.com
+1-202-255-8313

*i.* When he has advertised his business, including taking out **full page advertisements** in a monthly town newspaper, the advertisements only reference his Business Cell Number. App. 69, 131; *see also* App 132-140 (real estate listings); App. 714-780 (Newspaper advertisements from May 2018 through October 2018).

*j.* Hirsch deducts the cost of his Business Cell Number as a business expense for federal income tax purposes. App. 141-145, 631-638.

8. Although Hirsch now conveniently claims to use the same Business Cell Number for residential purposes, he has two unrelated VoIP telephone numbers for telephones at his home. App. 65. He keeps one of the active telephone numbers at his home solely because he thought there might be more telephone calls that might violate the TCPA. App. 66. One of the VoIP lines is Hirsch's "way of calls at a landline." App. 66.

**C. <u>Hirsch Calls & Consent</u>**

9. The complained-of calls and text messages to Hirsch began in November 2017 and all went to Hirsch's Business Cell Number. App. 64-65.

10. Hirsch admits that he had looked for health insurance before receiving telephone calls, including by calling "the Maryland Obamacare line." App. 68

11. On November 10, 2017 a third-party lead generator that has a relationship with George Priovolos, an independent insurance advisor, called Hirsch. App 39, 85. On the call, nothing was encouraged or offered for sale, rent or investment. App. 153-54. Hirsch calls this lead generator "Dosys." App. 146-152. During the November 10 telephone call from Dosys,[5] Hirsch consented to and scheduled a follow-up call with a licensed health insurance representative. App. 85.

---

[5] Plaintiff has not made any effort to conduct discovery on Dosys.

12. The third-party lead generator sold that information to independent insurance advisor George Priovolos. App. 46-48. There is a recording from the November 10, 2017 call that Hirsch had with the third-party lead generator, during which time Hirsch provided detailed information relating to his health insurance situation and consented to be contacted by an independent insurance advisor. App. 47-50, 153-54. Hirsch did not ask to be added to the "do-not-call" list. App. 81.

13. Dosys does not have any relationship with USHA. App. 29. The information from Dosys would have been added to Priovolos' CRM, and any independent insurance advisor working with Priovolos and who had purchased a license to link to Priovolos' customer resource management platform ("CRM"), would have access to it. App. 46-48, 165-66. USHA does not have access to Priovolos' CRM. App. 41.

14. R. J. Martin, an independent insurance advisor with a license link to Priovolos' CRM, spoke with Hirsch on November 13, 2017 in specific response to Hirsch's request on November 10 to be contacted. App. 46-50, 81, 85, 153-54, 165-167.

15. At the end of the November 13, 2017 call, Hirsch asked to be added to the caller's, R.J. Martin, do-not-call list. App. 81, 816. Thereafter, R.J. Martin marked Hirsch's telephone number as "do-not-call" in the CRM. App. 50-53, 168.

16. On December 1, 2017 at 10:19 a.m., Hirsch claims he received a telephone call from an individual he identified as Jim White and that he claims is associated with USHA. App. 81, 87, 816. Hirsch later called "Jim White" back at 11:46 a.m. App. 87, 781, 787.

17. The telephone number associated with the December 1, 2017 10:19 call was identical to the incoming telephone number associated with the November 10, 2017 call, which Plaintiff alleges was from "dosys," not "Jim White." App. 146-152.

18. On May 15, 2018, Hirsch claims he received a call at 10:14 a.m., in which he spoke to a "female" seeking to schedule a follow up call. App. 188. Hirsch later confirmed this call was from Dosys. App. 146-152. Hirsch, like he did on November 10, consented to receive a follow up call. App. 88. Hirsch claims that he made outgoing telephone calls to the same telephone number that called him at 10:14 a.m. several minutes later at 10:18 a.m. and again at 10:21 a.m. to determine if it was a spoofed number, despite the fact that he spoke with a representative at 10:14 a.m. App. 88, 781-82, 788

19. On May 16, 2018, Hirsch received the follow-up call to which he had consented the previous day; he claims it was conducted by Jacquelyn Levine, an independent insurance advisor. App. 88-89,146-152. Hirsch claims he asked to be place on the do-not-call list. App. 816.

20. On July 14, 2018, Hirsch claims he received another telephone call from Dosys during which he again consented to a follow-up telephone call. App. 89-90, 146-152. An email was sent from an email domain @dosysbpo.com to Julio Cortes with an email domain @gmail.com, transmitting information that relates to Hirsch's consent based lead. App. 207-08, 216. Cortes forwarded the @dosysbpo.com email to independent insurance advisor Jacquelyn Levine. App. 207-08, 216.

21. On July 16, 2018, Hirsch received the follow-up call to which he had previously consented two days before (as reflected in the E-mail to Mr. Cortes), and Jacquelyn Levine was the caller. App. 90, 216.

22. Although not reflected in his contemporaneous notes, Hirsch claims that at the end of the July 16, 2018 call, he asked to be added to the do-not-call list. App. 90, 816. Hirsch stated

at his deposition that if there was a conflict between his Complaint and his notes, his notes were to be believed. App. 80.

23. On July 17, Hirsch called back the number that called him on July 14 (Dosys). App. 782, 789. There are no records in Hirsch's notes about the content or existence of this call. App. 816.

24. Later, on July 17, July 25, and on September 23, Hirsch called Jacquelyn Levine back at the same number Ms. Levine called Mr. Hirsch from on July 16. App. 782, 790-92. There are no records of these calls in Hirsch's notes. App. 816.

25. On November 8, 2018, Hirsch received another telephone call from Dosys requesting to schedule a follow-up call to which Hirsch again consented; the consented-to follow-up call occurred later the same day, and Hirsch claims it was made by Mike Pope, an independent insurance advisor associated with USHA. App. 92, 146-152.

26. Though Hirsch makes no allegation in his Complaint and does not have any notes of a telephone call, a telephone call was made by independent insurance advisor Aaron Verity on November 15, 2018 and it was noted by Verity that Hirsch requested to be placed on the "do-not-call" list. App. 825.

27. On March 2, 2019, Hirsch claims to have received another call from David Miller. App. 146-152. A review of the records show that the caller ID associated with this call had the same area code as the May 15 and November 8 2018 telephone calls from Dosys. There is no evidence to support that this call was made by USHG or USHA or any independent insurance advisor named David Miller; in fact, the only independent insurance advisor by the name of David Miller that was ever contracted with USHA had his Agreement terminated in August 2017, roughly

18 months prior to Hirsch allegedly receiving a call from this individual. App. 217, 227 (Exhibits to Declaration omitted from Appendix).

28. Based on his deposition testimony, notes, and Verizon Wireless records, Hirsch received six calls from Dosys: November 10, 2017, December 1, 2017, May 15, 2018, July 14, 2018, November 8, 2018, and March 2, 2019. App. 146-152, 785-803, 816. On four of the calls (November 10, May 15, July 14, and November 8) Hirsch consented to receive and actively scheduled a follow-up telephone call with a licensed insurance advisor. App. 77, 81, 88-90, 92. Because of his consent, he then received follow-up calls from licensed insurance advisors on November 13, 2017, May 16, 2017, July 16, 2018, and November 8, 2018. App. 77, 81, 88-90, 92.

29. Hirsch claims he consented to these follow-up calls to get more information about the person or company calling him; otherwise, he "can't pursue a case against them." App. 76.

30. Hirsch attempts to make notes regarding any unsolicited telephone call he receives, and shares those notes in real time with his attorneys in an effort to sue those parties. App. 67, 816.

**D. <u>Hirsch Text Messages & Consent</u>**

31. Hirsch also complains that he received and responded to text messages. App. 79.

32. Hirsch received the first complained-of text message on August 13, 2018, which says it was following up on a previously provided insurance quote.[6] App. 90. Hirsch responded

---

[6] Aaron,
This is Devin I am an assistant with US Health… you spoke with one of the agents I work with and got a quote..reaching out to see if you are interested and learning more about our coverage..Please feel free to reach out… if you no longer wish to receive one, please respond with that as well..so I may mark your account accordingly.. [smile emoji]
Have a wonderful day!

by requesting additional information, which the text message sender provided. App. 91. Only after receiving the specifically requested information did Hirsch then request by text message that he be added to the do-not-call list. App. 91, 146-152.

33. Hirsch next received a text message on October 18, 2018 containing a personalized inquiry relating to a prior insurance quote from Gretchen Kennett.[7] App. 91, 233-34.

### E. <u>USHA and Independent Insurance Advisors' Contractual Relationship</u>

34. The independent insurance advisors may work as much or as little as they want; they do not have to use leads or even call potential customers. App. 28-29, 158-59, 198, 231, 245, 249. If they choose to engage in any form of telemarketing, it is the independent insurance advisors' responsibility to ensure compliance with the Telephone Consumer Protection Act ("TCPA") and all applicable regulations. App. 22, 252-268, 269-306.

35. USHG did not contract with the independent licensed insurance advisors that made telephone calls to Hirsch; it also has no relationship with Dosys. App. 0003-4, 316-319, 827.

36. USHA does not directly supervise or control the day to day activities of the independent insurance advisors. App. 18. USHA does, however, provide independent insurance advisors with training and information relating to compliance with the TCPA and all applicable regulations. App. 21-22, 40, 160, 211-12, 237, 269-306, 321, 330-485.

37. USHA maintains an internal do-not-call list, which it updates with information provided by the independent insurance advisors. App. 23, 165, 205, 321, 323-24

---

[7] Aaron,
Hello, its Gretchen with US Health Advisors.. We spoke with you in the past, and I wanted to follow up with you about health care coverage options for the upcoming year. I would love to have the opportunity to put together a benefit package for you.. Please feel free to reach out with a good time to call you.. I look forward to helping you in the near future. [smile emoji].

38. The independent insurance advisors are supposed to update USHA the same day if they receive a do-not-call request, and USHA updates the list the same day. App. 24, 165, 205. USHA then circulates the additional do-not-call request information to all of the independent insurance advisors. App. 21, 321-324, 330-485.

39. To aid any independent insurance advisors who want help, USHA obtains or assists in obtaining leads from various lead generation vendors. App 20-21. The rest of the leads are either purchased by the insurance advisors themselves or obtained in other ways, such as personal referrals, relationships, networking, or other ways unrelated to the purchase of leads through third parties. App. 159-160, 204, 233-36, 269-306, 486-92, 514, 517-18, 542-547; 568-70, 591-96.

40. Neither USHG nor USHA have any relationship with Dosys, the lead generator that called Hirsch on November 10, 2017, December 1, 2017, May 15, 2018, July 14, 2018, November 8, 2018 and March 2, 2019. App. 29, 309, 316, 617, 620. USHG and USHA have never purchased any leads from Dosys. App. 309, 316. Independent insurance advisors are not required to share the lead generators they purchase from with USHA. *See generally* App 252-268. However, the independent insurance advisors are required to ensure that the leads purchased comply with all local, state, and federal laws. App 252.

**F. <u>The Independent Insurance Advisor Activity</u>**

41. Each of the independent insurance advisors who are alleged to have called Hirsch operated as independent contractors, and were not employed by USHG or USHA. App. 158-59, 199-201, 204, 542-43, 568-69, 591-92.

42. Martin testified that he is a self-employed independent contractor, working for himself. App. 158. Martin contracts to work with USHA. App. 158, 496-510. Martin does not have employees working for him, and does not have a supervisor that he reports to. App. 158-59.

Martin works where he desires, and has both a home office and personally pays to rent a separate office space. App. 158-59. Martin worked exclusively from home for three and a half years. App. 160. USHA does not set any requirement as to where he must work from. App. 158-59.

43. Martin purchases his own leads. App. 159. Martin personally contracts with two different third-party vendors. App. 163. USHA has no role in Martin's contracts with third-party vendors. App. 163. The third-party vendors Martin contracts with warrant that the leads they provide are legally compliant. App. 163, 170. Martin does not contract with Dosys. App. 168.

44. Martin pays for his own equipment that he uses in his capacity as an independent insurance advisor. App. 159-161. In addition, Martin procured business through networking groups that he personally pays the cost to be part of, and through social media. App. 161. Martin pays for a license to use a CRM on his own directly from the software provider. App. 161-62. USHA is not involved in the licensing for Martin's CRM. App. 163.

45. Martin completed training provided by USHA on the products he sold and on compliance with the TCPA and other federal, state, and local laws. App. 159-160. In addition, Martin learned from other independent contractors whom he spoke with. App. 160. Martin testified that he needed to take continuing education courses with the state of Florida to maintain his status as an insurance agent, and that he took those courses independent of USHA. App. 160. Martin never received a script of what to say on a telephone call from USHA. App. 160.

46. Martin does not submit a list of all of the telephone calls he places to USHA. App. 164. Martin does include information about calls he places where someone purchases insurance to USHA. App. 164. Martin informs USHA of telephone calls where a caller requests not to be called again. App. 164-65. If Martin placed the telephone call through his CRM, he will also mark it as "do-not-call" in his own CRM. App. 164.

47. Consistent with the above, Martin acquired a lead concerning Plaintiff. App. 158. Martin purchased the lead to call Plaintiff from George Priovolos, who had purchased it from a third-party vendor. App. 46-48, 57, 166. On November 13, 2017 Martin spoke with Plaintiff as scheduled. App. 166-67. Plaintiff requested that Martin add Plaintiff to the "do-not-call" list, and Martin did so. App. 168, 493-95, 513.

48. Levine worked as an independent insurance advisor. App. 198-99. Levine contracted with USHA. App. 199. Levine worked from either her home office, or from an office where she paid rent. App. 199-200. She also worked from two other offices that she had access to, depending on where she was located when she was working. App. 199. There were no expectations from USHA as to where she must work. App. 199.

49. Levine only worked on her own equipment (cell phone and computer), and no equipment was provided to her by USHA for her business as an independent insurance advisor. App. 200. Levine also used a CRM, which she paid for the license for on her own. App. 200.

50. Levine received leads from multiple sources, including purchasing directly from third-party vendors and through live transfers. App. 204. Levine contracted with specific lead vendors. App. 204. Levine also purchased leads from other independent insurance advisors App. 204.

51. When Levine purchased leads from third-party vendors, the vendor put individuals' information into her CRM so that she could contact those individuals. App. 200-01. Levine had an administrator for her CRM, who helped get the information input into her CRM. App. 200-01. The CRM administrator does not work for USHA, and Levine personally paid for a pro rata share of her services. App. 201. There was no expectation that Levine use the CRM that she did. App. 203. Levine testified that there was no connection between her CRM and USHA. App. 203.

52. Levine received training on the insurance products she was licensed to sell. App. 201. Levine also had continuing education that she needed to maintain with the state to keep her license. App. 201. USHA did not provide or help Levine with her required training. App. 201. Levine was never trained or provided with a script on what to say to the people she called. App. 198, 201.

53. Levine kept track of all of the calls she made in her CRM. App. 202. If Levine was asked to place a number on a "do-not-call" list, she marked it as DNC, and then informed her CRM administrator that the individual did not want to be called. App. 205. If the person informed Levine that they continued to receive phone calls, Levine would also send an e-mail to USHA informing them that the person does not want to be called. App. 205.

54. Levine testified that she had no recollection or records of ever speaking to Plaintiff. App. 203, 205. Despite having no recollection or any record of ever having contact with Hirsch, Levine testified that she had received do-not-call requests on other calls, and when she did, she marked the person as do-not-call in the CRM and notified the administrator. App. 205. She testified she never contacted a person who informed her that he had previously requested not to be called. App. 207.

55. Michael Pope is another independent insurance advisor. App. 591-92, 600-16. Pope stated that USHA does not supervise his day to day activities, nor control his activities. App. 591-94. In addition, USHA does not control the manner or means in which Pope markets himself. App. 591-596. Pope has never considered USHA to be his principal, nor him to be USHA's legal agent. App. 593. Pope has never and does not sell anything on behalf of USHG. App. 591.

56. Pope does not inform USHA of what leads he contacts, how he contacts them, or when he contacts them. App. 592-94. Pope works from his home office, or from an office for

which he pays rent. App. 592-93. USHA does not impose any restrictions on where Pope works from. App. 592-93. Pope uses his own equipment to conduct his business as an independent insurance advisor. App. 593.

57. Aaron Verity is another independent insurance advisor. App. 542-543, 551-567. Verity stated that USHA does not supervise his day to day activities, nor control his activities. App. 542-550. Verity stated that he was free to market his business how he wished, so long as he complied with the law. App. 542-546. Verity will work from his home office, on the road, or from an office he pays for. App. 542-544

58. Verity has never considered USHA to be his principal, nor he to be USHA's agent. App. 543-44. Verity has never sold any product for or on behalf of USHG. Verity uses his own equipment to conduct his business as an independent insurance advisor. App. 543-44. When Verity has received requests to put an individual on the do-not-call list, he does so immediately. App. 549-50, 825.

59. Devin Cahill was another independent insurance advisor. App. 569-69, 574-90. Cahill stated that USHA did not supervise her day to day activities, nor control her activities. App. 568-69. In addition, USHA did not control the manner or means in which Cahill marketed herself. App. 570-71. Cahill never considered USHA to be her principal, nor she to be USHA's legal agent. App. 570.

60. Cahill did not inform USHA of what leads she contacted, how she contacted them, or when she contacts them. App. 570-71. USHA does not impose any restrictions on where Cahill worked from. App. 568-70. Cahill used her own equipment to conduct her business as an independent insurance advisor. App. 570.

61. If Cahill ever sent a text message to a prospective insurance purchaser, she did so following up on a lead where an advisor previously spoke with the individual, and the individual consented to be contacted by text message. App. 572-73.

62. Kennett is another independent insurance advisor. App. 230, 524-541. USHA does not supervise her day to day activities, nor control her activities. App. 517. USHA does not control the manner or means in which Kennett markets herself. App. 517. Kennett has never considered USHA to be her principal, or her to be USHA's legal agent. App. 516-17.

63. Kennett has obtained leads from the internet, from live transfers, or from leads she purchased from other independent insurance advisors. App. 233. Kennett does not inform USHA of what leads she contacts, how she contacts them, or when she contacts them. App. 517. If Kennett enters into a relationship with a third-party lead generator, she does so on her own, and is responsible for paying for such leads. App. 518.

64. Kennett works from her home office, or from an office for which she pays rent. App. 231. USHA does not impose any restrictions on where Kennett works from. App. 231. 515. Kennett uses her own equipment to conduct her business as an independent insurance advisor. App. 231-32, 516.

65. Kennett uses a CRM. App. 232. Kennett pays for a license to use her CRM. App. 517. Kennett has used text messages to follow-up with individuals who have requested a quote, but who she has not been able to reach. App. 234. When Kennett receives a request via text to add a number to a do-not-call list, Kennett does so. App. 232.

## III. ARGUMENT

### A. Legal Standard

The purpose of summary judgment is to isolate and dispose of factually unsupported claims or defenses. *See FFGGP, Inc. v. Specialized Loan Servicing, LLC*, Case No.: 4:18-cv-00875-P, 2020 WL 109655 (N.D. Texas, 2020) *citing Celotex Corp v. Catrett*, 477 U.S. 317, 327 (1986). Summary judgment is appropriate if the movant shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Norwegian Bulk Transp. A/S v. Int'l Marine Terminals Partnership*, 520 F.3d 409, 411 (5th Cir. 2008). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is material if it "might affect the outcome of the suit under the governing law." *Id.* "[T]he substantive law will identify which facts are material." *Id.* The moving party makes a showing that there is no genuine dispute as to any material fact by informing the court the basis for its motion and by identifying the portions of the record supporting the motion for summary judgment. *Celotex Corp*, 477 U.S. at 323. The moving party may also demonstrate a particular fact by showing that the non-moving party cannot produce admissible evidence to support a particular fact. *See Jenkins v. United States*, Case No.: 4:18-cv-918-P, 2019 WL 6878174 at *2 (N.D. Texas, 2019). "Although the Court is required to consider only the cited materials, it may consider other materials in the record." *Id.*

### B. The Undisputed Facts Show That Plaintiff is Not A Residential Telephone Subscriber

Each of Plaintiff's causes of actions depend on the telephone calls being made to a *residential telephone subscriber*. *See e.g.*, 47 U.S.C. § 227(c)(5); 47 C.F.R. § 64.1200(c)(2); *Id* § 64.1200(d); *Id* § 64.1200(e) *citing In Re Rules & Regulations Implementing the Tel. Consumer*

*Prot. Act of 1991*, 18 F.C.C. Rcd. 14014, 14039 (2003) (hereafter, the "FCC Rules and Regulations.").[8] Plaintiff's allegation in the Complaint that his Business Cell Number is a "residential telephone number" is false. (D.E. 42 ¶ 31).[9] The Business Cell Number is subscribed to Verizon *Wireless*; it is not residential and is not a landline. App. 64. This fact, alone, bars any relief Plaintiff seeks in the Complaint because telephone calls to a cellular telephone number are *de facto* outside of the scope of the TCPA. *See Cunningham v. Politi*, No. 18-cv-00362-ALMCAN, 2019 WL 2517085, at *4 (E.D. Tex. Apr. 30, 2019); *See Cunningham v. Sunshine Consulting Grp., LLC*, No. 3:16-2921, 2018 WL 3496538, at *6 (M.D. Tenn. July 20, 2018); *Cunningham v. Spectrum Tax Relief, LLC*, No. 3:16-2283, 2017 WL 3222559, at *3 (M.D. Tenn. July 7, 2017); *Cunningham v. Enagic USA, Inc.*, No. 3:15-0847, 2017 WL 2719992, at *6 (M.D. Tenn. June 23, 2017).

Although *Politi* should end the inquiry, Defendants acknowledge that some courts have gone on to analyze the merits of whether a telephone call to a cellular telephone subscriber can be a violation of section 227(c). In doing so, however, those courts have placed the burden of proof on the party seeking to establish a violation of section 227(c)(5) that the telephone number is used only for residential purposes. *See Osorio v. State Farm Bank, F.S.B.*, 746 F.3d 1242, 1250 (11th Cir. 2014); *Cunningham v. Rapid Response Monitoring Servs., Inc.*, 251 F. Supp. 3d 1187, 1201 (M.D. Tenn. 2017); *see also Cunningham v. Capital Advance Sols., LLC*, No. CV 17-13050 (FLW), 2018 WL 6061405, at *5 (D.N.J. Nov. 20, 2018) ("***[I]f the subscriber holds out such a***

[8] Registration on the NDNC or even IDNC, alone, does not make the "registered" telephone number "residential." *Stevens-Bratton v. TruGreen, Inc.*, No. 2:15-2472, 2020 WL 556405, at *6 (W.D. Tenn. Feb. 4, 2020).

[9] In fact, Plaintiff doubled down on this false statement in his declaration in support of his Motion for Class Certification, without so much as an acknowledgement of his deposition testimony where he admits to using it for business purposes, including deducting it as a federal tax expense. App. 141-145, 631-638.

***telephone number to the general public as a business line, the line should not be considered "residential" for purposes of the TCPA . . . .'***") (emphasis added); *Bank v. Indep. Energy Grp. LLC*, No. 12-CV-1369 JG VMS, 2015 WL 4488070, at *2 (E.D.N.Y. July 23, 2015); *see also Shelton v. Target Advance LLC*, No. CV 18-2070, 2019 WL 1641353, at *6 (E.D. Pa. Apr. 16, 2019); *Stevens-Bratton*, 2020 WL 556405, *4 ("A plaintiff, however, must put forth evidence establishing that her cellular telephone is used for residential purposes."). If the plaintiff cannot satisfy this burden, he or she cannot prevail on the claim. *See Politti* at *7; *Lee v. Loanepot.com, LLC*, No. 14-CV-01084 EFM, 2016 WL 4382786, *7 (D. Kan. Aug. 17, 2016).

As demonstrated below, and displayed above in the factual section, Hirsch's Business Cell Number is not "residential". *See, e.g.*

- App. 63-64 (admitting that Plaintiff provides his Business Cell Number in connection with his work as a real estate agent at Fairfax Realty Incorporated);
- App. 64 (admitting that Plaintiff provides his Business Cell Number in connection with his real estate development businesses and projects);
- App. 65 (admitting plaintiff has two VoIP telephone lines at his home that he considers to be his "*calls at a land line*");
- App. 69 (admitting that Plaintiff lists – and has always listed – his Business Cell Number on his business cards);
- App. 69 (admitting that Plaintiff listed his Business Cell Number in a local newspaper as part of business advertisements that he purchased);
- App. 69 (admitting that his Business Cell Number is the number that he uses for business, to list properties, to get referrals, and to provide to his clients)[10];
- App. 70-71 (admitting that a real estate listing for a project owned by one of Plaintiff's LLC's would have been created by Plaintiff, with Plaintiff's Business Cell Number, and that Plaintiff had in fact been contacted about the property, to his Business Cell Phone, in response to the listing);

---

[10] In fact, when confronted with the opportunity to provide the telephone number at the real estate agency office he has access to, Hirsch could not do so, or the address of that supposed office.

- App. 72 (admitting that Plaintiff provided his Business Cell Number in an SEC filing that he submitted for his business Kingman Properties, LLC, and that he has been listing his Cell Number as being associated with various business ventures since at least 2010);

- App. 73 (admitting that Plaintiff provided his Business Cell Number as the contact number for showing of properties that he listed online);

- App. 74 (admitting that he communicates with his business partners exclusively on his Business Cell Phone);

- App. 75 (admitting that Plaintiff submitted an application to grow medical marijuana in Washington D.C., in which he listed his Business Cell Number as the contact information for his company, Delta 9, LLC);

- App. 75 (admitting to using his Business Cell Number for two other businesses, Kingman Construction, and 51 Randolph Place, LLC); and

- App. 653-713 (listing his Business Cell Number on Kingman Development's website since at least 2003).

These are just the examples that Defendants were able to find though the public records. *See* § II, Factual Background, *supra* at ¶¶ 7(a-j). Most damning of all is that Hirsch has ***deducted the cost of his Business Cell Number as a business expense for federal income tax purposes <u>for years</u>***. App. 141-145, 631-638. And, Hirsch separately keeps **<u>two</u>** VoIP line in his home, one which he himself describes he keeps as a residential "landline." *See* § II, Factual Background, *supra* at ¶ 8.

The evidence presented in this case far exceeds others in which the courts have still found that the telephone number was not a residential line. In *Stevens-Bratton,* the court found that the plaintiff's cellular telephone was not a "residential" telephone despite plaintiff submitting an affidavit swearing to the fact that the cellular telephone was used for residential purposes, that she did not have a separate landline, and that she had registered her cellular telephone on the NDNC registry. 2020 WL 556405 at *5-6. The court, in contrast, found that the record not only did not support plaintiff's statements, but refuted them. *Id.* In fact, the plaintiff had previously listed a separate home phone number, refuting her claim she did not have one. *Id.* at *5. The court rejected

plaintiff's argument that simply registering the cellular telephone on the NDNC registry was sufficient to presume it was a "residential" telephone. *Id.* Hirsch has no more support for his position than the plaintiff in *Stevens-Bratton*, while at the same time being confronted with the overwhelming amount of record evidence demonstrating his use of the Business Cell Number for business purposes that was not present in that case. *See supra*, FACTUAL BACKGROUND, ¶¶ 5-7(a-j), 8.

Likewise, in *Mattson v. Quicken Loans Inc.*, the court granted summary judgment for the defendant on the plaintiff's claim for violation of section 227(c) of the TCPA – the same claim Hirsch brings here, because his Business Cell Number was used primarily as a business telephone in his commercial real estate investment company. No. 3:18-CV-00989-YY, 2019 WL 7630856, *5 (D. Or. Nov. 7, 2019). While the plaintiff used the phone for both personal and business calls, the court found persuasive that plaintiff used the telephone for: 1) regular business calls, 2) listed the number on a zoning application, and 3) deducted the costs of the cell phone as a business expense. *Id.* at *2, *6. The facts in *Mattson* were not even close to as abundant as those adduced here, but it was the fact that the plaintiff there "deduct[ed] the cost of his phone and phone service as business expenses [that was] irreconcilable with his assertion that the phone is for personal use". *Id.* (citing 26 U.S.C. § 262, prohibiting business tax deductions for personal expenses). That Hirsch may use his Business Cell Number for some personal calls is irrelevant, where he likewise deducts the cost of his Business Cell Number as a business expense when filing taxes every year. *See id.* at *6; App. 141-145, 631-638. Plaintiff is left to answer a troubling question before this Court—could it be that his Business Cell Number is actually used for business purposes, negating his entire action, or has Plaintiff been committing tax fraud for several years?

Plaintiff is not a residential telephone subscriber, and so Defendants are entitled to summary judgment on all counts. *Jenkins*, 2019 WL 6878174 at *2; *see also* Md. Code Ann., Com. Law § 14-320 (adopting the TCPA as a state cause of action).

### C. **<u>Plaintiff Has No Standing</u>**

Hirsch lacks Article III standing. Hirsch did not suffer any injury, not just because he is not a residential telephone subscriber, but also because he welcomed and consented to receive each telephone call or text that he claims violated the TCPA. *See Van Patten v. Vertical Fitness Grp., LLC*, 847 F.3d 1037, 1043 (9th Cir. 2017).

"[T]he 'irreducible constitutional minimum' of standing consists of three elements[:] The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016), as revised (May 24, 2016) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)). *Spokeo* instructs that the "injury in fact" component of "Article III standing requires a concrete injury even in the context of a statutory violation," (*id.* at 1549), meaning that if a bare procedural violation results in no "harm" and no "material risk of harm," it is not concrete. *See id.* at 1550. In assessing whether an injury is concrete, *Spokeo* instructs courts to consider both congressional judgment and history. *Spokeo*, 136 S. Ct. at 1549.

"Courts considering harm in connection with TCPA claims have noted that one of the purposes of the TCPA was to protect telephone subscribers from the 'nuisance' of unwanted calls." *Morris v. Unitedhealthcare Ins. Co.*, No. 415CV00638 (ALM)(CAN), 2016 WL 7115973, *5 (E.D. Tex. Nov. 9, 2016) (internal quotation omitted); *see also tMelito v. Experian Mktg. Sols., Inc.*, 923 F.3d 85, 93 (2d Cir.). Courts have specifically focused on the unwanted nature of the

communications in finding the existence of a concrete harm. *See Gadelhak v. AT&T Servs., Inc.*, 950 F.3d 458, 462 (7th Cir. 2020); *Van Patten*, 847 F.3d at 1042. Courts have compared TCPA violations to "intrusion upon seclusion," "nuisance," and "privacy invasion." *See e.g.*, *Melito*, 923 F.3d at 93; *Van Patten, LLC*, 847 F.3d at 1043; *Susinno v. Work Out World Inc.*, 862 F.3d 346, 351 (3d Cir. 2017). However, a bare procedural violation of the TCPA, however, is not automatically sufficient to confer standing. *See Gadelhak*, 950 F.3d at 461–62 ("[Plaintiff's] standing to sue is not settled by the fact that the [TCPA] authorizes his suit. *It depends on whether the unwanted texts…caused him concrete harm or were merely a technical violation of the statute.*")

Hirsch **wants to receive these telephone calls**. He is a repeat TCPA plaintiff. App. 62. He maintains a spreadsheet that he shares in real time with his attorney, Max Maccoby, Esq., in which he records hundreds of telephone calls for the sole purpose of filing lawsuits. *See* App. 61, 82-83, 817-24. Hirsch keeps two VoIP telephone numbers at his home, one of which exists solely to receive more telephone calls that he could claim violate the TCPA, meaning he literally *pays to keep a telephone line just so he can receive more telephone calls to claim more damages under the TCPA.* App. 66. Hirsch only maintains his NDNC registration on his Business Cell Number to fraudulently bring claims that he has no standing to pursue; same with his convenient requests to be placed on company do-not-call lists. App 62, 77. This is a familiar scheme operated by Plaintiff, who attempts to manufacture liability against numerous companies. App. 823 ("[Caller] then suggested that I call her back…after I had a chance to research the company more. I said okay because I wasn't ready to ask to be added to the DNC list -- I needed to verify all of the information

on the company. We ended the call.”)[11] He consents to telephone calls and lies to callers to make himself more likely to get more telephone calls that he can sue over. App. 639-40. Even after asking to be on a company do-not-call list, he then consents to additional telephone calls, only to file a lawsuit urging that the consented-to telephone calls were “violations.” App. 77, 81, 88-90, 92. And even after allegedly requesting to be added to a “do-not-call” list, Hirsch goes and ***calls the numbers back.*** App. 781-91. For Hirsch, far from a nuisance, far from an invasion of privacy, the ringing of his Business Cell Number is akin to the sound of a cash register, and he welcomes and consents to and thus engineers more and more calls to himself.

This is **not** the type of “intangible harm” Congress intended to “elevate” from a mere hypothetical harm to a concrete one. *See Spokeo*, 136 S. Ct. at 1549. Nor is Plaintiff’s “harm” rooted in American common law, as there can be no invasion of Plaintiff’s privacy where, as here, he opens the door to his home, invites you in, and sets a place for you for dinner. The facts in this case are substantially the same as in a recent decision where the court found a serial TCPA litigant had not suffered any concrete harm or injury:

> the record evidence clearly shows that [plaintiff] welcomed such calls in his role as a paid investigator aiding his counsel in the preparation of TCPA lawsuits. No other plausible inference can be drawn from the 20+ follow-up calls he made to DialAmerica, the types of questions he asked DialAmerica’s representatives, his use of a false name and employer, his secret recordings of the calls, his submission of those recordings to his counsel, and, especially, his refusal to be added to DialAmerica’s Do-Not-Call list when he was twice given the opportunity. On these facts, no reasonable jury could find that Plaintiff suffered an Article III injury. Having asserted only a procedural violation that resulted in no harm and no material risk of harm, Plaintiff fails to meet his burden of establishing the elements of standing and summary judgment is therefore warranted.

---

[11] Plaintiff’s entire narrative that he did not want to be called by independent insurance advisors is negated by his deposition testimony, in which he admits that he consented to receive each follow up call from an independent advisor, and in which he admits that he welcomes sales calls generally. App. 77, 81, 88-90, 92.

*Leyse v. Bank of Am., Nat'l Ass'n*, No. cv-117128S(DWS)(CM), 2020 WL 1227410, *4 (D.N.J. Mar. 13, 2020) (internal citations omitted). As in *Leyse*, Hirsch does not have standing where he welcomes and consents to each communication in an effort to prepare his counsel for his next lawsuit. And, even if the consent, permission, or invitation to be called is not perfectly compliant with the TCPA, "if [a called party] has expressly agreed and expected to receive calls from defendant, and did receive those calls, the [called party] has not been injured in any way, even if defendants technically violated a procedural requirement of the TCPA. Thus, under *Spokeo* . . . those [called parties] would not have suffered a concrete injury." *Legg v. PTZ Ins. Agency, Ltd.*, 321 F.R.D. 572, 577 (N.D. Ill. 2017).

Finally, if Plaintiff's professional litigant status is not preclusive of concrete injury, Hirsch's Business Cell Number's use as a business – not residential – telephone number as detailed above is preclusive. *Supra*, Part III(B).

**D. TCPA (and the Maryland TCPA) do not Provide a Private Right of Action Under 47 C.F.R. § 64.1200(d), and Therefore, Plaintiff's Causes of Action Under That Theory Must Fail**

Defendants are entitled to summary judgment on Plaintiff's third and sixth causes of action because the TCPA and Maryland TCPA do not provide Plaintiff with a private right of action under 47 C.F.R. § 64.12000(d). (D.E. 42 at 22, 23-24). Plaintiff alleges that he was a member of Defendants IDNC, yet received telemarketing calls and texts. (D.E. 42 ¶ 88.)

Even if accurate, there is no private right of action under 47 C.F.R. § 64.12000(d), and there are no rules or regulations prescribing such a cause of action by a private party. The TCPA permits a private party to bring a private action based on a violation of subsection (b) and *regulations prescribed under subsection (b)* to enjoin a violation and/or damages. 47 U.S.C. § 227(b)(3). Likewise, subsection (c) of the TCPA grants a private right of action to persons who

receive more than one call within any 12-month period from an entity in violation of the *regulations prescribed under subsection (c)* for injunctive relief and/or damages. Beyond these two sections, the TCPA does not grant any other private right of action.

47 C.F.R. § 64.12000(d) was prescribed pursuant to subsection **(d)** of the TCPA. *See Worsham v. Travel Opinions.*, No. JKB-14-2749, 2016 WL 4592373, at *4 (D. Md. Sept. 2, 2016) ("the requirements of [section] 64.1200(d)…fall under the aegis of ***subsection (d) of the TCPA***.") In *Worsham*, the court considered whether the plaintiff has stated a claim for relief under 64.1200(d)(4), which requires that a telemarketer provide the called party with the caller's name and other related information. *Id.* at *7. The court properly determined that 64.1200(d) was a procedural standard, and therefore within subsection (d) of the TCPA. *Id. citing Burdge v. Assn. Health Care Mgmt., Inc.*, No. 1:10-cv-00100, 2011 WL 379159, at *7-10 (S.D. Ohio Feb. 2, 2011). Without a private right of action to assert a claim, the action was dismissed. *Id.* The *Worsham* decision was later affirmed by the Fourth Circuit. *See Worsham v. Travel Opinions, Inc.*, 678 Fed. App'x. 165 (4th Cir. 2017); *Braver v. NorthStar Alarm Servs.*, LLC, No. CIV-17-0383-F, 2019 WL 3208651, at *14 (W.D. Okla. July 16, 2019); *Burdge v. Ass'n Health Care Mgmt., Inc.*, No. 1:10-CV-00100, 2011 WL 379159, at *4 (S.D. Ohio Feb. 2, 2011); *but see Cunningham v. Nationwide Sec. Sols., Inc.*, No. 3:17-CV-00337-M, 2017 WL 10486988, at *4 (N.D. Tex. Nov. 2, 2017) ("47 C.F.R. § 64.1200(d) is a regulation prescribed under 47 U.S.C. § 227(c)(1).")[12]

The same result as in *Worsham* is appropriate. Plaintiff's third and sixth causes of action are based on procedural obligations set forth in the rules implemented by the FCC under the TCPA.

---

[12] Even if the Court agreed with the district court opinion, the Maryland TCPA claims are subject to Fourth Circuit precedent, and so the sixth cause of action must be dismissed.

**E. <u>Calls Received From Third-Party Scheduling Companies are not "Telephone Solicitations"</u>**

A communication violates section 227(c) only if it was a "telephone solicitation" for NDNC claims or a "telemarketing" call for IDNC claims. 47 C.F.R. §§ 64.1200(c) & (d). These terms are defined identically, except that certain types of communications are excluded from the definition of "telephone solicitations" for IDNC claims. *Id.* Both are defined as "the initiation of a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services, which is transmitted to any person." 47 C.F.R. §§ 64.1200(f)(12) & (14).

The six telephone calls that Hirsch received from Dosys (November 10, 2017, December 1, 2017, May 15, 2018, July 14, 2018, November 8, 2018, and March 2, 2019) do not qualify as "telephone solicitations" or "telemarketing."[13] Dosys' telephone calls did nothing more than set up a subsequent telephone call between the consumer and the insurance advisor. App. 77, 81, 88-90, 92. No goods or services were offered or encouraged for sale or purchase. App. 77, 81, 88-90, 92; App. 153-54 ("the reason I am calling you is that right now sir we are trying to contact people that are at the moment paying for their own medical insurance….***keep in mind I am not trying to sell you anything Aaron***."); App. 644-646 ("I don't know if you remember but we actually spoke a couple of months ago…I am not the licensed agent I am an appointment setter…I am just an appointment setter, and the name of my company is Dosys.") Each of the telephone calls from Dosys were substantially similar. App. 77, 81, 88-90, 92, 153-54, 644-646.

Similar scheduling calls have been found not to constitute telemarketing for purposes of the TCPA. *See Morris*, 2016 WL 7115973 at *11 (finding calls to schedule a call with a person

---

[13] Hirsch never asked Dosys to stop calling his Business Cell Number.

based on their expression of interest regarding insurance plan coverage or benefits is not a telephone solicitation for purposes of TCPA); *Freyja v. Dun & Bradstreet, Inc.*, No. CV147831DSFMRWX, 2015 WL 6163590, at *2 (C.D. Cal. Oct. 14, 2015) ("Defendant has provided several pieces of evidence to show that the call was made for the purpose of acquiring information about the commercial services provided by Plaintiff and not to market to Plaintiff or to sell her anything"); *Danehy v. Time Warner Cable Enterprises*, No. 5:14-CV-133-FL, 2015 WL 5534094, *10 (E.D.N.C. Aug. 6, 2015) (finding call made with the "purpose" of "schedule[ing] a service visit that TWC's customer had requested" could not constitute "telephone solicitation"); *Warnick v. Dish Network LLC*, 301 F.R.D. 551, 558 (D. Colo. 2014) ("Informational calls are not included in the DNC type of calls"); *FCC Rules and Regulations*, 18 F.C.C. Rcd.at 14039–40 ("calls that do not fall within the definition of "telephone solicitation" as defined in section 227(a)(3) will not be precluded by the national do-not-call list.") Defendants are entitled to summary judgment on each of these six calls from Dosys.

### F. <u>Plaintiff Expressly Consented to and/or Created an Established Business Relationship for Four of the Telephone Calls he Received From Independent Insurance Advisors</u>

There is no liability under the TCPA for a NDNC or IDNC telephone call that was made with the called party's consent or permission or for whom there is an established business relationship ("EBR") or personal relationship.[14] *See* 47 C.F.R. § 64.1200(c)(2)(ii); 47 C.F.R. § 64.1200(f)(14). Prior express consent is not specifically defined by the TCPA, and the FCC has stated that there is no single answer to what constitutes "consent." *See Matter of Groupme, Inc./skype Commc'ns S.A.R.l Petition for Expedited Declaratory Ruling Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 29 F.C.C. Rcd. 3442, 3444 (2014) (hereafter

[14] Likewise, there is no liability under the Maryland TCPA.

"Groupme.") Telemarketers may "obtain prior express written consent using any medium or format permitted by the E-Sign Act,"[15] including "email, website form, text message, telephone keypress, or voice recording." *In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 27 FCC Rcd. 1830, 1844 (Feb. 15, 2012) (emphasis added). The FCC has also clarified that consent may be acquired by a third-party, and not necessarily the actual caller:

> We emphasize that the intermediary may only convey consent that has actually been provided by the consumer; the intermediary cannot provide consent on behalf of the consumer. As discussed above, neither the TCPA nor our implementing rules and orders *require any specific method by which a caller must obtain such prior express consent* for non-telemarketing calls to wireless phones, and *we conclude that the TCPA does not prohibit a caller from obtaining consent through an intermediary.*

*Id.* at 3447 (emphasis added).

In contrast, an "established business relationship" includes not only "a prior or existing relationship . . . on the basis of the subscriber's purchase or transaction with the entity within the eighteen (18) months immediately preceding the date of the telephone call," *but also "on the basis of the subscriber's inquiry or application regarding products or services offered by the entity within the three months immediately preceding the date of the call, which relationship has not been previously terminated by either party*." 47 C.F.R. § 64.1200(f)(5).

Plaintiff ***admits*** that at least four of the telephone calls he received from independent insurance advisors were based upon his prior express consent. App. 77, 81, 88-90, 92. Recanting his sworn testimony now would be futile, as there are recordings of two of the telephone calls. App. 153-54, 644-66. Plaintiff also admitted that the scheduling calls in which he gave consent

---

[15] Electronic Signatures in Global and National Commerce Act, 15 U.S.C. § 7001 *et seq.*

were all similar. App. 77, 81, 88-90, 92, 153-54, 644-646. Hirsch's motivation for providing consent is not relevant—the fact that he actually provided it is. Nor is it a concern that the consent was acquired by an intermediary. *See Groupme*, 29 F.C.C. Rcd. at 3444. This is especially true since each of the lead generators used by independent insurance advisors, including Dosys, represent that the leads they provide are TCPA compliant. App. 39, 46, 57, 163, 170, 212, 237. The recordings prove they are. App. 153-54, 644-66.

And even if this Court did not find that Plaintiff's sworn testimony of consent to be sufficient evidence, those telephone calls fall under the EBR exemption because Plaintiff "inquired" as to the products the insurance advisors were offering, and the subsequent telephone calls occurred within the three month period following that inquiry. 47 C.F.R. § 64.1200(f)(5). The transcript of the November 10, 2017 call, which Plaintiff states under oath was nearly identical to all of the telephone calls made by "dosys," unequivocally demonstrates the Plaintiff's interest in health insurance, and shows the exact type of "inquiry" that the FCC excluded from TCPA violations. 7 C.F.R. § 64.1200(f)(5). "By setting up an appointment . . . , [Plaintiff] created an 'established business relationship'" with [the independent insurance advisors]," therefore falling outside of TCPA liability. *See Hamilton v. Spurling*, No. 3:11CV00102, 2013 WL 1164336, *10 (S.D. Ohio Mar. 20, 2013). Summary judgment is proper on these four calls (November 13, 2017, May 16, 2018, July 16, 2018 and November 8, 2018) placed by independent insurance advisors to Hirsch.[16]

[16] To the extent the Court denies summary judgment on the residential subscriber issue and lack of standing, factual issues exist on whether or not the other contacts alleged are TCPA violations. Regardless, for the reasons set forth below, neither USHA nor USHG are directly or vicariously liable.

**G. <u>The Undisputed Facts Show no Direct Liability Under the TCPA and no Theory Of Vicarious Liability is Pleaded</u>**

"Direct liability under the TCPA ... applies only to entities that 'initiate' the telemarketing calls." *See In re Joint Petition filed by Dish Network, LLC*, 28 F.C.C.R. 6574, 6582 ¶ 24 (2013) (hereinafter "*Dish Network*"); *Politi*, 2019 WL 2519568, at *6 (E.D. Tex. Apr. 30, 2019). An entity can only be considered to have initiated a telephone call if it "takes the steps necessary to physically place a telephone call" or text. *See id.* at 6583. Having a third party initiate a call on your behalf is not considered "initiating" a call within the TCPA. *See id.*; *see also Palm Beach Golf Ctr.–Boca, Inc. v. John G. Sarris, D.D.S., P.A.*, 781 F.3d 1245, 1255 (11th Cir. 2015); *Vessal v. Alarm.com*, No. 17 C 2188, 2017 WL 4682736, at *2 (N.D. Ill. Oct. 18, 2017) ("Direct liability under the TCPA [] applies only to entities that 'initiate' the telemarketing calls . . . . [A]s the FCC made clear to initiate a call means to physically place a telephone call."). If a party fails to allege, or to prove, that a defendant directly initiated a call in violation of the TCPA, it cannot be found liable. *Politi*, 2019 WL 2519568, at *6; *Cunningham v. Lifestyles Dev., LLC,* No. 419CV00006ALMCAN, 2019 WL 4282039, at *3 (E.D. Tex. Aug. 8, 2019); *see also Keating v. Peterson's Nelnet, LLC*, 615 Fed. Appx. 365, 371 (6th Cir. July 21, 2015.) .

USHG did not initiate a single telephone call or text message to the Business Cell Number. Nor did USHA. Thus, neither can be directly liable. While Plaintiff alleges he received a telephone call directly from USHA on December 1, 2017, he has no record evidence to support the conclusory allegation. ***It's not true***. The December 1, 2017 telephone call was from the same telephone number that called him on November 10, 2017 – Dosys. App. 87, 146-152. Moreover, although there is an executive at USHA named Jim White, there is no evidence from which any inference could be drawn that a USHA executive was calling Hirsch in an effort to sell insurance products. App. 647-48. Jim White has never owned, nor used a telephone associated with the

number Plaintiff received the December 1 call from. App. 647-48. Mr. White went so far as to research his own office telephone records to see if any outgoing telephone calls were made to Plaintiff; there were none. App. 647-48. In fact, Mr. White made **<u>zero</u>** outbound calls on December 1, 2017 from his office because he was out on December 1, 2017. App. 647-48. Plaintiff has no evidence, beyond his own self-serving and unsupported allegation, that the December 1 call was from the Jim White at USHA. Even assuming the telephone call was from USHA, there is no record evidence to conclude it was made in violation of Section 227(c).[17] Defendants are entitled to summary judgment because they are not directly liable and no theory of vicarious liability was pleaded. *See Abante Rooter & Plumbing, Inc. v. Arashi Mahalo, LLC*, No. 18-CV-07311-VC, 2019 WL 6907077, at *1 (N.D. Cal. Dec. 19, 2019). ("[Defendant] did not call [Plaintiff]; therefore, [Defendant] did not directly violate the TCPA. The calls to [Plaintiff] were instead placed by…a third-party lead-generation company retained by [Defendant] as an independent contractor) (hereafter "*Abante*").

### H. <u>Plaintiff Lacks Evidence of any Relationship That Would Give Rise to any Theory of Vicarious Liability Against Either USHA or USHG</u>

Even had Plaintiff sufficiently pleaded a theory of vicarious liability, Defendants are entitled to summary judgment. Quite simply, Defendants never authorized anyone to place telephone calls without consent in violation section 227(c). USHG should not be involved in this case at all. It is a holding company; that's it. That fact alone is no basis for any form of liability.

[17] Section 227(c) only provides a private right of action, if at all, for more than one violative call in the same 12-month period. But here, on December 1, 2017 – and ignoring that the Business Cell Number cannot be a "residential telephone subscriber – it was a second telephone call from Dosys. As explained above, the Dosys calls are neither "telemarketing" calls nor "telephone solicitations". The November 13, 2017 call was made with consent. So, the December 1, 2017 telephone call could not have been a "second" call. Moreover, the call was not made more than 30 days after a request to be placed on the "do-not-call" list.

And, USHG has no relationship with Dosys or any overseas call center, is not a party to the Advisor Agreements, does not market or sell anything, and does not have anyone do so on its behalf. App. 486-87, 516-17, 542, 568, 591, 826-27.[18]

In this case, there are six independent advisors alleged to have initiated a telephone call or text message to Hirsch, and Dosys – a third party overseas call center that George Priovolos paid for consent-based health insurance leads. App. 146-152. USHA and the independent insurance advisors have a contractual relationship. Pursuant to the Agreement, the independent insurance advisors are independent contractors. App 252, 496-510, 524-541, 551-567, 574-90, 600-16. The record shows the true independent contractor status of each of the six independent insurance advisors. FACTUAL BACKGROUND, ¶¶ 41-63. If they choose to market, the Agreement requires that those advisors comply with the TCPA. App. 252; FACTUAL BACKGROUND, ¶¶ 41-63. Furthermore USHA had policies and procedures in place, shared with the independent insurance advisors, in order to ensure that the TCPA's mandates were followed. App. 269-306. Each of the current independent insurance advisors deposed in this case and who are alleged to have contracted Hirsch testified that they were aware of USHA's policies and took USHA's compliance training. App. 160, 212, 237, 321, 330-485; *see also* App. 56, 269-275. Moreover, despite not knowing or even accepting the theory espoused by Plaintiffs during this litigation, Defendants never knowingly accepted the benefits of any wrongful conduct. The buck stops well before it ever reaches Defendants.

[18] It is puzzling why Plaintiff originally included, and has maintained, USHG as a Defendant despite a complete absence of any evidence supporting a theory of liability under the TCPA. USHG is an insurance holding company; not a single one of the advisors or lead generator companies contracts with USHG. The independent insurance advisors do not sell any product, let alone insurance products, for USHG. They only sell products for USHA. Plaintiff's minimal discovery directed at USHG, and failure to conduct a deposition of a corporate representative of USHG, suggest they recognize this fact, and have directed their efforts toward USHA instead.

Vicarious liability is liability placed upon one party for the conduct of another, based upon the relationship between the two. *Affordable Power, L.P. v. Buckeye Ventures, Inc.*, 347 S.W.3d 825, 833 (Tex. App. 2011). The Supreme Court has held that a party can be held liable for a TCPA violation through federal common law principles of vicarious liability. *Campbell-Ewald Co. v. Gomez*, 136 S. Ct. 663, 674, (2016), *as revised* (Feb. 9, 2016). There are three theories of vicarious liability that could apply to Defendants: (1) actual authority, (2) apparent authority, and (3) ratification. *Dish Network, LLC*, 28 F.C.C.R. at 6587 ¶ 36; *Jones v. Royal Admin. Servs., Inc.*, 887 F.3d 443, 449 (9th Cir. 2018); *see also Warciak v. Subway Restaurants, Inc.*, 949 F.3d 354, 357 (7th Cir. 2020) ("in order to be held vicariously liable under the TCPA, an agent must have express or apparent authority.") These theories apply equally to alleged violations under subsection (b) or (c) of the TCPA. *Dish Network, LLC*, 28 F.C.C.R. at ¶¶ 31, 34, 36.

**i. No agency relationship exists**

As an initial matter, all three theories depend on establishing "agency." *Id.* ("[t]he classical definition of 'agency' contemplates 'the fiduciary relationship that arises when one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control'"). No agency relationship exists among the Defendants and Dosys. No agency relationship exists among the Defendants and any independent insurance advisor. *Dish Network, LLC*, 28 F.C.C.R. at 6587. Agency is the consensual relationship between two parties when one, the agent, acts on behalf of the other for a specific purpose, the principal, and is subject to the principal's **control**. *Id.* Federal common law on the subject of agency "invokes the Restatement (Third) of Agency's theory of vicarious liability arising out of an employer-employee relationship" which focuses on whether one party controls the "manner and means" by which a second party performs a task. *See Jones*, 887 F.3d at 450 *citing*

Restatement (Third) Of Agency § 7.07 (2006); *Hodgin v. UTC Fire & Sec. Americas Corp.*, 885 F.3d 243, 252 (4th Cir. 2018). *See also ETC Texas Pipeline, Ltd. v. Addison Expl. & Dev., LLC*, 582 S.W.3d 823, 838 (Tex. App. 2019). "While an agency relationship can be created by contract or by conduct, not all contracts create agency relationships and not all conduct creates agency relationships." *Chemtool, Inc. v. Lubrication Techs., Inc.*, 148 F.3d 742, 745 (7th Cir. 1998). Furthermore, "[a]gency is never to be presumed; it must be shown affirmatively." *Karl Rove & Co. v. Thornburgh*, 39 F.3d 1273, 1296 (5th Cir. 1994). A formal agency relationship "requires both the principal's control over the agent and both parties' consent to the agent's acting on the principal's behalf." *Christiana Tr. v. Riddle*, 911 F.3d 799, 803 (5th Cir. 2018). *See also* Restatement (Third) of Agency § 1.01 cmt. f(1) (2006).

Here, there is no evidence in the record to support any relationship, let alone an agency relationship, existed between either Defendant and Dosys. The only evidence that exists on this point directly refutes a relationship between either Defendant and Dosys. App. 29, 309, 316, 617, 620. Summary judgment must be granted with respect to all telephone calls made by Dosys.

There is also no evidence in the record to support any agency relationship between USHG and any of the independent insurance advisors.[19] USHG does not contract with any of the independent insurance advisors to sell insurance coverage. App. 252. USHG does not direct the conduct of, does not supervise or review the conduct of, and does not provide tools or instrumentalities to the independent insurance advisors; it is not even in the business of marketing

[19] That USHG owns 100% of the membership interests in USHA does not make it liable for the actions of USHA and there is no theory pleaded nor any evidence in the record that it should be. Subsidiary corporations and parent corporations are considered "separate and distinct 'persons' as a matter of law, and the separate entity of corporations will generally be observed by the courts even where one company may dominate or control the other company, or treats the other company as a mere department, instrumentality, or agency." *R&M Mixed Beverage Consultants, Inc. v. Safe Harbor Benefits Inc.*, 578 S.W.3d 218, 229 (Tex. App. 2019).

or selling insurance products. *Jones*, 887 F.3d at 450; App. 826-27. Simply put, Plaintiff has not presented **any** evidence that USHG controlled the conduct of the independent insurance advisors. *See Jenkins*, 2019 WL 6878174 at *2 (N.D. Texas, 2019) (the moving party may also demonstrate a particular fact by showing that the non-moving party cannot produce admissible evidence to support a particular fact.)

Similarly, there is ample evidence in the record that shows the absence of an agency relationship between USHA and the independent insurance advisors. The Agreement defines the relationship as that of an independent contractor. App. 252. Moreover, the terms of the contract demonstrate that the independent insurance advisor has complete authority over the manner and means by which they conduct their activities. App. 252 ("Agent is free to exercise his/her own judgment as to the time and manner for performing services required under this Agreement"); *id.* ("Agent is also free to exercise his/her own judgment as to the persons form whom agent will solicit applications and enrollments"); *Id.* (Agent controls the time and place of solicitation); *id.* at 256 ("Agent shall be responsible for acquiring and maintaining all licenses"); *id.* at 259 ("Agent is responsible for obtaining referral leads from family, friends, and other customers).

The depositions of the independent insurance advisors confirm the lack of any agency relationship. App. 35-39, 44, 49, 158-59, 199-200; *see also* App. 249 (each independent advisor did things differently, some used leads, some did not); App. 25-26, 29 (independent insurance advisors responsible for the manner in which they conduct their own business): *id.* (insurance advisors perform their own promotional, networking, and marketing); *id.* (insurance advisors purchase leads from any infinite number of third-party vendors of their choice); *id.* (insurance advisors provide their own insurance, and they provide all their own offices, supplies, CRM systems, employees, and everything else needed to run their businesses.) They further confirm

that USHA had no control over the manner in which the independent advisors purchased leads or contacted prospective purchasers. App. 39, 46, 57 (lead generators used obtain consent from the potential customer before providing the identity of the potential customer to the individual independent advisors); App. 158 (Martin works as independent contractor, acquires individual leads on own); App. 159 (Martin pays for own office space, USHA has no control over his use of that space); App. 159 (Martin furnishes his own equipment used in job); App. 162 (Martin personally purchased license for software to generate leads, no reimbursement from USHA); App. 163 (Martin hires lead generators and personally pays the costs associated with same); App 163, 170 (lead generators for Martin warrant that the leads they provide were obtained in compliance with the TCPA and applicable regulations); App. 486-95; App. 204 (Levine purchased leads on her own through several companies); App. 514-520 (Kennett); App. 591-96 (Pope); 568-73 (Cahill); App. 542-550 (Verity). There is nothing in the Agreement or in practice that would demonstrate the type of control required to prove an agency relationship. *See Jones*, 887 F.3d at 450 *citing* Restatement (Third) Of Agency § 7.07 (2006). In fact, one of the only few ways in which USHA directed the conduct of the independent advisors was by ***requiring that each "solicitation shall be [] in accordance with applicable local, state, and federal laws***." App. 252. Moreover, USHA makes each advisor aware of their obligation to comply with the law, including the TCPA, and each acknowledged USHA's DNC and TCPA compliance documents and procedures. App. 237 (Kennett is familiar with USHA TCPA policy, trained on it, has been tested on it); App. 211-212 (Levine's sub-advisors required to independently train on TCPA compliance, pass test with 90% success); App. 160, 170 (Martin trained with USHA for compliance with the TCPA, has certified on compliance basics several times); App. 598 (Pope received and was trained on compliance procedures); App. 572-73 (Cahill received and trained on compliance procedures);

App. 549 (Verity received and trained on compliance procedures); *see also* App. 321, 330-485 (USHA training guidelines, TCPA compliance documents.) And, with respect to "dosys," USHA did not know it existed, as the advisors purchase a majority of their own leads. App. 29, 38-39.

"Agency requires more than mere authorization to assert a particular interest." *Hollingsworth v. Perry*, 570 U.S. 693, 713 (2013); *see also Jones*, 887 F.3d at 450 (affirming finding of no agency relationship where defendant did not exercise control over the "manner and means" of telemarketing); *Thomas v. Taco Bell Corp*., 582 Fed. Appx. 678, 679 (9th Cir. 2014) (same); *Chinitz v. NRT W., Inc*., No. 18-CV-06100-NC, 2019 WL 4142044, *5 (N.D. Cal. Aug. 30, 2019) (same). The fact that the independent insurance advisors may have been furthering the interest of USHA is insufficient to establish an agency relationship. *See Jones*, 887 F.3d at 450. The independent insurance advisors are no more "agents" of Defendants than Hirsch is an "agent" of the real estate agency under which his license is held. Defendants are entitled to summary judgment on each theory of liability in this case because Plaintiff cannot raise a single question of material fact on the issue of agency.

**ii. Defendants did not provide any advisor with actual authority to make any of the telephone calls or texts in violation of the TCPA**

Actual authority requires proof that USHA expressly directed the independent advisors to take the actions *in violation* of the TCPA. "Express authority exists when a principal expressly authorizes an agent and the agent acts on the principal's behalf and subject to the principal's control." *Warciak*, 949 F.3d at 357.

There is zero evidence in the record to support any contention that USHA or USHG "expressly directed" Dosys or the independent insurance advisors to make any telephone calls in violation of the TCPA. *See discussion, supra.* In *Jones*, the court found that even assuming

plaintiffs had demonstrated agency, they failed to demonstrate that the defendants *authorized* telemarketers to violate the TCPA. *See* 887 F.3d at 449. The Ninth Circuit stated:

> [plaintiffs] identify no record evidence contradicting th[e] limitation on [the telemarketer's] authority. Instead, they assert that this case fits the analogy…in which 'A, a well-heeled entity ... stands next to B, an impecunious defendant, and directs B to place unsolicited, prerecorded calls to consumers on their cell phones.' ***The opposite is true here. Royal expressly prohibited [the telemarketer] from employing these marketing tools.*** And [the telemarketer]'s impecuniosity and unresponsiveness are immaterial to the issue of actual authority. Accordingly, we reject the actual authority theory.

*Id.* The present facts are identical. Plaintiff has no record evidence contradicting the ample proof that, if the independent insurance advisors even qualified as "agents" of USHA or USHG, they were required to comply with all federal laws, including the TCPA, and even received training and directions from USHA to do so. App. 252, 269-306. If the "agents" violated the TCPA, they did so in direct violation of USHA or USHG's instructions and their own acknowledgments of the training. App. 160, 170, 210-212, 237, 252-306, 321, 330-485. Summary judgment must be granted on any theory of actual authority.

**iii. Dosys did not have apparent authority**

"[A]pparent authority exists when the principal's own actions lead the plaintiff to reasonably believe that the agent has authority to perform certain acts for the principal." *Abante*, 2019 WL 6907077, at *1. Only an alleged principal's words or conduct that are *represented to the third party* can clothe an alleged agent with apparent authority. *Id.; see also*, *Warciak*, 949 F.3d at 357 ("[s]tatements by an agent are insufficient to create apparent authority"); *Coleman v. Klockner & Co. AG*, 180 S.W.3d 577, 592 (Tex. App. 2005). In the context of the TCPA, courts require that the plaintiff show that the defendant provided apparent authority *to conduct the violative act* in order to impose liability. *See Abante*, 2019 WL 6907077 at *1; *see also Kristensen*

*v. Credit Payment Servs. Inc.*, No. 2:12-CV-00528-APG, 2015 WL 4477425, *5 (D. Nev. July 20, 2015) ("*Kristensen I*") (finding no triable issue of apparent authority to violate the TCPA by company's hiring of companies to generate leads); *Bridgeview Health Care Center, Ltd. v. Clark*, 816 F.3d 935, 938-39 (7th Cir. 2016) (no vicarious liability for faxes sent by vendor in excess of those approved by defendant).

The extreme remoteness of an alleged agency relationship in this case is strikingly similar to the facts in *Keating*, where the Sixth Circuit affirmed summary judgment finding a defendant could not be vicariously liable for text messages allegedly sent in violation of the TCPA by a subcontractor unknown to the defendant and several times removed – like here. 615 Fed. Appx. at 373-375. In *Keating*, a consumer (Keating) sued an advertiser and its marketing company (CuNet) for text messages received by him and a putative class allegedly in violation of the TCPA. Like here, the advertiser was not directly liable. *Id*. at 371. Rather, Keating's claims relied entirely upon his conclusory argument that the text messages were sent by the advertiser's "agents." *Id.* at 372. But the district court found no evidence that the advertiser or CuNet had conferred actual or apparent authority on a subcontractor (Cornerblue) or its downstream vendor (River City Media), which were entirely unknown to the defendants, to send the text messages. *Id*. at 373-375. In affirming summary judgment, the Sixth Circuit noted:

> [T]he improper acts that Keating seeks to impute to CUnet through that defendant's business relationship with CornerBlue were not performed by CornerBlue at all. Instead, all evidence in the record points to the fact that River City Media sent the unauthorized text messages to the putative plaintiff class – without the knowledge or acquiescence of CornerBlue or CUnet. Moreover, Keating has offered no evidence to support his bald assertion that River City Media could have been acting at CUnet's behest. To the contrary, the evidence adduced by the parties makes clear that CUnet and River City Media were unaware of each other's existence until the filing of this lawsuit.

*Id.* at 372. Similarly, here there is no evidence that the calls from Dosys were made at the direction of USHG or USHA, or that Plaintiff was provided with any impression from USHA or USHG that Dosys was authorized to make non-complaint TCPA calls on their behalf. *See id*. Nor can Plaintiff show that USHG or USHA provided apparent authority to any independent advisor to make telephone calls in violation of the TCPA or any other applicable law. The court's conclusion in *Abante* is helpful:

> Th[e] conversation certainly could lead one to reasonably conclude (correctly) that [the third party] possessed the authority to procure leads for [Defendants….But [Defendant] did nothing to give [Plaintiff] the (incorrect) impression that [Defendant,] by purchasing leads, had authorized [the third party] to use an ATDS or to call merchants on the Do-Not-Call Registry

*Abante*, 2019 WL 6907077 at *1. While the phrase "USHEALTH" may have been mentioned on a telephone call, USHA and USHG "did nothing to give [Hirsch] the (incorrect) impression that" either had authorized Dosys or the independent insurance advisors to violate the TCPA. *See id.*

**iv. Defendants did not ratify any TCPA violations.**

"Ratification is the affirmance of a prior act done by another, whereby the act is given effect as if done by an agent acting with actual authority." *Hodgin,* 885 F.3d at 252 *citing* Restatement (Third) of Agency § 4.01(1) (2006); *Henderson v. United Student Aid Funds, Inc.*, 918 F.3d 1068, 1073 (9th Cir. 2019). A party 'may ratify an act by failing to object to it or to repudiate it'…"or by 'receiving or retaining [the] benefits it generates.'" *Id.* "However, a party 'is not bound by a ratification made without knowledge of material facts involved in the original act when the [party] was unaware of such lack of knowledge.'" *Id.*; *see* also *Kristensen I,* 879 F.3d at 1014.

First, there is no agency. *See discussion, supra*. Even if there were, a ratification theory fails because Defendants did not benefit from any of the communications made to Plaintiff. Hirsch

made abundantly clear that when he received the telephone calls—or any telemarketing call—he has no actual intent to purchase the product. App. 67-68. In fact, rather than confer a benefit to Defendants the **only** possible outcome from a telemarketing call made to Hirsch is that he sues you, which is certainly not a "benefit." App. 66-67, 77.

Moreover, Plaintiff cannot demonstrate that Defendants had any knowledge that any telephone calls or text messages were initiated in violation of the TCPA. The facts of this case are akin to *Kristensen*, where the Ninth Circuit held

> Nor did [plaintiff] raise a genuine issue of material fact as to whether [defendant] ratified [third party's] unlawful text messages….[plaintiff] presented no evidence that [defendant] ***had actual knowledge that [a third party] was sending text messages in violation of TCPA.*** Nor is there any basis to infer that defendant assumed the risk of lack of knowledge, because plaintiff did not present evidence that [defendant] 'had knowledge of facts that would have led a reasonable person to investigate further,' but ratified [the third party's] acts anyway without investigation.

*See Kristensen I*, 879 F.3d at 1015. The court further rejected the ratification theory that because the third party was contractually required to comply with the TCPA, defendant was obligated to investigate whether the third party was in fact complying with that obligation. *Id.* ("The knowledge that an agent is engaged in an otherwise commonplace marketing activity is not the sort of red flag that would lead a reasonable person to investigate whether the agent was engaging in unlawful activities.") Neither USHG nor USHA had actual knowledge that any of the independent insurance advisors were calling Hirsch in violation of the TCPA. Instead, USHA had every right to believe that the insurance advisors were complying with the terms of their agreements and the DNC policies and procedures they all acknowledged and agreed to. App. 160, 170, 210-12, 237, 252, 269-306, 321-485, 549, 572-73, 598. Plaintiff cannot succeed on this theory, and summary judgment is proper.

## IV. CONCLUSION

All of the evidence in this case refutes Plaintiff's false narrative that he has been a "victim" of TCPA violations. Notwithstanding the fact that Plaintiff's Business Cell Number is plainly not a "residential telephone," the evidence demonstrates that Plaintiff has manufactured this entire dispute in a transparent effort to "cash in" for himself and his attorney/friend. Plaintiff has not suffered any harm. Rather, he has been provided with the exact result he wanted from each of the communications he received—no, not health insurance—a lawsuit. Plaintiff's egregiously transparent conduct negates any standing he might have had in this action. Worse, even if he could have established standing, the record proves that neither USHG, nor USHA, placed, directed, or are responsible for any of the conduct Plaintiff alleges constituted a violation of the TCPA or the Maryland TCPA. Defendants are entitled to summary judgment.

Dated: May 19, 2020

GREENSPOON MARDER LLP

*/s/ Jeffrey A. Backman*

JEFFREY A. BACKMAN
Florida Bar No. 662501 (*pro hac vice*)
GREGG I. STROCK
Florida Bar No. 1010140 (*pro hac vice*)
jeffrey.backman@gmlaw.com
khia.joseph@gmlaw.com
gregg.strock@gmlaw.com
lisa.webster@gmlaw.com
200 East Broward Blvd., Suite 1800
Fort Lauderdale, FL 33301
Tel: (954) 491-1120; Fax: (954) 213-0140

DANIEL L. BATES
State Bar No. 01899900
dbates@deckerjones.com
**DECKER JONES, P.C.**
801 Cherry Street, Unit #46
Burnett Plaza, Suite 2000
Fort Worth, Texas 76102
(817) 336-2400

(817) 336-2181 (Fax)

***ATTORNEYS FOR DEFENDANTS***

**CERTIFICATE OF SERVICE**

I hereby certify that on May 19, 2020, a true and correct copy of the foregoing document was served upon counsel of record in accordance with the Federal Rules of Civil Procedure.

*/s/ Jeffrey A. Backman*
Jeffrey A. Backman